Paul M. Crisalli, WSBA #40681
Spencer W. Coates, WSBA #49683
Jeffrey T. Sprung, WSBA #23607
R. July Simpson, WSBA #45869
*Assistant Attorneys General*
ROBERT W. FERGUSON
ATTORNEY GENERAL
Washington Attorney General's Office
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

| | |
|---|---|
| STATE OF WASHINGTON, | NO. |
| Plaintiff, | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| v. | |
| BETSY DeVOS, in her official capacity as Secretary of the United States Department of Education; and the UNITED STATES DEPARTMENT OF EDUCATION, a federal agency, | |
| Defendants. | |

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
NO.

i

**TABLE OF CONTENTS**

I.     INTRODUCTION.................................................................................................. 1

II.    JURISDICTION AND VENUE ........................................................................... 3

III.   PARTIES................................................................................................................ 4

IV.    RELEVANT FACTS ............................................................................................ 5

       A.   The COVID-19 Pandemic ........................................................................ 5

       B.   The Coronavirus Aid, Relief, and Economic Security Act........................ 7

            1.   The Education Stabilization Fund ...................................................... 7

            2.   The Governor's Emergency Education Relief Fund ......................... 8

            3.   The Elementary and Secondary School Emergency Relief Fund .................... 8

            4.   The CARES Act requirement that funds for services for private schools
                 be based on a low-income formula ................................................... 10

       C.   Section 1117 of the Elementary and Secondary Education Act of 1965 ................ 10

       D.   The Department's CARES Act Guidance ............................................... 13

            1.   The Department's April 30, 2020, guidance ................................... 13

            2.   Public reactions to the Department's April 30, 2020, guidance...................... 14

            3.   Defendant DeVos's public statements of May 19, 2020................... 15

            4.   Defendant DeVos's May 22, 2020, letter......................................... 15

       E.   The Department's Interim Final Rule of July 1, 2020............................... 16

       F.   The Rule Causes Immediate and Irreparable Harm to Washington, Its Schools,
            and Its Residents ...................................................................................... 18

V.     CAUSES OF ACTION ........................................................................................ 25

VI.    PRAYER FOR RELIEF........................................................................................ 29

# I.  INTRODUCTION

1.     This suit challenges an interim final rule issued by the United States Department of Education (Department) that unlawfully funnels money—which Congress allocated to elementary and secondary schools to prevent and respond to the spread of COVID-19—to private schools regardless of student need. In the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Congress allocated funds for public schools and low-income families in private schools. School districts can use the funds to purchase items such as personal protective equipment, cleaning supplies, technology for online classes, meal programs, and services for underrepresented students. The Department's interim final rule impermissibly disregards Congress's allocation and the intended purpose of CARES Act funds.

2.     Just last month, Washington obtained a separate preliminary injunction against these same defendants for their attempts to issue a rule that is contrary to the clear, express statutory language of the CARES Act related to aid for colleges and universities. *Washington v. DeVos*, No. 2:20-CV-0182-TOR, 2020 WL 3125919 (E.D. Wash. June 12, 2020). Undeterred, the Department issued a new interim final rule (Rule) related to aid for elementary and secondary schools that is again contrary to the clear, express statutory language of the CARES Act. The Rule presents two unlawful options to the State and its districts—either limit which public schools can use the funds, or reallocate significant funds to private schools regardless of student need.

3.     The Department's Rule is contrary to the clear, express statutory language of the CARES Act. When enacting the CARES Act, Congress made clear in Section 18005(a) that allocating funds for services to private schools must be done "in the same manner as provided under Section 1117 of the [Elementary and Secondary Education Act (ESEA)] of 1965." And Section 1117, in turn, sets the amount of funds to be allocated to services for private schools based on the number of students *from low-income families* who attend the private schools. But

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
NO.

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

rather than follow this formula, the Department's Rule offers school districts two choices, both of which are contrary to the CARES Act.

4.     The first option ("the poverty-based formula") allows school districts to determine private schools' allocations based on the number of low-income students—but only if they exclude certain public schools within their districts, *i.e.*, those that do not participate in the federal funding program under Part A of Title I of the ESEA. This requirement of exclusion is found nowhere in the CARES Act. However, because many public schools with low-income students in desperate need of CARES Act assistance do not participate in Title I-A, this option would force school districts to abandon the needs of many of their disadvantaged public-school students. Here in Washington, for example, approximately two-thirds of elementary and secondary schools are not part of this federal program. Thus, if a district chooses this option, those schools (and their low-income students) would not receive the CARES Act services.

5.     The Rule's other choice ("the enrollment-based formula") allows school districts to use the funds for all public schools, but when calculating the funds for services for private schools, the districts must base the calculation on *all* private school students, *regardless of income*. This formula is not found in the CARES Act. Moreover, this formula dramatically expands the funds allocated to services for private schools because it looks to all private school students rather than the students from low-income families in violation of Section 1117. In some districts, the enrollment-based formula will require them to allocate over five times more funds to services for private schools than they would otherwise allocate under Section 1117.

6.     The Department's unauthorized Rule violates the Administrative Procedure Act (APA), separation of powers, and the Spending Clause in the United States Constitution. The CARES Act does not delegate to the Department authority to issue rules dictating how school districts must distribute the emergency funds, let alone dictate either of the choices the Department gave them. The Department's Rule is contrary to the express language of the CARES Act, so it is entitled to no deference: Section 18005(a) expressly provides that school

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
NO.

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

districts will allocate the emergency funds in the same manner as the law that directs services to *low-income* private school students.

7.      Yet the Department disregards Congress's will and imposes a choice that either excludes up to two-thirds of Washington schools or increases in some cases as much as five times the amount of funds districts would otherwise direct to private schools, all to the detriment of public schools. Even then, because of the restrictions imposed on Title I-A schools in other parts of the Rule, the Rule states its obvious preference that funds go to all private school students by placing extra-statutory limitations on the ability of public schools with high numbers of disadvantaged students to use the funds. More than that, the Rule states that schools must go through the decision-making process before making any expenditures. Even if the Rule were entitled to some deference, it would be too minimal to save the Rule.

8.      Further, the Rule is arbitrary and capricious because, among many reasons, it reallocates funds to private schools regardless of need rather than focusing on the intended needs of public schools and low-income students at private schools.

9.      Finally, separation-of-powers principles and the Spending Clause prevent the Department from asserting unilateral authority to thwart Congress's will by canceling its appropriations. *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018).

10.     To avert irreparable injury to the State and its residents, Washington brings this suit to declare unlawful and enjoin the Department's Rule that restricts funding for public schools in favor of private schools regardless of student need.

## II.      JURISDICTION AND VENUE

11.     This Court has personal jurisdiction over the Defendants pursuant to 28 U.S.C. § 1391(e) because Defendants are agencies and officers of the United States.

