1

2

3

4

5

6

7

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

8

9

10

11

12

13

14

15

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>    Plaintiff,<br><br> v.<br><br>BETSY DeVOS, in her official capacity as Secretary of the United States Department of Education; and the UNITED STATES DEPARTMENT OF EDUCATION, a federal agency,<br><br>    Defendants. | NO. 2:20-cv-01119-MLP<br><br>STATE OF WASHINGTON'S MOTION FOR PRELIMINARY INJUNCTION<br><br>NOTED FOR: August 14, 2020<br><br>ORAL ARGUMENT REQUESTED |

16

17

18

19

20

21

22

23

24

25

26

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................. 1

II.   STATUTORY AND FACTUAL BACKGROUND ............................................... 2

      A.   COVID-19 ................................................................................................... 2

      B.   The Coronavirus Aid, Relief, and Economic Security Act ......................... 3

      C.   The Department's Guidance and Public Remarks ...................................... 4

      D.   The Department's Interim Final Rule ........................................................ 4

      E.   Injury to the State of Washington ............................................................... 5

III.  ARGUMENT ....................................................................................................... 7

      A.   Legal Standards .......................................................................................... 7

      B.   Washington Is Likely to Succeed on the Merits of Its Claims ................... 7

           1.   The Rule exceeds the Department's statutory authority ..................... 8

                a.   Congress did not delegate authority to the Department to reallocate
                     funds for equitable services ........................................................... 8

                     (1)   The plain language of section 18005 forecloses any
                           rulemaking authority ........................................................... 8

                     (2)   The Department has no implicit rulemaking authority ................... 9

                     (3)   The Department lacks authority to interpret section 18005
                           because it is an appropriations statute ............................................ 10

                b.   No deference is warranted under *Chevron* or *Skidmore* ........................... 11

                     (1)   No deference is warranted under *Chevron* ..................................... 11

                     (2)   Even if *Skidmore* deference applied, the Rule lacks any
                           persuasive value to have any application ...................................... 13

           2.   The Rule is arbitrary and capricious ............................................... 14

                a.   The Rule represents an unexplained inconsistency .................................. 15

                b.   The Rule fails to consider important aspects of the problem .................. 16

                c.   The Rule is so implausible it cannot be ascribed to a difference in
                     view or the product of agency expertise ................................................. 17

3.   The Rule violates Separation of Powers ........................................................ 17

4.   The Rule violates the Spending Clause .......................................................... 18

C.   Washington Will Suffer Irreparable Harm Absent Preliminary Relief .................. 19

1.   Curtailing Washington's proprietary interest in using funds for students most in need of essential services ..................................................... 20

2.   Interfering with Washington's sovereign interests and educational mission ...................................................................................... 20

3.   Harming Washington's Public Schools and Students ..................................... 21

4.   Increasing administrative burden on Washington's institutions ..................... 23

5.   Irreparable constitutional violations ............................................................. 23

D.   Equity and Public Interest Strongly Favor an Injunction ......................... 23

IV.   CONCLUSION ................................................................................................. 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

STATE OF WASHINGTON'S MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:20-cv-01119-MLP

ii

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1

## TABLE OF AUTHORITIES

2

### <u>Cases</u>

3

*Adams v. U.S. Forest Serv.*,
    671 F.3d 1138 (9th Cir. 2012) ........................................................................ 13

4

5

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
    458 U.S. 592 (1982) ...................................................................... 20, 22

6

*Arizona Dream Act Coal. v. Brewer*,
    757 F.3d 1053 (9th Cir. 2014) ........................................................ 20

7

8

*Ass'n of Civilian Technicians v. Fed. Labor Relations Auth.*,
    370 F.3d 1214 (D.C. Cir. 2004) ...................................................... 10

9

*Brown v. Kramer*,
    49 F. Supp. 359 (M.D. Pa. 1943) .................................................... 20

10

11

*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018) .................................................... 19, 20

12

*California v. Health & Human Servs.*,
    281 F. Supp. 3d 806 (N.D. Cal. 2017), *aff'd in pertinent part, remanded sub nom.*
    *Azar*, 911 F.3d 558 (9th Cir. 2018) ................................................ 22

13

14

*Charles v. Verhagen*,
    348 F.3d 601 (7th Cir. 2003) .......................................................... 19

15

16

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) ........................................................................ 11

17

*Chinook Indian Nation v. U.S. Dep't of Interior*,
    435 F. Supp. 3d 1130 (W.D. Wash. 2020) .................................. 13, 15

18

19

*City & Cty. of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) ...................................................... 17, 18

20

*City of Los Angeles v. Barr*,
    941 F.3d 931 (9th Cir. 2019) .......................................................... 10

21

22

*City of Philadelphia v. Attorney Gen. of U.S.*,
    916 F.3d 276 (3d Cir. 2019), *reh'g denied* (June 24, 2019) .............. 10

23

*Clinton v. City of New York*,
    524 U.S. 417 (1998) ........................................................................ 17

24

*Diaz v. Brewer*,
    656 F.3d 1008 (9th Cir. 2011) ........................................................ 24

25

26

STATE OF WASHINGTON'S MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:20-cv-01119-MLP

iii

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

*Disney Enters., Inc. v. VidAngel, Inc.*,
   869 F.3d 848 (9th Cir. 2017) ............................................................................... 7

*DLS Precision Fab LLC v. U.S. Immigration & Customs Enf't*,
   867 F.3d 1079 (9th Cir. 2017) ........................................................................... 10

*Drakes Bay Oyster Co. v. Jewell*,
   747 F.3d 1073 (9th Cir. 2014) ........................................................................... 23

*E. Bay Sanctuary Covenant v. Trump*,
   354 F. Supp. 3d 1094 (N.D. Cal. 2018), *aff'd*, 950 F.3d 1242 (9th Cir. 2020) ..... 21

*E. Bay Sanctuary Covenant v. Trump*,
   909 F.3d 1219 (9th Cir. 2018) ........................................................................... 21

*Elrod v. Burns*,
   427 U.S. 347 (1976) ........................................................................................... 23

*F.C.C. v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ........................................................................................... 15

*Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*,
   28 F.3d 1268 (D.C. Cir. 1994) ........................................................................... 21

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ........................................................................................... 11

*Gonzales v. Oregon*,
   546 U.S. 243 (2006) ...................................................................................... 8, 9, 11

*Hernandez v. Sessions*,
   872 F.3d 976 (9th Cir. 2017) ......................................................................... 7, 24

*Idaho v. Coeur d'Alene Tribe*,
   794 F.3d 1039 (9th Cir. 2015) ........................................................................... 20

*In re Aiken County*,
   725 F.3d 255 (D.C. Cir. 2013) ........................................................................... 18

*La. Pub. Serv. Comm'n v. F.C.C.*,
   476 U.S. 355 (1986) ............................................................................................. 8

*League of Women Voters of the U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) .......................................................................... 21, 24

*McCleary v. State of Wash.*,
   173 Wn.2d 477, 269 P.3d 227 (2012) ............................................................... 21

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012) ............................................................................. 23

STATE OF WASHINGTON'S MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:20-cv-01119-MLP

iv

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ............................................................................................................ 15

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
545 U.S. 967 (2005) .......................................................................................................... 15

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) .................................................................................................... 18, 19

*New York v. United States*,
505 U.S. 144 (1992) .......................................................................................................... 19

*Oakley v. DeVos*,
No. 20-CV-03215-YGR, 2020 WL 3268661 (N.D. Cal. June 17, 2020) ............................ 18

*Oregon v. Trump*,
406 F. Supp. 3d 940 (D. Or. 2019) .................................................................................... 17

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981) ........................................................................................................ 18, 19

*Pennsylvania v. Trump*,
351 F. Supp. 3d 791, 828 (E.D. Pa. 2019), *aff'd*, 930 F.3d 543 (3d Cir. 2019), *as amended* (July 18, 2019), *rev'd and remanded sub nom. Little Sisters of the Poor Saints Peter & Paul Home v. Pa.*, No. 19-431, 2020 WL 3808424 (U.S. July 8, 2020)....... 22