12.     This Court has jurisdiction over the subject matter of this lawsuit pursuant to 28 U.S.C. §§ 1331 and 1346 because this action arises under federal law.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
NO.

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because this is a judicial district in which Plaintiff State of Washington resides; the Department's interpretation of the CARES Act will adversely affect the health and welfare of residents in this district, and the finances of the State; and this action seeks relief against a federal agency and its official acting in her official capacity.

### III.     PARTIES

14.     The State of Washington is a sovereign state of the United States of America.

15.     Plaintiff State of Washington is represented by its Attorney General, who is the State's chief legal advisor. The powers and duties of the Attorney General include acting in federal court on matters of public concern to the State.

16.     The State of Washington brings this action to redress harms to its sovereign, proprietary, and quasi-sovereign interests and its interests in protecting the health and well-being of its residents. The State of Washington is affected and directly injured by the Department's interpretation of the CARES Act, and the relief requested will redress its injuries.

17.     Washington's Office of Superintendent of Public Instruction (OSPI) and local educational agencies (LEAs) (specifically, school districts, charter schools, and state-tribal education compact schools) are recipients of CARES Act emergency relief funds. OSPI and LEAs are forced to change their behavior because of the Department's unlawful interim final rule. Accordingly, Washington is directly harmed by the Department's unlawful regulation concerning Section 18005 of the CARES Act.

18.     Washington has a proprietary interest in the use of CARES Act funds to support public education at its elementary and secondary schools. The Department's guidance harms this interest because it redistributes funds from public elementary and secondary schools to private schools.

19.     Washington has a quasi-sovereign interest in protecting the health, safety, and well-being of its residents. The Department's interpretation severely limits the use of emergency

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
NO.

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

funding that Congress intended to broadly assist vulnerable public-school students affected by COVID-19. It therefore jeopardizes the health, housing, nutrition, and well-being of students in the State of Washington.

20.     The State of Washington, its elementary and secondary public schools, and its students will suffer significant and irreparable harm if the Department's regulation is allowed to stand.

21.     Defendant Betsy DeVos is the Secretary of the Department of Education. She is sued in her official capacity.

22.     Defendant United States Department of Education is an executive agency with responsibility for distributing Elementary and Secondary School Emergency Relief (ESSER) funds to Washington in compliance with Section 18005 of the Cares Act.

## IV.     RELEVANT FACTS

### A.     The COVID-19 Pandemic

23.     According to Johns Hopkins University & Medicine Coronavirus Resource Center, on December 29, 2019, the Wuhan City government, in Hubei Province, China, started to trace cases of a coronavirus. On January 6, 2020, a Wuhan doctor and 13 nurses were infected after operating on an infected patient, and the next day the pathogen was identified as a novel coronavirus.

24.     On January 30, 2020, the World Health Organization (WHO) declared the novel coronavirus outbreak a Public Health Emergency of International Concern. WHO provided an official name for the disease causing the 2019 outbreak, coronavirus disease 2019, abbreviated as COVID-19. (In COVID-19, 'CO' stands for 'corona,' 'VI' for 'virus,' and 'D' for 'disease.' ")

25.     On February 29, 2020, Washington Governor Jay Inslee declared a state of emergency in all counties in Washington State. In Proclamation 20-05, Governor Inslee stated that the CDC had identified the potential public health threat posed by COVID-19 both globally and in the United States as "high." State of Washington Office of the Governor, Proclamation

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
NO.

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

by the Governor 20-05, https://www.governor.wa.gov/sites/default/files/proclamations/20-05%20Coronavirus%20%28final%29.pdf (last visited July 1, 2020).

26.     On March 12, 2020, Governor Inslee announced closures for all public and private K-12 schools in King, Snohomish, and Pierce Counties beginning from March 17 through at least April 24. Later, on March 13, Governor Inslee announced K-12 closures until at least April 24 throughout the state. On April 6, 2020, Governor Inslee announced that the school closure would encompass the rest of the school year statewide. A June 11 Proclamation permits schools to re-open so long as they comply with health standards.

27.     On March 13, 2020, President Trump issued a proclamation that the COVID-19 outbreak constituted a national emergency.

28.     As of July 16, 2020, the Washington State Department of Health reported 42,443 confirmed cases of COVID-19 in the State and 1,421 deaths.[1]

29.     As of July 16, 2020, Johns Hopkins University & Medicine Coronavirus Resource Center reported over 13 million confirmed COVID-19 cases, with over 3 million in the United States, and over 585,000 global deaths.[2]

30.     As a result of the COVID-19 pandemic, public schools have been forced to transition to online instruction, implement new health and safety measures, and meet significant needs of their students, including civil rights protections and supports beyond core educational services. The efforts of OSPI and public school districts include serving meals, providing special education and related services to students with disabilities, providing remote learning access for English learners, and offering computing and connectivity technology to low-income students.

---

[1] Washington State Department of Health's COVID19 Data Dashboard, https://www.doh.wa.gov/Emergencies/NovelCoronavirusOutbreak2020COVID19/DataDashboard (last visited July 15, 2020).
[2] Johns Hopkins University & Medicine, COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHU), https://coronavirus.jhu.edu/map.html (last visited July 16, 2020).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
NO.

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

31.     The COVID-19 pandemic has caused economic stress and uncertainty on the State budget, posing significant challenges to the Governor, OSPI, and public school districts in their efforts to adapt and provide for needy and vulnerable students.

**B.      The Coronavirus Aid, Relief, and Economic Security Act**

32.     In late March 2020, the United States Congress acted to address the COVID-19 outbreak. It passed legislation, signed by the President, which included large new appropriations to federal agencies with explicit directions for distributing the new funding.

33.     On March 25, 2020, the Senate passed the Coronavirus Aid, Relief, and Economic Security Act as an amendment in the nature of a substitute to H.R. 748. On March 27, 2020, the House passed the bill and presented it to the President, who signed it the same day. Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020) (CARES Act).

**1.      The Education Stabilization Fund**

34.     The CARES Act appropriates federal funding for a wide array of purposes related to COVID-19. It contains a series of provisions directing funding through the Department of Education. Specifically, the CARES Act makes the following appropriation to the Department:

> For an additional amount for "Education Stabilization Fund", $30,750,000,000, to remain available through September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally[.]

*Id.*

35.     Section 18001 of the CARES Act directs the Secretary of Education to allocate the Education Stabilization Fund for specified purposes in specified percentages. After directing the Secretary to allocate 2% of the Education Stabilization Fund to certain purposes, Section 18001 specifies the percentages the Secretary is to allocate to three funds created by the Act: the Governor's Emergency Education Relief (GEER) Fund, the Elementary and Secondary Schools Emergency Relief (ESSER) Fund, and the Higher Education Emergency Relief Fund. CARES Act, § 18001(b).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF NO.