*Ramirez v. U.S. Immigration & Customs Enf't*,
310 F. Supp. 3d 7 (D.D.C. 2018) ...................................................................................... 24

*Russello v. United States*,
464 U.S. 16 (1983) .............................................................................................................. 9

*Sierra Club v. Trump*,
929 F.3d 670 (9th Cir. 2019) ............................................................................................ 11

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944) .......................................................................................................... 13

*South Dakota v. Dole*,
483 U.S. 203 (1987) .......................................................................................................... 18

*Stormans, Inc. v. Selecky*,
586 F.3d 1109 (9th Cir. 2009) .......................................................................................... 23

*Sutton v. United Air Lines, Inc.*,
527 U.S. 471 (1999) ............................................................................................................ 9

*Train v. City of New York*,
420 U.S. 35 (1975) ............................................................................................................ 18

STATE OF WASHINGTON'S MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:20-cv-01119-MLP

v

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

*Trump v. Int'l Refugee Assistance Project*,
   137 S. Ct. 2080 (2017)............................................................................................ 24

*U.S. Dep't of Navy v. Fed. Labor Relations Auth.*,
   665 F.3d 1339 (D.C. Cir. 2012) ............................................................................. 10

*Valle del Sol Inc. v. Whiting*,
   732 F.3d 1006 (9th Cir. 2013) ................................................................................ 21

*Washington v. DeVos*,
   No. 2:20-CV-0182-TOR, 2020 WL 3125916 (E.D. Wash. June 12, 2020) ............ 9

*Washington v. U.S. Dep't of State*,
   318 F. Supp. 3d 1247 (W.D. Wash. 2018) ............................................................. 16

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008).............................................................................................. 7, 24

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952)............................................................................................... 17

## Statutes

5 U.S.C. § 533 ................................................................................................................ 9

5 U.S.C. § 706(2)(A) ................................................................................................. 7, 15

5 U.S.C. § 706(2)(B) ...................................................................................................... 7

5 U.S.C. § 706(2)(C) ...................................................................................................... 7

20 U.S.C. 1221e-3 ...................................................................................................... 8, 9

20 U.S.C. 3474 ............................................................................................................... 8

RCW 28A.150.210 ....................................................................................................... 21

RCW 28A.150.295 ....................................................................................................... 21

## Other Authorities

.S. Department of Education, "Certification and Agreement for Funding under the
   Education Stabilization Fund Program,"
   https://oese.ed.gov/files/2020/04/ESSERF-Certification-and-Agreement-2.pdf (last
   visited July 9, 2020).............................................................................................. 6

*About the Agency*,
   Wash. Off. of Superintendent of Pub. Instruction,
   https://www.k12.wa.us/about-ospi/about-agency (last visited July 9, 2020)............ 5

Coronavirus Aid, Relief, and Economic Security Act
  Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020 ...................................................... passim

ESEA of 1965, § 1114 .............................................................................................. 9

ESEA of 1965, § 1117 ........................................................................................ passim

ESEA of 1965, § 1118 .............................................................................................. 4

ESEA of 1965, § 8501 .......................................................................................... 12, 14

HEA. CARES Act § 3513(f)........................................................................................ 9

https://www.privateschoolreview.com/washington/seattle (last accessed July 13, 2020)........... 6

*Improving Basic Programs Operated by Local Educational Agencies (Title I, Part A)*,
  https://www2.ed.gov/programs/titleiparta/index.html (last visited July 14, 2020) ................ 3

Johns Hopkins University & Medicine, COVID-19 Dashboard by the Center for
  Systems Science and Engineering at Johns Hopkins University (JHU),
  https://coronavirus.jhu.edu/map.html (last visited May 19, 2020)......................................... 2

*List of Title I, Part A Schoolwide and Targeted Assistance Schools 2019–20*,
  Wash. Off. of Superintendent of Pub. Instruction,
  https://www.k12.wa.us/sites/default/files/public/titlei/pubdocs/TitleISchoolList2019-
  20.xlsx (last visited July 9, 2020) .............................................................................. 5

OSPI Title School List 2019-20.
  https://www.k12.wa.us/sites/default/files/public/titlei/pubdocs/TitleISchoolList2019-
  20.xlsx.................................................................................................................. 7

*Report Card Enrollment 2019–20 School Year*,
  DATA.WA.GOV, https://data.wa.gov/Education/Report-Card-Enrollment-2019-20-
  School-Year/gtd3-scga (last visited July 9, 2020) ................................................... 5

United States Government Accountability Office, A Glossary of Terms Used in the
  Federal Budget Process,
  No. GAO-05-734SP at 13 (September 2005), available at
  https://www.gao.gov/new.items/d05734sp.pdf (last visited July 8, 2020).......................... 11

Wash. Off. of Superintendent of Pub. Instruction,
  *Report Card Enrollment 2019–20 School Year*, DATA.WA.GOV,
  https://data.wa.gov/Education/Report-Card-Enrollment-2019-20-School-Year/gtd3-
  scga (last visited July 9, 2020)................................................................................. 5

**Rules**

Rule 65(c) ....................................................................................................... 24

STATE OF WASHINGTON'S MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:20-cv-01119-MLP

vii

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1

**Regulations**

2

85 Fed. Reg. 39,479 ........................................................................................................... 4

3

85 Fed. Reg. 39,488 ........................................................................................................... 4

4

**Constitutional Provisions**

5

U.S. Const. art. I, § 8, cl. 1 .......................................................................................... 17, 18

6

Wash. Const. art. IX, § 1 .............................................................................................. 5, 21

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

STATE OF WASHINGTON'S MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:20-cv-01119-MLP

viii

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

# I.    INTRODUCTION

The Court should enter a preliminary injunction to prevent the United States Department of Education (Department) from unlawfully funneling emergency pandemic relief funds away from Washington's public education institutions and vulnerable students who need essential services that the funds would provide.

In late March, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), appropriating $16.5 billion for services to prevent and respond to the spread of COVID-19 in elementary and secondary schools. Congress mandated that state and local educational agencies distribute the funds "in the same manner as provided under section 1117 of the ESEA of 1965," which requires expenditures for services at private schools in proportion to the "number of children from low-income families who attend private schools."

Though the Department recognized in prior guidance that section 1117 governs funding based on student poverty data in private schools, the Department reversed course by reallocating services through an interim final rule (Rule) that requires state and local authorities to choose from two formulas that do not comport with the law. Under the Rule, state and local authorities can either base their expenditures on total enrollment in private schools or exclude from CARES Act funding all schools that do not participate in the Title I program. Either way, the Rule shifts emergency funding from public schools to private schools, depriving Washington's public education institutions and students of essential services that Congress intended to fund.

Washington is likely to succeed on the merits of its claims under the Administrative Procedure Act and the U.S. Constitution. First, the Department exceeded its authority by issuing the Rule. The CARES Act delegated no rulemaking authority to the Department, and the Department's Rule cannot be reconciled with the statutory text it purports to interpret. The CARES Act is clear—funds should be expended at private schools according to how many low-income students attend them—and the Department's contrary Rule warrants no deference. Second, the Rule is arbitrary and capricious because it is inconsistent with prior Department

STATE OF WASHINGTON'S MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:20-cv-01119-MLP

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

guidance and is based on an interpretation so ungrounded in the text and purpose of the CARES Act as to render it wholly implausible. Third, the Rule infringes on Congress's "power of the purse" by rewriting the appropriation established in the statute, so the Rule is unconstitutional and should be enjoined for that reason as well.

Washington will suffer irreparable harm. The Rule deprives Washington's Governor and Office of Superintendent of Public Instruction (OSPI) of control over the funds that Congress allocated to them. And without full and prompt availability of the emergency funds that Congress allocated to them, Washington's educational agencies will be unable to provide the services that public school students urgently need to relieve the pandemic's effects. For many students, these services—including personal protective equipment, cleaning, and remote learning technology— may mean the difference between continuing their education or not. By undermining support for public school students, the Rule undermines the Washington's quasi-sovereign interests and the mission of Washington's educational agencies.