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

36.     In total, the CARES Act appropriates approximately $3 billion in funding to the GEER Fund and approximately $13.5 billion to the ESSER Fund.

**2.      The Governor's Emergency Education Relief Fund**

37.     In Section 18002, the GEER Fund provides funds to Governors of each state based on the relative population of K-12 and higher education students and the relative population of students from low-income families. Governors may use the GEER funds to support local educational agencies, institutes of higher education, and other education related entities in response to the COVID-19 crisis.

38.     Significantly, despite the Department's assertion that CARES Act funds may be restricted to only those schools receiving Title I-A funds, other provisions of the CARES Act demonstrate Congress had no such intent. For example, governors may allocate moneys from the GEER Fund to any LEA regardless whether it receives funds under Title I-A, and LEAs enjoy broad flexibility in their use of the moneys. CARES Act, § 18002(d).

**3.      The Elementary and Secondary School Emergency Relief Fund**

39.     In Section 18003, Congress established the ESSER Fund, which provides funds to state education agencies (in Washington, the Office of Superintendent of Public Instruction) "in the same proportion as each State received under part A of title I of the ESEA of 1965 in the most recent fiscal year," which formula is based primarily on the number of children from low-income families and foster children in each State's LEAs. *Id.*, § 18003(b); 20 U.S.C. §§ 6332–39.

40.     In turn, recipient States shall allocate "not less than 90 percent of the grant funds awarded to the State under this Section as subgrants to local educational agencies (including charter schools that are local educational agencies) in the State in proportion to the amount of funds such local educational agencies and charter schools that are local educational agencies received under part A of title I of the ESEA of 1965 in the most recent fiscal year." CARES Act, § 18003(c).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
NO.

8

41.     Congress intended the ESSER Fund to be used for purposes critically important to disadvantaged students affected by the coronavirus. In Section 18003(d), Congress directs that local educational agencies may use CARES Act funds for the following: (1) "[a]ny activity authorized by the ESEA of 1965;" (2) coordination of preparedness and response efforts to prevent, prepare for, and respond to coronavirus; (3) providing principals and school leaders "with the resources necessary to address the needs of their individual schools;" (4) activities to address the unique needs of low-income children or students, children with disabilities, ESL, racial and ethnic minorities, homeless students, and foster youth; (5) developing and implementing procedures and systems to improve local educational agencies' preparedness and response efforts; (6) training and professional development for staff on sanitation and minimizing the spread of infectious diseases; (7) purchasing supplies to sanitize and clean facilities; (8) planning and coordinating long-term closures, "including for how to provide meals to eligible students, how to provide technology for online learning to all students," how to comply with requirements for disabled students, and how to ensure educational services can continue to be provided consistent with requirements; (9) purchasing educational technology to aid in regular and substantive educational interaction; (10) providing mental health services and support; (11) planning and implementing activities related to summer learning and supplemental afterschool programs, including for low-income students, students with disabilities, ESL, migrant students, students experiencing homelessness, and children in foster care; and (12) "[o]ther activities that are necessary to maintain the operation of and continuity of services in local educational agencies and continuing to employ existing staff of the local educational agency."

42.     Like the GEER Fund, the ESSER Fund may be distributed to LEAs regardless whether they receive Title I-A funds. States must return any funds not spent within a year. CARES Act, § 18003(f).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
NO.

9

**4.      The CARES Act requirement that funds for services for private schools be based on a low-income formula**

43.      In Section 18005(a), Congress made clear that LEAs shall provide services in the same manner as provided under Section 1117 of the ESEA to students and teachers in non-public schools: "A local educational agency receiving funds under Sections 18002 or 18003 of this title shall provide equitable services in the same manner as provided under Section 1117 of the ESEA of 1965 to students and teachers in non-public schools, as determined in consultation with representatives of non-public schools." Funds for the services provided to non-public schools must be controlled by a public agency, which shall "administer such funds, materials, equipment, and property and shall provide such services (or may contract for the provision of such services with a public or private entity)." CARES Act, § 18005(b).

44.      By referencing Section 1117, Congress explicitly and clearly directed LEAs to provide services based only on the number of low-income private school students, not all private school students. The CARES Act does not, for example, require LEAs to provide services in the same manner as Section 8501 of the ESEA, a general provision that measures services based on proportional total enrollments. 20 U.S.C. § 7881(b). If Congress intended LEAs to provide services based on allocations derived from the number of all private school students and not just low-income students, it would have incorporated Section 8501 instead of Section 1117 of the ESEA.

**C.      Section 1117 of the Elementary and Secondary Education Act of 1965**

45.      Passed as part of President Lyndon Johnson's War on Poverty, the ESEA of 1965 provides federal funding for primary and secondary education, emphasizing equal access to education and aiming to narrow the achievement gaps between students. The law has been amended several times, including in 2015. *See* Every Student Succeeds Act, PL 114-95, 129 Stat 1802 (2015).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
NO.

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

46.     Section 1117 dictates that educational services received by private schools are determined based on the number of the schools' low-income students, not by multiple formulas as the Department posits. Section 1117 of the ESEA addresses LEAs (which in Washington include school districts, approved charter schools, and state-tribal education compact schools) and their provision of services to students and teachers in private elementary and secondary schools. Subsection (a) states that LEAs shall, "on an equitable basis" and as requested by private schools provide "special educational services, instructional services . . . , counseling, mentoring, one-on-one tutoring, or other benefits under this part . . . that address their needs" and ensure that teachers and families participate, on an equitable basis, in services and activities. Such services and benefits shall be "secular, neutral, and nonideological." ESEA of 1965, § 1117(a)(2).

47.     Congress provided that "[e]ducational services and other benefits for such private school children shall be equitable in comparison to services and other benefits for public schools participating under this part, and shall be provided in a timely manner." *Id.* at § 1117(a)(3)(A).

48.     In Subsection (a)(4)(A)(i), Congress set forth a formula for expenditures for private schools, based on the proportionate share of the children from low-income families who attend private schools: "Expenditures for educational services and other benefits to eligible private school children shall be equal to the proportion of funds allocated to participating school attendance areas based on the number of children from low-income families who attend private schools." The proportional share "shall be determined based on the total amount of funds received by the local educational agency under this part prior to any allowable expenditures or transfers by the local educational agency." *Id.* at § 1117(a)(4)(A)(ii).