## II.    STATUTORY AND FACTUAL BACKGROUND

### A.    COVID-19

On February 29, 2020, Washington State made its first announcement of a death from COVID-19 in the United States. On the same day, Washington Governor Jay Inslee declared a state of emergency in all counties in Washington. At the time, there were 66 confirmed cases of COVID-19 in the United States. Crisalli Decl. Ex. 1. As of this motion, the country has gone from 66 to 3.9 million reported cases and from 1 to more than 142,000 deaths.[1]

COVID-19 particularly affected elementary and secondary schools in Washington. On March 12, 2020, Governor Inslee announced closures of all public and private K-12 schools in three counties, and on April 6, he announced school closures statewide. Crisalli Decl. Ex. 2.

---

[1]Johns Hopkins University & Medicine, COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHU), https://coronavirus.jhu.edu/map.html (last visited July 22, 2020).

STATE OF WASHINGTON'S MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:20-cv-01119-MLP

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

**B.      The Coronavirus Aid, Relief, and Economic Security Act**

On March 27, 2020, Congress enacted the (CARES Act). Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020). The CARES Act appropriated $30.75 billion to the Department "to prevent, prepare for, and respond to coronavirus[.]." *Id.*, Preamble to § 18001.

Of the $30.75 billion, the CARES Act creates two separate funds for elementary and secondary education. First, the CARES Act appropriates about $3 billion for the Governor's Emergency Education Relief (GEER) Fund, which can be used to provide emergency support to local educational agencies (LEAs) significantly impacted by COVID-19, among other things. *Id.*, § 18002(c). Second, the CARES Act appropriates about $13.5 billion to the Elementary and Secondary School Emergency Relief (ESSER) Fund, which provides funds to state educational agencies to provide subgrants to LEAs to be used for responding to, preventing the spread of, and teaching during the COVID-19 pandemic. *Id.*, § 18003. Both funds may be distributed to LEAs regardless whether they receive Title I-A funds. *Id.* [2]

In section 18005(a), Congress made clear that LEAs shall provide services in the same manner as provided under section 1117 of the ESEA to students and teachers in private schools: "A [LEA] receiving [GEER or ESSER] funds . . . shall provide equitable services in the same manner as provided under section 1117 of the ESEA of 1965 to students and teachers in non-public schools, as determined in consultation with representatives of non-public schools."

Section 1117 addresses concerns about private-school students from low-income families not having access to similar services to meet similar needs. ESEA, § 1117(a)(2). It provides services for those students on an equitable basis as for public schools participating in Title I-A: "[e]xpenditures for educational services and other benefits to eligible private school children shall be equal to the proportion of funds allocated to participating school attendance

---

[2]Title I, part A of the ESEA provides financial assistance to local education agencies and schools with high numbers or high percentages of children from low-income families to ensure that all children meet challenging state academic standards. *Improving Basic Programs Operated by Local Educational Agencies (Title I, Part A)*, https://www2.ed.gov/programs/titleiparta/index.html (last visited July 22, 2020). Federal funds are allocated though statutory formulas based on census poverty estimates and cost of education in each state. *Id.*

STATE OF WASHINGTON'S MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:20-cv-01119-MLP                    3                    ATTORNEY GENERAL OF WASHINGTON
                                                              Complex Litigation Division
                                                              800 Fifth Avenue, Suite 2000
                                                              Seattle, WA  98104-3188
                                                              (206) 464-7744

1   areas based on the number of children from low-income families who attend private schools."

2   *Id.*, §§ 1117(a)(3)(A), (a)(4)(i). Under Section 1117, expenditures for services for private-school

3   students are based on the proportion of low-income students attending private schools.

4   **C.      The Department's Guidance and Public Remarks**

5          For over a month after the CARES Act passage, the Department stayed silent, and school

6   superintendents and state educational agencies followed the plain language of the CARES Act,

7   understanding that funds would be allocated to services for private school students following the

8   formula set forth in section 1117. Berge Decl. ¶¶ 6-7 ; Kelly Decl. ¶¶ 12, 15 ; Posthumus Decl.

9   ¶¶ 5-6  But on April 30, the Department issued guidance stating that LEAs should distribute

10  funds for services for private school students based on the total number of enrolled students in

11  public and private schools, regardless of their income levels. Dkt. # 1-4.

12         Members of Congress from both parties expressed concerns about such a reading of the

13  CARES Act, and department heads for elementary and secondary education in several states

14  asked the Department to allow them to focus the funds where needed most. Dkts. # 1-5–1.7.

15  Instead, the Department Secretary doubled down that she would use this "particular crisis" to

16  benefit private schools. Dkt. #1-8. She responded to the educators that if they insist on acting

17  contrary to the Department's non-binding position, they should put funds in escrow—directing

18  LEAs to delay providing services with the emergency funds during the crisis. *Id.*

19  **D.      The Department's Interim Final Rule**

20         The Department released the Rule on June 25, and it was published on July 1. 85 Fed.

21  Reg. 39,479. Rather than follow the CARES Act or the previous guidance, the Rule creates out

22  of whole cloth a choice for LEAs. First, if an LEA uses *all* its funds to serve *only* Title I-A

23  schools, it can follow the section 1117 formula that looks only to the proportion of students from

24  low-income students attending private school ("the poverty-based formula"). *Id.* at 39,488. In

25  that case, the Rule also subjects LEAs to the "supplement not supplant" requirement found in

26  section 1118(b)(2) of the ESEA, which prohibits LEAs from using grant funds to cover certain

expenditures that would normally be covered by state and local funds. *Id.* Otherwise, the LEA must calculate the proportional share based on total enrollment participating in private schools compared to the total enrollment in both public and participating private schools ("the enrollment-based formula"). *Id.* LEAs must consult with private schools and make this choice before expending funds, a process that can take months. *Id.*

**E.     Injury to the State of Washington**

Washington's constitution mandates that the State's "paramount duty" is to "make ample provision for the education of all children residing within its borders, without distinction or preference on account of race, color, caste, or sex." Wash. Const. art. IX, § 1. As such, Washington serves over 1,147,000 students across 2,369 primary and secondary public schools.[3] The State's public education system comprises 295 public school districts, 14 authorized charter schools, and six state-tribal education compact schools.[4] Of the 2,369 primary and secondary public schools, 1,594 are eligible to participate in Title I, and 1,002 participate in Title I.[5]

In the 2019–20 academic year, public schools served 520,475 students from low-income families.[6] For example, as many as 45% of Washington students qualify for free or reduced-price meals. Crisalli Decl. Ex. 3. Some school districts have expanded these services during school closures by delivering breakfast and lunch to families' places of residence using vans and school buses.[7]

During the 2018–19 academic year, the most recent available data indicated that 84,058

---

[3]*Report Card Enrollment 2019–20 School Year*, DATA.WA.GOV, https://data.wa.gov/Education/Report-Card-Enrollment-2019-20-School-Year/gtd3-scga (last visited July 22, 2020).
[4]*About the Agency*, WASH. OFF. OF SUPERINTENDENT OF PUB. INSTRUCTION, https://www.k12.wa.us/about-ospi/about-agency (last visited July 22, 2020).
[5]*See List of Title I, Part A Schoolwide and Targeted Assistance Schools 2019–20*, Wash. Off. of Superintendent of Pub. Instruction, https://www.k12.wa.us/sites/default/files/public/titlei/pubdocs/TitleISchoolList2019-20.xlsx (last visited July 22, 2020).
[6]Wash. Off. of Superintendent of Pub. Instruction, *Report Card Enrollment 2019–20 School Year*, DATA.WA.GOV, https://data.wa.gov/Education/Report-Card-Enrollment-2019-20-School-Year/gtd3-scga (last visited July 9, 2020).
[7]*Id.*

STATE OF WASHINGTON'S MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:20-cv-01119-MLP

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

K-12 students attended private schools. During the 2019–20 academic year, there were 504 private schools accredited by the Washington State Board of Education. In some school districts, over 20% of enrolled K-12 students attend private schools. Crisalli Decl. Ex. 4. Of the 50 largest cities in America, Seattle ranks third in percentage of K-12 private school attendance. *Id.* The national average is 10 percent. *Id.* The average private school tuition for elementary schools in Seattle is $15,927, and $19,372 for high schools.[8]

Washington's schools have been closed since April 6 or earlier. Crisalli Decl. Ex. 2. School administrators are working this summer on plans and changes to prepare for a safe potential reopening in the fall. Berge Decl. ¶ 19; Kelly Decl. ¶ 34; Posthumus Decl. ¶ 18. The pandemic's disruption has left many of the State's most vulnerable students without access to services provided by public educational institutions, including educational technology, internet access, supplemental after-school programs, food services, and mental health services. Berge Decl. ¶ 19; Kelly Decl. ¶ 15; Posthumus Decl. ¶ 18. Each of those resources are eligible for relief funding under the CARES Act. CARES Act, §§ 18002, 18003.