49.     Section 1117 focuses on the number of students from low-income families attending private schools. For purposes of calculating the number of private school children from low income families, a "local educational agency shall have the final authority, consistent with this section, to calculate the number of children, ages 5 through 17, who are from low income

families and attend private schools by" one of four means. *Id.* at § 1117(c)(1). The LEA can (1) use the same measure of low income used to count public school children, (2) use the results of a survey whose results can be extrapolated, (3) apply a low-income percentage of each participating public school attendance area to the number of private school children who reside in that area, or (4) use an equated measure of low income correlated with the measure of low income used to count public school children. *Id.*

50.     Notably, the CARES Act does not require LEAs to provide services in the same manner as Section 8501 of the ESEA, a different provision that apportions services by proportional total enrollments. 20 U.S.C. § 7881(b). The CARES Act instead refers to Section 1117 of the ESEA, which is based on the number of low-income students.

51.     Private schools can challenge the consultation process and expenditures to the Department, who can seek recoupment of funds from LEAs. Any dispute regarding low-income data for private school students is subject to the complaint process in Section 8503 of the ESEA of 1965. If the Secretary determines that a LEA "has substantially failed or is unwilling, to provide for such participation [on an equitable basis of eligible children enrolled in private schools], as required by this Section, the Secretary shall—

1)     waive the requirements of this Section for such local educational agency;

2)     arrange for the provision of services to such children through arrangements that shall be subject to the requirements of this Section and Sections 8503 and 9504; and

3)     in making the determination under this subsection, consider one or more factors, including the quality, size, scope, and location of the program and the opportunity of eligible children to participate."

*Id.* at § 1117(e).

52.     LEAs can provide services either directly or through contracts with public and private agencies, organizations, and institutions. *Id.* at § 1117(a)(5). LEAs must consult with

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
NO.

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

private school officials about the provision of services for eligible private school children. *Id.* at § 1117(b)(1). LEAs must document their consultation efforts and transmit their results to a designated ombudsman. *Id.* at § 1117(b)(1), (5). Should there be a disagreement, the LEA must provide in writing the reasons why the LEA disagrees with the provision of services requested. *Id.* at § 1117(b)(2). A private school official may file a complaint with the State educational agency that the LEA that did not engage in consultation that was meaningful and timely, did not give due consideration to the views of the private school official, or did not make a decision that treats the private school students equitably as required by Section 1117. *Id.* at § 1117(b)(6).

**D.      The Department's CARES Act Guidance**

**1.        The Department's April 30, 2020, guidance**

53.      On April 30, 2020, over a month after passage of the CARES Act, the Department issued a document titled, "Providing Equitable Services to Students and Teachers in Non-Public Schools Under the CARES Act Programs" (Guidance). Att. 1. According to the Guidance, the CARES Act's requirement that LEAs should distribute funds "in the same manner as provided under section 1117" meant that LEAs should distribute funds based on the total number of enrolled students in public and private schools, regardless of the income-level of those students' families.

54.      The Department attempted to justify its interpretation of the CARES Act in the Guidance by noting the "significantly broader eligibility and uses of funds authorized under the CARES Act as compared to Title I, Part A," notwithstanding the CARES Act's reference to Title I, Part A for the distribution of funds. The Department also noted that "[t]he services that an LEA may provide under the CARES Act programs are clearly available to *all* public school students and teachers, not only low-achieving students and their teachers as under Title I, Part A," again notwithstanding the CARES Act's reference to Title I, Part A for the distribution of funds.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
NO.

13

55.     In most school districts in Washington State, the percentage of students in low-income families is significantly higher in public schools than in private schools. Contravening Section 1117, the Department's Guidance would have resulted in the reallocation of significant CARES Act funds from low-income public-school students to higher-income private-school students.

**2.     Public reactions to the Department's April 30, 2020, guidance**

56.     On May 5, 2020, the Council of Chief State School Officers (CCSSO), a nationwide organization of public officials who head departments of elementary and secondary education, wrote a letter urging Secretary DeVos to clarify the Guidance in line with the CARES Act's requirements for services. Att. 2. The CCSSO explained that the Department's Guidance "is counter to the CARES Act statute and the Department's longstanding interpretations of the [ESEA]," and expressed concern that the Department's Guidance disregarded Congress's intention "to concentrate ESSER funds in areas of the most need, where the educational and social impacts of the COVID crisis will be most extreme and difficult to overcome with limited local funds."

57.     On May 20, 2020, Chairman Bobby Scott of the House Committee on Education and Labor; Chairwoman Rosa DeLauro of the House Subcommittee on Labor, Health, Human Services, and Related Agencies; and Ranking Member Patty Murray of the Senate Committee on Health, Education, Labor, and Pensions wrote to Secretary DeVos, urging the Department to "immediately revise your April 30 guidance, including Question 10 of the guidance document to come into compliance with the CARES Act and section 1117 of ESEA." Att. 3. The letter also requested the Department's internal records related to the development of "its interpretation of the equitable services provision and its inconsistency with long-standing requirements related to equitable services."

58.     On May 21, 2020, Senator Lamar Alexander, the Chair of the Senate Committee on Health, Education, Labor, and Pensions, publicly expressed disagreement with the

Department's Guidance: "My sense was that the money should have been distributed in the same way we distributed Title I money . . . . I think that's what most of Congress was expecting." Att. 4.

### 3. Defendant DeVos's public statements of May 19, 2020

59.  On May 19, 2020, Defendant DeVos gave an interview with Cardinal Timothy Dolan, the Catholic archbishop of New York.[3] Cardinal Dolan asked Defendant DeVos:

> [S]tage two, I understand, Secretary DeVos, is a particularly passionate dream of yours, namely let's utilize this particular crisis to ensure that justice is finally done to our kids and the parents who choose to send them to faith-based schools through agencies like these educational scholarship microgrants — that would be more long range. Am I correct in understanding what your agenda is?

Defendant DeVos responded:

> Yes absolutely. For more than three decades that has been something that I've been passionate about.

60.  Defendant DeVos's statements in her May 19, 2020, interview reflect the Department's Guidance and favoritism toward private and faith-based schools. They are inconsistent, however, with the CARES Act.

### 4. Defendant DeVos's May 22, 2020, letter

61.  On May 22, 2020, Defendant DeVos responded to the letter the Department had received from the Council of Chief State School Officers on May 5, 2020. Att. 5. In her response, Defendant DeVos disagreed that LEAs should distribute CARES Act funds according to the number of low-income students. She cautioned that if any LEAs "insist on acting contrary to the Department's stated position," they should "put into an escrow account the difference" between the Department's and their calculations. She also noted that the Department "will be issuing a rule on the topic in the next few weeks and inviting public comments."

---

[3] A partial transcript of the interview is available at https://www.chalkbeat.org/2020/5/20/21265527/devos-using-coronavirus-to-boost-private-schools-says-yes-absolutely (last visited July 9, 2020).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
NO.