Washington applied for CARES Act funds on April 27, 2020, and on April 29, Washington received approximately $216.9 million in federal aid through the ESSER Fund. Kelly Decl. ¶¶ 18–19. An additional $56.8 million was awarded to Washington through the GEER Fund. Of the $216.9 million, 90% will be subgranted to LEAs, and OSPI will control the remaining 10%. In receiving the funds, OSPI was required to submit a Certification and Agreement stating that it would comply with all applicable Federal laws, executive orders and regulations and any failure may result in liability. Dkt. #1-9.[9] OSPI is responsible for supervising and reporting on the use of the CARES Act funds by the LEAs. Kelly Decl. ¶ 18.

In essence, the enrollment-based formula shifts funds from needy public-school students

---

[8] https://www.privateschoolreview.com/washington/seattle (last accessed July 22, 2020).
[9] *See also* U.S. Department of Education, "Certification and Agreement for Funding under the Education Stabilization Fund Program," https://oese.ed.gov/files/2020/04/ESSERF-Certification-and-Agreement-2.pdf (last visited July 22, 2020).

STATE OF WASHINGTON'S MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:20-cv-01119-MLP

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

towards less needy private school students. By using that formula, more funds will be shifted to private schools than under the usual section 1117 formula—in some cases up to seven times more. Kelly Decl. ¶¶ 26, 35 ; Berge Decl. ¶¶ 11, 13, 14. Likewise, the alternative poverty-based formula ultimately harms poorer students in non-Title I schools. Almost two-thirds of Washington schools do not participate in Title I, yet there are many students in those schools who are in low-income families and who will not be receiving the services allowed under the CARES Act. *See* OSPI Title School List 2019-20. https://www.k12.wa.us/sites/default/files/public/titlei/pubdocs/TitleISchoolList2019-20.xlsx.

### III.    ARGUMENT

#### A.    Legal Standards

"A party can obtain a preliminary injunction by showing that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in [its] favor, and (4) an injunction is in the public interest." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (internal quotation marks and citations omitted); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Under the Ninth Circuit's "sliding scale" approach, these elements, known as *Winter* factors, are "balanced, so that a stronger showing of one element may offset a weaker showing of another." *Hernandez v. Sessions*, 872 F.3d 976, 990 (9th Cir. 2017) (citation omitted).

#### B.    Washington Is Likely to Succeed on the Merits of Its Claims

The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be" (1) in excess of statutory authority, (2) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or (3) "contrary to constitutional right, power, privilege, or immunity[.]" 5 U.S.C. §§ 706(2)(A), (B), (C). Here, the Rule exceeds the Department's delegated authority, is arbitrary and capricious, violates the Constitution, and should, therefore, be set aside.

STATE OF WASHINGTON'S MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:20-cv-01119-MLP

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1          **1.     The Rule exceeds the Department's statutory authority**

2          An agency "literally has no power to act . . . unless and until Congress confers power

3    upon it." *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986). Congress conferred no

4    power upon the Department to reallocate funds that Congress appropriated for equitable services

5    for vulnerable students, and the Rule thus exceeds the Department's authority.

6          **a.     Congress did not delegate authority to the Department to reallocate
               funds for equitable services**

7

8          **(1)     The plain language of section 18005 forecloses any rulemaking
               authority**

9          The Rule improperly rewrites the CARES Act to do away with the clear reference to the

10   poverty-based determination of equitable services funding provided by section 1117 of the

11   ESEA. Section 18005 of the CARES Act allows no room for the Department's reallocation of

12   emergency funding.

13         "The starting point for this inquiry is, of course, the language" of the statutory provision

14   at issue. *Gonzales v. Oregon*, 546 U.S. 243, 258 (2006). The language of section 18005 lacks

15   *any* delegation of rulemaking authority to the Secretary. As in *Gonzalez*, the CARES Act "does

16   not grant" the Department "broad authority to promulgate rules." *Id*. at 259. Nor can

17   "the . . . limited powers [granted to the Department], to be exercised in specific ways," support

18   the Department's rulemaking on this point. *Id*.

19         The CARES Act gives the Department specific direction for the allocation of GEER and

20   ESSER Funds: "in the same manner as provided under section 1117 of the [ESEA]." There is

21   nothing ambiguous about this direction and it cannot endow the Department with any rulemaking

22   power. Section 1117 establishes a well-known and oft-applied formula for distributing funds

23   based on student poverty levels. It is beyond the Department's authority to issue a rule

24   reallocating CARES Act funds in a *different* manner than provided under section 1117.

25         The Department cites 20 U.S.C. 1221e-3 and 20 U.S.C. 3474—the general grants of

26   rulemaking authority to the Secretary—as authority for the Rule, but neither statute authorizes

1    the Department's rulemaking. Indeed, courts have rejected the Department's invocation of these

2    statutes when the Department sought to "impose special conditions on grants absent express

3    authority to do so." *See, e.g.*, *Washington v. DeVos*, No. 2:20-CV-0182-TOR, 2020 WL

4    3125916, at *9 (E.D. Wash. June 12, 2020) (rejecting Department's reliance on general authority

5    under 20 U.S.C. 1221e-3 in CARES Act case).

6        The absence of rulemaking authority in section 18005 stands in sharp contrast to other

7    sections of the CARES Act that delegate rulemaking authority to agencies. For example, an

8    earlier section addressing student loan relief delegates authority for the Secretary to "waive the

9    application of . . . negotiated rulemaking" under the HEA. CARES Act § 3513(f). Another

10   section authorizes the Director of the Bureau of Prisons to engage in rulemaking to provide

11   prisoners with video visitation and exempts the Director from the notice and comment period of

12   5 U.S.C. § 533. *Id*. § 12003(c). Yet another section delegates to the Small Business

13   Administration an "emergency rulemaking authority." *Id*. § 1114. Section 18005, on the other

14   hand, makes no reference to rulemaking whatsoever. "[W]here Congress includes particular

15   language in one section of a statute but omits it in another section of the same Act, it is generally

16   presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."

17   *Russello v. United States*, 464 U.S. 16, 23 (1983). Congress's intention not to delegate

18   rulemaking authority in section 18005 is clear.

19       **(2)    The Department has no implicit rulemaking authority**

20       Courts have rejected assertions that agencies have implicit interpretive authority over one

21   area due to authority granted in another. In *Gonzales*, 546 U.S. 243, the Court held the Attorney

22   General lacked authority to interpret the meaning of the law even though he was delegated the

23   authority to ensure compliance with the law. *Id*. at 263–64. In *Sutton v. United Air Lines, Inc.*,

24   527 U.S. 471 (1999), the Court rejected the claim that EEOC or any other agency had authority

25   to define "disability" under the ADA when the delegating provision instructing the EEOC to

26   "issue regulations . . . to carry out this subchapter" was in a separate subchapter from the

STATE OF WASHINGTON'S MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:20-cv-01119-MLP                                    9                ATTORNEY GENERAL OF WASHINGTON
                                                                          Complex Litigation Division
                                                                          800 Fifth Avenue, Suite 2000
                                                                          Seattle, WA  98104-3188
                                                                          (206) 464-7744

definition. *Id.* at 478. Likewise here, the Department has no implicit authority to redefine the phrase "in the same manner as provided under section 1117" to reallocate funding for services.