15

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

**E.      The Department's Interim Final Rule of July 1, 2020**

62.      On June 25, 2020, the Department released an unofficial version of an interim final rule concerning GEER and ESSER funds (Rule). The Rule was published in the Federal Register and became effective on July 1, 2020. 85 Fed. Reg. 39,479.

63.      The Department lacked authority to issue the Rule and failed to follow the procedural requirements of the APA. The Rule cites 20 U.S.C. § 1221e-3 and 20 U.S.C. § 3474 as authority for rulemaking related to the CARES Act.  Neither of these statutes, nor the CARES Act itself, authorizes the Department to issue the Rule or requires OSPI and LEAs to act contrary to the CARES Act.

64.      Moreover, Congress did not authorize the Department to issue rules related to the provision of services for private school students without compliance with the notice and comment procedures of the APA. The Department issued the Rule as an interim final rule without demonstrating good cause that the notice and public procedures were impracticable, unnecessary, or contrary to the public interest. Consequently, the Rule does not comply with the APA's procedural requirements.

65.      In terms of substance, the Rule attempts to rewrite the proportional calculations and eligibility requirements for services under the CARES Act. The Rule is not consistent with or authorized by the CARES Act.

66.      The Department's Preamble claims that it is resolving a "critical ambiguity" in Section 18005(a) of the CARES Act. Specifically, it claims that the Section of 18005(a) of the CARES Act, titled "Assistance to Non-public schools," which requires LEAs to "provide equitable services in the same manner as provided under Section 1117 of the ESEA of 1965 to students and teachers in non-public schools," is ambiguous. 85 Fed. Reg. 39,479. The Preamble nowhere explains the ambiguity but simply asserts that construing the phrase to mean that Congress simply incorporated the entirety of Section 1117 disregards the statutory text and legal authorities requiring harmonizing of all relevant statutory provisions. *Id.*

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
NO.

16

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

67.     The Preamble then claims that Section 18005(a) is facially ambiguous because Congress did not need to add the words "in the same manner" if it simply intended to incorporate Section 1117 of the ESEA of 1965. The Preamble states, without any explanation or support, that the provisions in Section 1117 relating to funding and eligibility for services "are inapposite in a CARES Act frame," but that the provisions in Section 1117 relating to the "'manner' in which services are delivered . . . arguably do fit within and can be applied under the CARES Act." *Id.* at 39,481.

68.     After inventing an ambiguity, the Rule adds a new Section 76.665 to title 34 of the Code of Federal Regulations. Subsection (c) notes that LEAs receiving funds under the CARES Act must provide services "in the same manner" as provided under Section 1117, but then creates a requirement that LEAs must calculate the proportional share of funds for services to students and teachers in non-public elementary and secondary schools for each CARES Act program by using one of three new measurements. First, if an LEA is using *all* its funds under a CARES Act program to serve *only* students and teachers in public schools participating under Title I, Part A of the ESEA, it may calculate the proportional share for private schools in accordance with either the usual formula under Section 1117(a)(4)(A), the proportion of students from low income families in private schools compared to the total number of students from low income families in Title I schools and participating private schools, or the proportion of all private school students versus all public school students. *Id.* at 39,488.

69.     Otherwise, the LEA must calculate the proportional share based on enrollment in participating private schools compared to the total enrollment in both public and participating private schools. *Id.*

70.     LEAs must make their choice and determine the calculation of the proportional share of funds available for services before making any expenditures. *Id.* And when allocating funds for a Title I school, the LEA must comply with the "supplement not supplant requirement in section 1118(b) of the ESEA, which would prohibit the LEA from allocating CARES Act

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
NO.

17

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

funds to Title I schools and then redirecting State or local funds to non-Title I schools, among other things." *Id.* This requirement appears nowhere in the CARES Act or Section 1117 of the ESEA.

71.     In other words, diverging from the Department's April 30 Guidance, the Rule creates a choice for LEAs—but neither choice is consistent with or authorized by the CARES Act. As one option, the Rule provides that LEAs may choose to provide the proportional share of funds for services based on *enrollment* in public and private schools, without regard to the number of low-income students at each type of school. But this is inconsistent with not only the CARES Act, but also the Department's own guidance from October 7, 2019, which clearly explained that the provision of services must be based on comparative poverty data. *See* U.S. Department of Education, "Providing Equitable Services to Eligible Private School Children, Teachers, and Families," https://www2.ed.gov/about/inits/ed/non-public-education/files/equitable-services-guidance-100419.pdf (last visited July 16, 2020).

72.     If, however, LEAs wish to determine the proportional share of funds for services based on the *poverty* levels of students in their jurisdiction in accordance with Section 1117, the Rule prohibits LEAs from using any CARES Act funds for students from low-income families in public schools not participating in Title I.

73.     Though the Rule and accompanying commentary constitute 57 pages, there is no adequate explanation for why the Department declined to issue a rule in which GEER and ESSER funds could be distributed according to the poverty-based formula typically used under Section 1117 without excluding public schools not participating in Title I.

**F.     The Rule Causes Immediate and Irreparable Harm to Washington, Its Schools, and Its Residents**

74.     Washington serves over 1,147,000 students across 2,369 primary and secondary public schools. *See* Wash. Off. of Superintendent of Pub. Instruction, *Report Card Enrollment 2019–20 School Year*, Data.WA.Gov, https://data.wa.gov/Education/Report-Card-Enrollment-

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
NO.                                                            18                    ATTORNEY GENERAL OF WASHINGTON
                                                                                              Complex Litigation Division
                                                                                              800 Fifth Avenue. Suite 2000
                                                                                              Seattle, WA  98104-3188
                                                                                                   (206) 464-7744

2019-20-School-Year/gtd3-scga (last updated July 9, 2020). The State's public education system comprises 295 public school districts, 14 authorized charter schools, and six state-tribal education compact schools. *About the Agency*, Wash. Off. of Superintendent of Pub. Instruction, https://www.k12.wa.us/about-ospi/about-agency (last visited July 9, 2020). Of the State's 2,369 primary and secondary public schools, 1,594 are eligible to participate in Title I, and 1,002 actually participate in Title I. *See List of Title I, Part A Schoolwide and Targeted Assistance Schools 2019-20*, Wash. Off. of Superintendent of Pub. Instruction, https://www.k12.wa.us/sites/default /files/public/titlei/pubdocs/TitleISchoolList2019-20.xlsx (last visited July 9, 2020).

75.     In the 2019–20 academic year, Washington's Office of Superintendent of Public Instruction (OSPI) reports serving 520,475 low-income students. Wash. Off. of Superintendent of Pub. Instruction, *Report Card Enrollment 2019–20 School Year*, Data.WA.Gov, https://data.wa.gov/Education/Report-Card-Enrollment-2019-20-School-Year/gtd3-scga (last visited July 9, 2020).