The Ninth Circuit recently rejected an agency's unauthorized imposition of conditions on grants. In *City of Los Angeles v. Barr*, 941 F.3d 931 (9th Cir. 2019), an official imposed conditions on formula grants for JAG. Though Congress delegated general authority to the official to "plac[e] special conditions on all grants, and determin[e] priority purposes for formula grants," this did not grant "broad authority to impose any condition it chooses" on the award in question. *Id.* at 939, 942 (citing *City of Philadelphia v. Attorney Gen. of U.S.*, 916 F.3d 276, 288 (3d Cir. 2019), *reh'g denied* (June 24, 2019)). Instead, the Court held that "[s]uch a broad interpretation would be antithetical to the concept of a formula grant[.]" *Barr*, 941 F.3d at 942.

Here, Congress gave no authorization to the Department to impose conditions on or reallocate grants of CARES Act funds. Section 18005 directs the Secretary to make the funds available "in the same manner as provided under section 1117." It simply does not delegate rulemaking authority to the Department to rewrite or reinterpret the CARES Act to make the funds available in a manner different than provided under section 1117.

### (3)   The Department lacks authority to interpret section 18005 because it is an appropriations statute

The Department's interpretation is also unsupportable because agencies generally lack authority to interpret appropriations statutes and courts owe no deference to their interpretations. *See U.S. Dep't of Navy v. Fed. Labor Relations Auth.*, 665 F.3d 1339, 1348 (D.C. Cir. 2012); *Ass'n of Civilian Technicians v. Fed. Labor Relations Auth.*, 370 F.3d 1214, 1221 (D.C. Cir. 2004). The Department's interpretation of the CARES Act warrants no deference as a statute generally applicable to all federal agencies. *DLS Precision Fab LLC v. U.S. Immigration & Customs Enf't*, 867 F.3d 1079, 1087 (9th Cir. 2017).

An appropriations law is a "statute, under the jurisdiction of the House and Senate Committees on Appropriations, that generally provides legal authority for federal agencies to

STATE OF WASHINGTON'S MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:20-cv-01119-MLP

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

incur obligations and to make payments out of the Treasury for specified purposes."[10]

The statutory sections creating and implementing the ESSER are appropriations provisions. The preamble to section 18001 makes an appropriation of $30.75 billion to the Department, and sections 18001 through 18007 prescribe the specific purposes for which the funds may be spent. Sections 18002, 18003, and 18005 define the scope of the ESSER spending program. The Department lacks authority to reinterpret those sections, and its interpretation is not entitled to deference.

### b. No deference is warranted under *Chevron* or *Skidmore*

Congress's direction that LEAs should provide services "in the same manner as provided under section 1117 of the ESEA" is clear and unambiguous, so the Department's contrary Rule warrants no deference under *Chevron* and holds no persuasive power under *Skidmore*.

### (1) No deference is warranted under *Chevron*

First, since Congress did not delegate authority to the Department to interpret sections 18001 to 18007 of the CARES Act, *Chevron* deference is inapplicable. *See Gonzales*, 546 U.S. at 258; *Sierra Club v. Trump*, 929 F.3d 670, 692 (9th Cir. 2019). Even if Congress had delegated such authority, however, the Rule fails under *Chevron* because Congress's intent was clear in directing that LEAs provide equitable services "in the same manner as provided under section 1117." Under *Chevron*, a court uses the "traditional tools of statutory construction" to determine whether "the intent of Congress is clear[.]" *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 & n.9 (1984). The "traditional tools" include the statute's text, history, structure, and "context"—including its place among other statutes—as well as "common sense." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-3 (2000). If Congress's intent is clear, "that is the end of the matter[.]" *Chevron*, 467 U.S. at 842–43. Only if the statute "is

---

[10]United States Government Accountability Office, A Glossary of Terms Used in the Federal Budget Process, No. GAO-05-734SP at 13 (September 2005), available at https://www.gao.gov/new.items/d05734sp.pdf (last visited July 22, 2020); *see Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 549 (2001) (an appropriations act "defines the scope of a federal spending program").

STATE OF WASHINGTON'S MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:20-cv-01119-MLP

11

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1   silent or ambiguous with respect to the specific issue" will a court determine "whether the

2   agency's answer is based on a permissible construction of the statute." *Id.*

3        Here, the text and context of the CARES Act leave no ambiguity as to how Congress

4   intended funds should be distributed for equitable services: "in the same manner as provided

5   under section 1117 of the ESEA." Section 1117 contains a simple formula consistently employed

6   by LEAs for decades: expenditures "shall be equal to the proportion of funds allocated to

7   participating school attendance areas based on the number of children from low-income families

8   who attend private schools." Congress's intent is therefore clear that LEAs should use ESSER

9   funds to provide equitable services based on the number of low-income students attending

10   private schools in their area. Neither the CARES Act nor section 1117 of the ESEA imposes or

11   authorizes the conditions in the Department's Rule—no restriction on the schools to which LEAs

12   may provide services, no total-enrollment formula for determining expenditures, and no

13   "supplement not supplant" requirement for the use of funds.

14        Had Congress intended to impose or authorize the Department to implement a total-

15   enrollment formula for the allocation of CARES Act funds, Congress would have referred not

16   to section 1117 but to section 8501 of the ESEA. Section 8501 directs LEAs to provide equitable

17   services to *all* eligible private-school students, with expenditures not limited by the number of

18   low-income private-school students. The availability of section 8501 makes Congress's choice

19   to refer to section 1117 all the clearer: ESSER funds should be distributed according to section

20   1117's poverty-based formula, and the Department has no room to regulate otherwise.

21        Likewise, the CARES Act contains "supplement not supplant" requirements in other

22   parts but not in sections 18001 through 18007. *See* CARES Act §§ 3404(a)(3) (Nursing

23   Workforce Development); Pub. L. No. 116–136, 134 Stat. 281, at 736 ("Payments to States for

24   the Child Care and Development Block Grant"); *id.*, at 738–40 ("Children and Families Services

25   Programs"). The omission of a "supplement not supplant" requirement in sections 18001 through

26

STATE OF WASHINGTON'S MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:20-cv-01119-MLP

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1  18007 clearly reflects Congress's intent to not impose such a requirement on ESSER funds, and

2  the Department has no room to regulate otherwise.

3      Finally, common sense confirms Congress's straightforward intent in referring to the

4  poverty-based formula in section 1117 of the ESEA. Congress did not intend—during a

5  pandemic when the time and resources of Washington's educational institutions are limited—to

6  force LEAs to evaluate and choose between two unfamiliar formulas not contained in section

7  1117. Congress did not intend to retroactively impose a prior consultation requirement when

8  LEAs were authorized to spend funds in March for later reimbursement from ESSER funds. Nor

9  did Congress intend for LEAs to take up the burdensome administrative task of making sure that

10 no expenditures of CARES Act funds supplant expenditures of funds the State would otherwise

11 provide. None of these requirements is in the statute, and common sense confirms it was not

12 Congress's intent to silently impose them in the midst of a global pandemic.

13
14
       **(2)    Even if *Skidmore* deference applied, the Rule lacks any
               persuasive value to have any application**

15     The clarity of the CARES Act not only dooms the contrary Rule under *Chevron* but also

16 renders it without persuasive power under *Skidmore*. Though courts owe no deference to agency

17 interpretations that are "not controlling . . . by reason of their authority," courts may still uphold

18 agency interpretations—but only to the extent they have "power to persuade." *Skidmore v. Swift*

19 *& Co.*, 323 U.S. 134, 140 (1944). Under the *Skidmore* framework, which is less deferential than

20 the *Chevron* framework, *see Adams v. U.S. Forest Serv.*, 671 F.3d 1138, 1142 (9th Cir. 2012), a

21 court considers "the degree of the agency's care, its consistency, formality, and relative

22 expertness," *Chinook Indian Nation v. U.S. Dep't of Interior*, 435 F. Supp. 3d 1130, 1139 (W.D.

23 Wash. 2020). Here, the Rule fails the *Skidmore* standard as well, because it is a wholly

24 unpersuasive interpretation of the CARES Act.