76.     In the 2018–19 academic year, the most recent available data indicated that 84,058 students attended private schools. During the 2019–20 school year, there were 504 private schools accredited by the Washington State Board of Education. In some school districts, over 20% of enrolled K-12 students attend private schools. For instance, in Seattle, 22% of enrolled K-12 students attend private schools. https://www.seattletimes.com/seattle-news/data/more-than-1-in-5-seattle-students-are-enrolled-in-private-schools-among-highest-in-nation/ (last accessed July 13, 2020). Of the 50 largest cities in America, Seattle ranks third in percentage of K-12 private school attendance. *Id.* The national average is 10 percent. *Id.* The average private school tuition for elementary schools in Seattle is $15,927, and $19,372 for high schools. https://www.privateschoolreview.com/washington/seattle (last accessed July 13, 2020).

77.     Washington's students and families have been deeply affected by the COVID-19 pandemic. The disruption of primary and secondary education services has left many of the State's most vulnerable students without access to services provided by public educational institutions,

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
NO.

19

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

including educational technology, internet access, supplemental after-school programs, and mental health services. Each of those needs are eligible for assistance through funding under Section 18003(d) of the CARES Act.

78.     On April 27, 2020, Washington State submitted its application to the Department for ESSER funds. Att. 6. Washington State received approximately $216.9 million in federal aid through the ESSER Fund created by the CARES Act. Press Release, Patty Murray, Senator, Senator Murray Announces Federal Investments to Support Washington State Schools' Pandemic Response Efforts (Apr. 28, 2020), https://www.murray.senate.gov/public/index.cfm/newsreleases?ContentRecord_id=56B3686E-9247-4381-8A1D-9868832B4FAF. The funds are designed to "allow states and local school districts to flexibly support schools and students working to address the many education challenges that have arisen due to the COVID-19 pandemic and response." *Id.* Of the $216.9 million, 90% will be distributed by LEAs and 10% will be distributed by OSPI. *See* CARES Act, § 18003(c). OSPI is subject to CARES Act requirements in distributing its 10% of the funds.

79.     Like all State Education Agencies that receive funds through the CARES Act from the Department, OSPI was required to submit a Certification and Agreement, stating a "general agreement to comply with all applicable Federal laws, executive orders and regulations" and acknowledging that failure to comply with the same "may result in liability under the False Claims Act." Att. 6; *see* U.S. Department of Education, "Certification and Agreement for Funding under the Education Stabilization Fund Program," https://oese.ed.gov/files/2020/04/ESSERF-Certification-and-Agreement-2.pdf (last visited July 9, 2020). OSPI is responsible for supervising and quarterly reporting on the use of ESSER funds by Washington's school districts, which are also required to agree to comply with federal laws and regulations.

80.     Washington faces significant legal liability if its institutions disregard the Rule. OSPI is charged with supervising LEAs, and as noted above, OSPI was required to certify and agree that it will comply with all federal laws and regulations, acknowledging that failure to

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
NO.

20

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

comply with the same "may result in liability under the False Claims Act." The Department may also require the return, with interest, of any funds not distributed according to the Rule, and Washington's institutions are thus under severe and immediate pressure to follow the Rule, notwithstanding its inconsistency with the statutory text of the CARES Act.

81.     The Rule also harms the proprietary interests of Washington because ten percent of Washington's ESSER funds are under direct control of OSPI and Washington's GEER funds are under direct control of the Governor. The Rule interferes with OSPI's and the Governor's interests in distributing those funds. The Rule requires that Washington act against its proprietary interests and counter to the plain meaning of the CARES Act in distributing GEER and ESSER funds and supervising LEAs.

82.     Washington's sovereign interests are also harmed by the Rule because of the Rule's effects on public school students. Under the Rule's first poverty-based formula, public schools with low-income families that are not eligible for or do not participate in Title I cannot receive GEER or ESSER funds. Under the Rule's second enrollment-based formula, most public schools with significant numbers of students from low-income families will receive a significantly diminished share of funding due to the shift of funds toward private schools with lower percentages of low-income students. These impacts undermine Washington's ability to fulfill its constitutional mandates toward public school students as laid down in *McCleary v. State of Wash.*, 173 Wn.2d 477, 269 P.3d 227 (2012).

83.     Likewise, the Rule harms the mission of Washington toward its public schools. Washington's Constitution expressly states that "It is the paramount duty of the state to make ample provision for the education of all children residing within its borders, without distinction or preference on account of race, color, caste, or sex." Wash. Const. art. IX, § 1. The Constitution adds that all "schools maintained or supported wholly or in part by the public funds shall be forever free from sectarian control or influence." Wash. Const. art. IX, § 4.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
NO.

21

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

84.    Diverting funds from public schools to nonpublic institutions under the enrollment-based formula, or depriving the entire category of non-Title I public schools from funding under the poverty-based formula, diminishes the State's ability to fulfill its mandate to make "ample provision for the education of all children," including those most acutely affected by the COVID-19 pandemic. The Rule undercuts the provision of services to students most in need by shifting funds to non-public schools "at the direct expense of low-income children remaining in public schools." Att. 3, Letter from Members of Congress to Secretary DeVos (May 20, 2020).

85.    In effect, the enrollment-based formula provided by the Rule shifts funds from disadvantaged public-school students toward less disadvantaged private school students. By including all private school students in the formula, more funds will be dedicated to services in private schools. In the Seattle Public School district, for example, the enrollment-based formula would increase the share of ESSER funding for private schools to 19.13%—over five times the 3.4% proportional share of Title I funds that private schools in the Seattle school district received for the 2019–20 school year. Other school districts that ordinarily pay no funds for services for private schools will now have to pay a significant amount for services for private schools.

86.    Likewise, the alternative poverty-based formula ultimately harms poorer students in non-Title I schools. Two-thirds of Washington schools do not participate in Title I. While the purported purpose of the Rule is to focus on students from low-income families, it neglects to recognize that there are low-income students in non-Title I schools who will not have access to services originally contemplated under the Rule. Several hundred schools in Washington are Title I-A eligible but do not participate in the program. Further, approximately 45% of students in Washington public schools receive meal assistance, which indicates that they are in low-income families.

87.    While private schools have other emergency federal programs, such as the Payback Protection Program (PPP) loans and benefits under the Families First Coronavirus

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
NO.                                                      22                    ATTORNEY GENERAL OF WASHINGTON
                                                                                          Complex Litigation Division
                                                                                          800 Fifth Avenue. Suite 2000
                                                                                          Seattle, WA  98104-3188
                                                                                              (206) 464-7744

Response Act, Congress did not create additional funding sources for public elementary and secondary schools in response to the COVID-19 pandemic. That is why Congress expressly dedicated the funds for all elementary and secondary schools, not just to Title I schools.