25     The Rule is not rooted in the text of the CARES Act and thus lacks any persuasive power

26

STATE OF WASHINGTON'S MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:20-cv-01119-MLP

13

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

as an interpretation. Neither of the formulas in the Rule can be found in the CARES Act; the formula the CARES Act refers to in section 1117 of the ESEA is based on student poverty levels, not enrollment, and the CARES Act provides no basis for prohibiting LEAs from using funds at schools that do not receive funds under Title I. Congress could have instead referred to the enrollment-based formula in section 8501 of the ESEA, but it did not. The Department failed to explain why "in the same manner as provided under section 1117" could mean a manner *different* than the one provided under section 1117.

The Department's current position is inexplicably inconsistent with its prior position. In guidance dated October 7, 2019, the Department affirmed the clear meaning of section 1117 of the ESEA: "To calculate the proportional share for equitable services, the LEA would determine the overall number of children from low-income families who reside in participating Title I public school attendance areas and who attend public schools and private schools." Crisalli Decl. Ex. 5 at 15. But once Congress made ESSER funds available, the Department reversed its position, proclaiming that section 1117 *does not require* a count of the number of children from low-income families. *Id.*

Moreover, the Rule is unpersuasive because it is unreasonable. It is unreasonable to expect LEAs to choose and apply an unfamiliar formula on such a short timeframe, and to retroactively impose the consultation requirement as a prerequisite to decision-making when many LEAs have already expended funds for which they expect to be reimbursed. In light of the emergency the ESSER funds are intended to address, it is unreasonable to believe that Congress intended to force LEAs between (1) diluting the funds available for all public schools under the enrollment-based formula or (2) excluding non-Title I public schools under the poverty-based formula. The Department's Rule therefore cannot stand under *Skidmore*.

### 2. The Rule is arbitrary and capricious

The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in

STATE OF WASHINGTON'S MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:20-cv-01119-MLP

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1  accordance with law[.]" 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious if the

2  agency "entirely failed to consider an important aspect of a problem, offered an explanation for

3  its decision that runs counter to the evidence before the agency, or [made a decision that] is so

4  implausible that it could not be ascribed to a difference in view or the product of agency

5  expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463

6  U.S. 29, 43 (1983). "Unexplained inconsistency" between agency actions is also "a reason for

7  holding an interpretation to be an arbitrary and capricious change . . . ." *Nat'l Cable &*

8  *Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005).

9      **a.**  **The Rule represents an unexplained inconsistency**

10    A change in policy is permissible under the APA only if the agency (1) displays

11  "awareness that it *is* changing position," (2) shows that "the new policy is permissible under the

12  statute," (3) "believes" the new policy is better, and (4) provides "good reasons" for the new

13  policy. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009). The Department

14  failed to meet these standards and cannot explain the Rule's inconsistency with prior Department

15  guidance.

16    As explained above, the Rule is flatly inconsistent with its prior guidance of October 7,

17  2019 and thus fails the *Fox* factors. First, the Department showed no awareness of the change in

18  position, as there is no mention of the October 2019 guidance in the Rule or the April 2020

19  guidance. Second, the Department fails to show that the Rule is permissible under the CARES

20  Act; its reasoning accompanying the Rule claims ambiguity where there is none—in the phrase

21  "in the same manner as provided under section 1117"—and invents two formulas out of whole

22  cloth, neither one rooted in the statutory text. Third, because the Department failed to mention

23  its old policy, the Department has not manifested any belief that its new policy is better than the

24  old and has not provided good reasons for its new policy.

25    The Department's about-face is therefore arbitrary and capricious. *See Chinook Indian*

26  *Nation*, 435 F. Supp. 3d 1130; *Washington v. U.S. Dep't of State*, 318 F. Supp. 3d 1247, 1260

STATE OF WASHINGTON'S MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:20-cv-01119-MLP

15

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

(W.D. Wash. 2018).

**b.    The Rule fails to consider important aspects of the problem**

The Rule fails to consider an important aspect of the problem, that is: Washington's public schools have unmet needs for emergency funding due to the exigencies of the pandemic. Berge Decl ¶ 14, 15.; Kelly Decl. ¶ 28.b.; Posthumus Decl. ¶ 13.b. Any dilution, delay, or denial of these funds for public schools will have a significant impact on the vulnerable public school students that Congress intended to help. Berge Decl. ¶ 19; Kelly Decl. ¶ 15; Posthumus Decl. ¶ 18. Unlike Washington's public schools, many private schools have access to and have received funds under the CARES Act's separate Paycheck Protection Program. U.S. Department of The Treasury Paycheck Protection Program, https://home.treasury.gov/policy-issues/cares-act/assistance-for-small-businesses/sba-paycheck-protection-program-loan-level-data    (last visited July 23, 2020)The Rule's enrollment-based formula shifts funds away from needier public schools to less needy private schools, while its poverty-based formula shifts funds away from non-Title I public schools—which may be under equally distressing budgetary emergencies—to private schools.   Kelly Decl. ¶ 28a. The Rule ignores this problem and exacerbates it by reallocating funds to private schools. And particularly in these urgent circumstances, it is unreasonable for the Secretary to demand that objecting LEAs, under threat of litigation and enforcement action, should delay their funding and put disputed funds into escrow. Dkt. #1-8 at p.1.

The Rule fails to consider another important problematic aspect: though eligible schools have been permitted since March 2020 to spend funds for later reimbursement from ESSER, the Rule retroactively requires that LEAs consult with private schools *before* spending any funds. This requirement is impossible for many LEAs, and the Department expressed no awareness of the problem.

Finally, the Rule fails to consider the administrative burdens it imposes, particularly for the supplement-not-supplant requirement. The ESSER funds are for emergency relief, and the

STATE OF WASHINGTON'S MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:20-cv-01119-MLP

16

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Rule forces schools to shift vital resources to ensure that emergency funds for PPE and other urgent needs do not displace state funds for purposes of the supplement-not-supplant requirement. Berge Decl. ¶ 19; Kelly Decl. ¶ 37; Posthumus Decl. ¶ 18.

**c.**      **The Rule is so implausible it cannot be ascribed to a difference in view or the product of agency expertise**

The Department's decision to reallocate funds to private schools is implausible in light of the text and purpose of the CARES Act, as explained above. The CARES Act's reference to section 1117 of the ESEA is perfectly clear—ESSER funds should be distributed according to the well-known poverty-based formula that LEAs have used for decades. The Rule reinterprets the reference to section 1117 to (1) impose an enrollment-based formula, or (2) exclude schools that have not received Title I funds. This rewriting of the CARES Act is not grounded in any agency expertise or difference in view and is thus patently implausible.

**3.**      **The Rule violates Separation of Powers**

The Rule also violates constitutional separation-of-powers principles by improperly restricting or shifting expenditures of money appropriated by Congress. The Constitution gives Congress, not the Executive branch, the power to spend and to set conditions on funds. U.S. Const. art. I, § 8, cl. 1; s*ee Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952) ("The President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself."). The Executive Branch "does not have unilateral authority" to "thwart congressional will by canceling appropriations passed by Congress." *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018) (internal quotation marks and citations omitted); *see also Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("[N]o provision in the Constitution . . . authorizes the President to enact, to amend, or to repeal statutes."). The Executive Branch is without inherent power to "condition the payment of . . . federal funds on adherence to its political priorities." *Oregon v. Trump*, 406 F. Supp. 3d 940, 976 (D. Or. 2019). Absent a specific Congressional authorization, the Department "may not redistribute or withhold

STATE OF WASHINGTON'S MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:20-cv-01119-MLP

17

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1   properly appropriated funds in order to effectuate its own policy goals." *City & Cty. of San*

2   *Francisco*, 897 F.3d at 1235. The Department cannot amend or cancel duly enacted

3   Congressional appropriations by imposing, without congressional authority, its own restrictions

4   on such funds. *See Train v. City of New York*, 420 U.S. 35, 38, 44 (1975); *In re Aiken County*,

5   725 F.3d 255, 261 n.1 (D.C. Cir. 2013).