88.    Low-income students and their families are particularly affected by this disruption in services. Parents from lower income brackets express more concern than their higher income counterparts that their children are falling behind academically due to COVID-19 disruptions. Juliana Menasce Horowitz, *Lower-income parents most concerned about their children falling behind amid COVID-19 school closures*, Pew Res. Ctr., https://www.pewresearch.org/fact-tank/2020/04/15/lower-income-parents-most-concerned-about-their-children-falling-behind-amid-covid-19-school-closures (last visited June 16, 2020).

89.    Low-income primary and secondary school students often rely on services offered by the public education system. For example, as many as 45% of Washington's students qualify for free or reduced-price meals. Drew Mikkelsen, *No school for Washington students, but districts are giving out free meals*, King5 News (5:43 PM PDT, March 16, 2020), https://www.king5.com/article/news/local/no-school-for-washington-students-but-districts-are-giving-out-free-meals/281-d90d37a3-b151-4494-9d6e-8a45da0aa970. Some school districts have expanded these services during school closures by delivering breakfast and lunch to families' places of residence using vans and school buses. *Id.*

90.    The Rule disrupts an allocation of GEER and ESSER funds between Title I public schools, non-Title I public schools, and private schools. Under the Rule's enrollment-based formula, GEER and ESSER funds are shifted from lower-income public-school students toward higher-income private-school students. The Rule's poverty-based formula excludes services for low-income students at public schools that do not participate in Title I, as LEAs are precluded from allocating GEER and ESSER funds to their schools. But for the Rule's alteration of the terms of the CARES Act, Washington would distribute funds according to the allocation formula contained in

Section 1117 of Elementary and Secondary Education Act, as Congress intended and expressly prescribed in Section 18005 of the CARES Act.

91.     Washington also faces a significantly increased administrative burden due to the Rule. The Department severely underestimates this burden. OSPI and the LEAs it supervises must scramble to attempt to comply with the Rule, despite its inconsistency with the CARES Act. The burden on OSPI and the LEAs to distribute funds to public and private schools "in the same manner as provided by section 1117" would have been minimal, but the Rule departs from that approach and requires OSPI and LEAs to develop and implement a new set of criteria for the distribution of funding. These legally fraught determinations will inevitably result in disputes between LEAs and private schools, and Washington's officials will be further burdened with the settlement of these disputes.

92.     Washington's public school systems depend on state moneys. The CARES Act education stabilization funding assists public school systems, including both Title I and non-Title I schools and low-income private school students, address the numerous issues created by the pandemic.

93.     While the CARES Act provides funds for services for private school students following Section 1117 of the ESEA of 1965, the Rule creates formulas that diminish funds for public schools—either from non-Title I schools or from all public schools. Protecting and maintaining public-school education in Washington is imperative to ensuring the long-term success of public school students. The loss of federal funding for public schools will have significant, adverse impacts on public school students. The State has an interest in ensuring that funds are not diverted from other vital state priorities and programs providing long-term assistance to public-school students.

94.     The Rule will injure Washington's interests by causing significant harm to its residents, including children and other students who attend K-12 public-school educational

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
NO.                                                24                    ATTORNEY GENERAL OF WASHINGTON
                                                                        Complex Litigation Division
                                                                        800 Fifth Avenue. Suite 2000
                                                                        Seattle, WA  98104-3188
                                                                        (206) 464-7744

1   institutions, particularly as schools prepare for the 2020–21 academic year during a global
2   pandemic.

3                           **V.     CAUSES OF ACTION**
                                   **Count I:**
4                  **Violation of the Administrative Procedure Act**
     **Agency Action in Excess of Statutory Authority, Short of Statutory Right, or Not in**
5                              **Accordance with Law**

6          95.    Washington realleges and reincorporates by reference the allegations set forth in
7   each of the preceding paragraphs.

8          96.    The APA requires that a court hold unlawful and set aside agency action, findings,
9   and conclusions found to be in excess of statutory authority, short of statutory right, or not in
10  accordance with law. 5 U.S.C. § 706(2)(A), (C) (1966).

11         97.    Congress did not grant the Department authority to interpret Section 18005 of the
12  CARES Act. In addition, Congress did not delegate authority to the Department to make rules
13  concerning Section 18005, such as the Rule, carrying the force of law. The Department's Rule
14  is unauthorized by and contrary to Section 18005(a) of the CARES Act. It therefore is in excess
15  of statutory authority, short of statutory right, and not in accordance with law.

16         98.    Absent injunctive and declaratory relief suspending and vacating the Rule,
17  Washington and its residents will be immediately, continuously, and irreparably harmed by
18  Defendants' illegal actions.

19                                **Count II:**
                 **Violation of the Administrative Procedure Act**
20                    **Arbitrary and Capricious Agency Action**

21         99.    Washington realleges and reincorporates by reference the allegations set forth in
22  each of the preceding paragraphs.

23         100.   The APA requires that a court hold unlawful and set aside agency action, findings,
24  and conclusions found to be arbitrary, capricious, or an abuse of discretion. 5 U.S.C. § 706(2)(A)
25  (1966).

26

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
NO.                                        25                   ATTORNEY GENERAL OF WASHINGTON
                                                                   Complex Litigation Division
                                                                   800 Fifth Avenue. Suite 2000
                                                                   Seattle, WA  98104-3188
                                                                      (206) 464-7744

1    101.   The Rule is an arbitrary and capricious agency action because, among other
reasons, the Department expressed no awareness that it was reversing its position, its new
position is incompatible with Section 18005 of the CARES Act, and the Department failed to
provide good reasons for changing its interpretation. Further, the Rule's interpretation of Section
18005(a) and the phrase "in the same manner as provided under section 1117" is so implausible
that it cannot be ascribed to a difference in view or the product of agency expertise, ignores
important aspects of the problem, and runs counter to the evidence before the Department. The
Department also took into account factors Congress did not intend it to consider. Finally, the
Department failed to take into account the reliance interests that its former position generated.

102.   Absent injunctive and declaratory relief suspending and vacating the Rule,
Washington and its residents will be immediately, continuously, and irreparably harmed by
Defendants' illegal actions.

**Count III:**
**Violation of the Administrative Procedure Act**
**Agency Action Without Observance of Procedure Required by Law**

103.   Washington realleges and reincorporates by reference the allegations set forth in
each of the preceding paragraphs.

104.   The APA requires that a court hold unlawful and set aside agency action, findings,
and conclusions found to be without observance of procedure required by law. 5 U.S.C.
§ 706(2)(D) (1966).

105.   The Rule is a legislative rule adopted without complying with the notice and
comment requirements of the APA.

106.   Absent injunctive and declaratory relief suspending and vacating the Rule,
Washington and its residents will be immediately, continuously, and irreparably harmed by
Defendants' illegal actions.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
NO.