6         The Rule creates unauthorized restrictions on Congressional appropriations, where

7   Congress gave no discretion to the Department to impose such restrictions. Instead, as the

8   Department previously recognized in its October 7, 2019 guidance, the section 1117 formula

9   calls for funds to be distributing according to the number of private-school students from low-

10  income families. Crisalli Decl., Ex. 5 at pp. 14–15, 19–20. Nowhere does the CARES Act give

11  the Department discretion to conjure alternative formulas for ESSER funds not found in section

12  1117 of the ESEA. The Department took the legislative pen into its own hands and usurped

13  Congress' power in violation of constitutional principles of separation of powers. *See Oakley v.*

14  *DeVos*, No. 20-CV-03215-YGR, 2020 WL 3268661, at *7–12 (N.D. Cal. June 17, 2020) (finding

15  likely violations of separation of powers principles and Spending Clause).

16      **4.**      **The Rule violates the Spending Clause**

17        The Spending Clause, U.S. Const. art. I, § 8, cl. 1, mandates that an agency must not

18  impose conditions on federal funding that are (1) so coercive that they compel (rather than

19  encourage) recipients to comply, (2) ambiguous, (3) retroactive, or (4) unrelated to the federal

20  interest in a particular program. *Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519,

21  575–78 (2012); *South Dakota v. Dole*, 483 U.S. 203, 206-08 (1987).

22        First, the Department's Rule violates the prohibition on ambiguity. "If Congress intends

23  to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst*

24  *State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The CARES Act clearly imposes none

25  of the conditions that either of the Rule's formulas impose. And even if there were ambiguity in

26  the CARES Act, the Spending Clause prohibits the Department's attempt to impose new

STATE OF WASHINGTON'S MOTION FOR      18      ATTORNEY GENERAL OF WASHINGTON
PRELIMINARY INJUNCTION      Complex Litigation Division
NO. 2:20-cv-01119-MLP      800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1   conditions on Congress's granted funds.

2          Second, the Spending Clause does not permit what the Department is attempting to do

3   here: "surprising participating States with post acceptance or 'retroactive' conditions" on

4   congressionally appropriated funds. *Pennhurst*, 451 U.S. at 25; *see also NFIB*, 567 U.S. at 519

5   (holding Congress cannot retroactively alter conditions of Medicaid grants to states). Once a

6   state or state entity has accepted funds pursuant to a federal spending program, the federal

7   government cannot alter the conditions attached to those funds so significantly as to

8   "accomplish[] a shift in kind, not merely degree." *NFIB*, 567 U.S. at 583. Nonetheless, the

9   Department improperly surprised Washington's educational institutions with post-acceptance

10  conditions on funds by imposing the Rule (on June 25, 2020) *after* OSPI executed the

11  Certification and Agreement (on April 27). Kelly Decl. ¶ ¶ 18-19, 35; *see Pennhurst*, 451 U.S.

12  at 25. The Department retroactively imposes two formulas that are not grounded in the text of

13  the CARES Act and also retroactively requires LEAs to consult with private schools before

14  making decisions on ESSER expenditures.

15         Finally, the Rule violates Spending Clause's requirement that conditions be "reasonably

16  related to the purpose of the expenditure[.]" *New York v. United States*, 505 U.S. 144, 172 (1992).

17  The condition placed on a spending program must "share[] the same goal" as the program.

18  *Charles v. Verhagen*, 348 F.3d 601, 609 (7th Cir. 2003). The purpose of ESSER funds under the

19  CARES Act is to "support and prevent, prepare for, and respond to coronavirus." CARES Act §

20  18001. The Department's Rule is not related to that purpose but runs contrary to it by (1) shifting

21  funds from needier public schools (whose lower-income students have been impacted more

22  severely by coronavirus) to more wealthy private schools or (2) cutting out a large set of public

23  schools all together.

24  **C.     Washington Will Suffer Irreparable Harm Absent Preliminary Relief**

25         The harm analysis "focuses on irreparability, irrespective of the magnitude of the injury."

26  *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (internal quotation marks omitted).

STATE OF WASHINGTON'S MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:20-cv-01119-MLP

19

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Irreparable harm is harm "for which there is no adequate legal remedy, such as an award of damages." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). As explained by OSPI and several school districts, the Rule is likely to cause irreparable harm to Washington, its educational institutions and their mission, and Washington's public-school students. Washington's showing of irreparable injury could not be clearer. *See Brown v. Kramer*, 49 F. Supp. 359, 363 (M.D. Pa. 1943) (taking judicial notice of state of national emergency that "render[s] irreparable the injury occasioned by violations of the Acts of Congress").[11]

### 1. Curtailing Washington's proprietary interest in using funds for students most in need of essential services

The Rule directly curtails the control Congress gave Washington's Governor, OSPI, and LEAs over emergency funds to provide essential services to the neediest students. Washington itself has a proprietary interest in those funds, as the Governor and OSPI are directly tasked with administering a portion of them. OSPI is also tasked with supervising LEAs' use of the funds. If not for the Rule, Washington would distribute the funds as both they and Congress intended— according to section 1117 of the ESEA, which measures funds to be shared with private schools based on the number of students from low-income families at those schools. Kelly Decl. ¶ 14. The injury to Washington's proprietary interests in those funds is irreparable, because there is no statutory provision that would enable Washington to recoup these funds if disbursed according to Rule. *See Azar*, 911 F.3d 558, 581 (states' uncompensable financial harm is irreparable); *Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015).

### 2. Interfering with Washington's sovereign interests and educational mission

Washington has a sovereign interest in funding its constitutional commitments toward

---

[11] Because Washington faces direct, immediate, irreparable harm as discussed in this section and in the Complaint (Dkt. #1 ¶¶ 80–92)—not least the harms to Washington's proprietary interests in the portions of CARES Act funds which the Governor and OSPI control—Washington's standing to sue is well grounded. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601–02 (1982) ("As a proprietor, [a state] is likely to have the same interests as other similarly situated proprietors . . . , [a]nd like other such proprietors it may at times need to pursue those interests in court."); *Azar*, 911 F.3d at 573 (states established standing by showing "that the threat to their economic interest is reasonably probable").

STATE OF WASHINGTON'S MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:20-cv-01119-MLP

20

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

public school students, especially in times of crisis. As the Supreme Court of Washington held in *McCleary v. State of Wash.*, 173 Wn.2d 477, 546, 269 P.3d 227 (2012), Washington's constitution imposes the "paramount duty of the State to amply provide for the education of all children within its borders." *See* Wash. Const. art. IX, § 1. This duty requires Washington to "provide an opportunity for every child" to gain a certain level of "knowledge and skills." *McCleary*, 173 Wn.2d at 546. In accordance with those interests, Washington has established an educational mission toward providing a strong system of public education that meets the educational needs of all students. *See, e.g.*, RCW 28A.150.210 ("the state of Washington intends to provide for a public school system that is able to evolve and adapt in order to better focus on strengthening the educational achievement of all students"); RCW 28A.150.295 ("A general and uniform system of public schools embracing the common schools shall be maintained throughout the state of Washington in accordance with Article IX of the state Constitution.").

By diverting emergency funds from some or all public schools to private schools, the Rule interferes with Washington's sovereign interests and mission to amply provide for the education of all children—including those most in need and most affected by the coronavirus pandemic in Washington's public schools. This interference, undermining Washington's educational programs and impeding their purpose, constitutes irreparable harm. *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) ("An organization is harmed if the actions taken by [the defendant] have 'perceptibly impaired' the [organization's] programs.") (internal quotation marks and citations omitted).[12]

### 3.   Harming Washington's Public Schools and Students

Washington's public schools were counting on receiving their equitable share of funding to provide services for vulnerable students impacted by coronavirus. Berge Decl. ¶ 17;

---

[12]*See also Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013); *E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1116 (N.D. Cal. 2018), *aff'd*, 950 F.3d 1242 (9th Cir. 2020); *E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1241–42 (9th Cir. 2018) (recognizing injury caused by agency policy that "frustrates [an] organization's goals").

STATE OF WASHINGTON'S MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:20-cv-01119-MLP

21

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    Posthumus Decl. ¶ 6. These services include personal protective equipment, enhanced cleaning,

2    and support for remote learning technology for students who could not otherwise afford it.