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1

2

### Count IV:
### Separation of Powers

107.   Washington realleges and reincorporates by reference the allegations set forth in each of the preceding paragraphs.

108.   Article I of the Constitution "exclusively grants the power of the purse to Congress[.]" *City & Cty. of San Francisco*, 897 F.3d at 1231 (citing U.S. Const. art. I, § 9, cl. 7; U.S. Const. art. I, § 8, cl. 1). That power includes "condition[ing] the receipt of funds, by states and others, on compliance with federal directives." *State of Nevada v. Skinner*, 884 F.2d 445, 447 (9th Cir. 1989). As the Ninth Circuit recently reaffirmed, the Executive Branch "does not have unilateral authority" to "thwart congressional will by canceling appropriations passed by Congress." *City & County of San Francisco*, 897 F.3d at 1232 (internal quotation marks and citations omitted); *Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("[N]o provision in the Constitution . . . authorizes the President to enact, to amend, or to repeal statutes."). To that end, the Executive Branch is without inherent power to "condition the payment of . . . federal funds on adherence to its political priorities." *Oregon v. Trump*, 406 F. Supp. 3d 940, 961 (D. Or. 2019) (citing *City of Chicago v. Sessions*, 888 F.3d 272, 283 (7th Cir. 2018), *reh'g en banc granted in part, opinion vacated in part*, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018), *vacated*, Nos. 17-2991 & 18-2649, 2018 WL 4268814 (7th Cir. Aug. 10, 2018)). If the Executive Branch wishes to condition the receipt of federal funds, it may *only* do so pursuant to a specific delegation of spending authority by Congress. *City & County of San Francisco*, 897 F.3d at 1233–34.

109.   The Rule permits Defendants to withhold, deny, suspend, claw back, or terminate money appropriated by Congress, thereby violating constitutional separation of powers principles based on conditions not provided for in the CARES Act. Defendants did not have inherent authority to impose these restrictions. Nor did Congress afford Defendants any discretion or authority to place such restrictions through the CARES Act.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
NO.

27

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

110. In unilaterally imposing the Rule, the Department abrogated the discretion given the educational institutions in the CARES Act and usurped Congress's power to legislate, in violation of the principles of separation of powers.

111. Absent injunctive and declaratory relief vacating the Rule and prohibiting it from going into effect, Washington and its residents will be immediately, continuously, and irreparably harmed by Defendants' illegal actions.

## Count V:
## Spending Clause

112. Washington realleges and reincorporates by reference the allegations set forth in each of the preceding paragraphs.

113. Article I, Section 8, clause 1 of the United States Constitution, also known as the Spending Clause, states that "Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States[.]"

114. Under the Spending Clause, conditions may not be placed on federal funds that are (1) so coercive that they compel (rather than encourage) recipients to comply, (2) ambiguous, (3) retroactive, or (4) unrelated to the federal interest in a particular program. *Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 575–78 (2012); *South Dakota v. Dole*, 483 U.S. 203, 206–08 (1987).

115. At the very least, the Rule violates the Constitutional requirements that conditions on funds be "unambiguous" and not retroactive because they are improper "post-acceptance" restrictions. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) ("[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously."). States "cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst*, 451 U.S. at 17).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
NO.

28

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1       116.     "Though Congress' power to legislate under the Spending Power is broad, it does

2 not include surprising participating States with post acceptance or 'retroactive' conditions."

3 *Pennhurst*, 451 U.S. at 25; *see also Sebelius*, 567 U.S. at 584 (quoting *Pennhurst*, holding

4 Congress cannot retroactively alter conditions of Medicaid grants to states). Once a state has

5 accepted funds pursuant to a federal spending program, the federal government cannot alter the

6 conditions.

7       117.     Accordingly, the Spending Power does not permit what the Department is

8 attempting to do here: "surprising participating States with post acceptance or 'retroactive'

9 conditions" on congressionally appropriated funds. *Pennhurst*, 451 U.S. at 25; *see also Sebelius*,

10 567 U.S. at 519 (quoting *Pennhurst*, holding Congress cannot retroactively alter conditions of

11 Medicaid grants to states). Once a state or state entity has accepted funds pursuant to a federal

12 spending program, the federal government cannot alter the conditions attached to those funds so

13 significantly as to "accomplish[] a shift in kind, not merely degree." *Sebelius*, 567 U.S. at 523.

14       118.     The Rule is not stated unambiguously in the CARES Act. Further, Washington

15 institutions did not know of the Rule at the time they agreed to receive GEER and ESSER funds.

16 Therefore, they were unable to exercise their choice knowingly, cognizant of the consequences

17 of their participation, and they were surprised with post-acceptance or retroactive conditions. In

18 addition, the Rule is not related to the federal interest in assisting students impacted by COVID-

19 19, nor is it consistent with other provisions of the Constitution. For these reasons, the Rule

20 violates the Spending Clause.

21       119.     Absent injunctive and declaratory relief vacating the Rule and prohibiting it from

22 going into effect, Washington and its residents will be immediately, continuously, and

23 irreparably harmed by Defendants' illegal actions.

24 **VI.    PRAYER FOR RELIEF**

25       WHEREFORE, the State of Washington prays that the Court:

26

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
NO.

29

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

a.      Declare that Defendants' July 1, 2020, Interim Final Rule on the determination of the proportional share of GEER and ESSER funds for private schools is unauthorized by and contrary to the Constitution and laws of the United States, and the only requirement applicable to the Governor, OSPI, and educational institutions is that the funds be used "in the same manner as provided under section 1117," meaning that the funds should be distributed according to the number of low-income students in the LEA's jurisdiction without excluding non-Title I public schools from GEER and ESSER funding;

b.      Declare that Defendants' July 1, 2020, Interim Final Rule is invalid and without force of law;

c.      Issue preliminary and permanent injunctions prohibiting Defendants from implementing or enforcing the July 1, 2020 Rule;

d.      Compel Defendants to rescind the July 1, 2020, Interim Final Rule and to distribute CARES Act funds to Washington institutions without any such restriction, pursuant to 28 U.S.C. § 1361;

e.      Award the State of Washington its costs and reasonable attorneys' fees; and

f.      Award such other and further relief as the interests of justice may require.

RESPECTFULLY SUBMITTED this 20th day of July, 2020.

ROBERT W. FERGUSON
Attorney General

*/s/ Paul M. Crisalli*
PAUL M. CRISALLI, WSBA #40681
SPENCER W. COATES, WSBA #49683
JEFFREY T. SPRUNG, WSBA #23607
R. JULY SIMPSON, WSBA #45869
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744
paul.crisalli@atg.wa.gov
spencer.coates@atg.wa.gov
jeff.sprung@atg.wa.gov
july.simpson@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
NO.

30

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744