3         The injury to Washington's public schools and students is irreparable. Washington is the

4    midst of an unprecedented pandemic that has given rise to extraordinary needs, and at issue are

5    *emergency* funds urgently appropriated by Congress. Washington's public schools need

6    immediate and full use of these funds to purchase protective equipment, acquire remote learning

7    technology, and pay staff to handle other exigencies that have arisen during the pandemic. Berge

8    Decl. ¶ 9; Kelly Decl. ¶ 17; Posthumus Decl. ¶ 8. This is not the time to place funds in escrow

9    and wait to figure out whether the Rule is illegal, as the Secretary has asserted. Due to increasing

10   costs to provide critical services to vulnerable students, such as free and reduced-price lunches,

11   severely resource-constrained school districts are anticipating significant budget shortfalls.

12   Berge Decl. ¶ 15. The Rule's enrollment-based formula diverts much-needed emergency relief

13   funds away from public schools, in some cases increasing the proportional share of private

14   schools from 3.4% to 20%. Berge Decl. ¶ 3; Kelly Decl. ¶ 33. Likewise, the Rule's poverty-

15   based formula excludes schools that do not participate in Title I from receiving funds altogether,

16   even if those schools are Title I eligible.  If the Rule stands, students may be unable to safely

17   obtain the education they need. Berge Decl. ¶ 14.a.; Posthumus Decl. ¶ 13.a. And to the extent

18   public schools are unable to protect the health and safety of their students due to the Rule, this

19   also constitutes irreparable harm to Washington. *See Pennsylvania v. Trump*, 351 F. Supp. 3d

20   791, 828 (E.D. Pa. 2019), *aff'd*, 930 F.3d 543 (3d Cir. 2019), *as amended* (July 18, 2019), *rev'd*

21   *and remanded sub nom. Little Sisters of the Poor Saints Peter & Paul Home v. Pa.*, No. 19-431,

22   2020 WL 3808424 (U.S. July 8, 2020) ("the States also stand to suffer injury to their interest in

23   protecting the safety and well-being of their citizens"); *Snapp*, 458 U.S. at 607 ("[A] state has a

24   quasi-sovereign interest in the health and well-being—both physical and economic—of its

25   residents in general."); *California v. Health & Human Servs.*, 281 F. Supp. 3d 806, 830 (N.D.

26   Cal. 2017), *aff'd in pertinent part, remanded sub nom. Azar*, 911 F.3d 558 (9th Cir. 2018)

STATE OF WASHINGTON'S MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:20-cv-01119-MLP

22

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1   (finding irreparable injury based in part on "what is at stake: the health of Plaintiffs' citizens and

2   Plaintiffs' fiscal interests").

### 4.      Increasing administrative burden on Washington's institutions

4       The Rule imposes significant administrative burdens that the Department severely

5   underestimates, when districts are already "[under]staffed and overworked . . . in the midst of

6   the pandemic. Berge Decl. ¶ 16; Posthumus Decl. ¶ 15. First, it forces OSPI and LEAs to develop

7   and implement novel formulas and set of criteria for funding of services, despite the readily

8   available and familiar formula under section 1117 of the ESEA. Second, the compressed

9   timeframe for developing and implementing criteria and distributing emergency funding is likely

10  to give rise to disputes and litigation with private schools who disagree with OSPI's and LEAs'

11  actions. Finally, for some LEAs that have already made expenditures in expectation of

12  reimbursement, it may be impossible to comply with the Rule's provision requiring *prior*

13  consultation with private schools. All these burdens are compounded by the emergency

14  circumstances and public schools' urgent need for the funds.

### 5.      Irreparable constitutional violations

16      Finally, the constitutional violations—coupled with the concrete harms to Washington's

17  proprietary interests, sovereign interests, mission, administrative burden, and students also

18  discussed above—establish irreparable harm. *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138

19  (9th Cir. 2009) ("constitutional violations cannot be adequately remedied through damages" and

20  therefore generally constitute irreparable harm); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th

21  Cir. 2012) ("It is well established that the deprivation of constitutional rights 'unquestionably

22  constitutes irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

### D.      Equity and Public Interest Strongly Favor an Injunction

24      When the government is a party, the third and fourth *Winter* factors merge. *Drakes Bay*

25  *Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). "The purpose of such interim

26  equitable relief is not to conclusively determine the rights of the parties, but to balance the

STATE OF WASHINGTON'S MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:20-cv-01119-MLP

23

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1   equities as the litigation moves forward." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct.

2   2080, 2087 (2017) (internal citations omitted). The principal consideration concerns the extent

3   of the "public consequences" attendant to the stay of the Rule. *Ramirez v. U.S. Immigration &*

4   *Customs Enf't*, 310 F. Supp. 3d 7, 32 (D.D.C. 2018) (quoting *Winter*, 555 U.S. at 24); *see also*

5   *Hernandez*, 872 F.3d at 996. Here, the public consequences strongly favor a stay.

6       "There is generally no public interest in the perpetuation of unlawful agency action. To

7   the contrary, there is a substantial public interest in having governmental agencies abide by the

8   federal laws that govern their existence and operations." *League of Women Voters*, 838 F.3d at

9   12 (internal quotation marks and citations omitted). The Rule violates the APA, and it imposes

10  significant harms to Washington's educational institutions and the students they serve. It disrupts

11  the equitable balance that Congress established for expenditures of CARES Act funds. The

12  public interest favors protecting Washington's ability to serve vulnerable students so they can

13  safely continue to receive education during the pandemic, as Congress intended.

14      Preserving the status quo would not harm the Department, and refraining from enforcing

15  the Rule will cost it nothing. *See Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011) (court

16  may waive Rule 65(c) bond requirement). Washington merely seeks to keep in place the classic

17  funding formula provided under section 1117 of the ESEA—the same formula that the

18  Department recognized as recently as October 2019. The requested stay generates no negative

19  public consequences, but allowing the Rule to stand imposes significant public harm.

20              **IV.    CONCLUSION**

21      For the foregoing reasons, the State of Washington requests that the Court preliminarily

22  enjoin Defendants from implementing or enforcing the Rule.

23

24

25

26

STATE OF WASHINGTON'S MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:20-cv-01119-MLP

24

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1     DATED this 23rd day of July, 2020.

2                                                     ROBERT W. FERGUSON
                                                      Attorney General of Washington
3

4                                                      *s/ Paul M. Crisalli*

5                                                     PAUL M. CRISALLI, WSBA No. 40681
                                                      SPENCER W. COATES, WSBA No. 49683
                                                      JEFFREY T. SPRUNG, WSBA No. 23607
6                                                     R. JULY SIMPSON, WSBA No. 45869
                                                      Assistant Attorneys General
7                                                     800 Fifth Avenue, Suite 2000
                                                      Seattle, WA  98104-3188
8                                                     (206) 464-7744
                                                      paul.crisalli@atg.wa.gov
9                                                     spencer.coates@atg.wa.gov
                                                      jeff.sprung@atg.wa.gov
10                                                    july.simpson@atg.wa.gov
                                                      *Attorneys for Plaintiff State of Washington*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

STATE OF WASHINGTON'S MOTION FOR              25
PRELIMINARY INJUNCTION
NO. 2:20-cv-01119-MLP

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1

**DECLARATION OF SERVICE**

2

I declare that I caused a copy of the foregoing document to be served by:

3

Hand-delivered:

4

     U.S. Attorney's Office

5

     700 Stewart Street, Suite 5220
     Seattle, WA 98101

6

FedEx Overnight:

7

8

     Betsy DeVos
     Secretary of U.S. Department of Education

9

     U.S. Department of Education
     Department of Education Building

10

     400 Maryland Avenue SW
     Washington, DC  20202-1475

11

12

     U.S. Department of Education
     Department of Education Building

13

     400 Maryland Avenue SW
     Washington, DC  20202-1475

14

DATED this 23rd day of July 2020, at Seattle, Washington.

15

16

                    */s/ Paul M Crisalli*

17

                    PAUL M. CRISALLI, WSBA No. 40681
                    Assistant Attorney General

18

19

20

21

22

23

24

25

26

STATE OF WASHINGTON'S MOTION FOR
PRELIMINARY INJUNCTION
NO. 2:20-cv-01119-MLP

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744