HONORABLE BARBARA J. ROTHSTEIN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                     Plaintiff,<br><br>   v.<br><br>BETSY D. DeVOS, in her official capacity as the United States Secretary of Education, and UNITED STATES DEPARTMENT OF EDUCATION,<br><br>                    Defendants. | No. 2:20-cv-01119-BJR<br><br>**THE COUNCIL OF THE GREAT CITY SCHOOLS AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

## STATEMENT OF INTEREST

*Amicus curiae* the Council of the Great City Schools ("Council") is a coalition of 76 of the nation's largest urban public school systems and is the only national organization exclusively representing the needs of urban public schools. Founded in 1956 and incorporated in 1961, the Council serves as the national voice for urban educators and provides a forum to share best practices. The Council is composed of school districts with enrollments greater than 35,000 students located in cities with a population exceeding 250,000. Districts located in the largest city of any state are also eligible for membership based on urban characteristics. The Council's member districts have a combined enrollment of over 8.2 million students. Headquartered in Washington, D.C., the Council promotes urban education through research, instruction, management, technology, legislation, communications, and other special projects.

The Council and its members are deeply concerned that the U.S. Department of Education's ("Department") recently announced interim final rule ("Rule") regarding the provision of equitable services under emergency relief funds will divert hundreds of millions of dollars of desperately needed funds away from their primary intended recipients, public schools serving at-risk students. *See* CARES Act Programs; Equitable Services to Students and Teachers in Non-Public Schools, 85 Fed. Reg. 39,479 (July 1, 2020). Through the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act" or "Act"), Congress in March 2020 appropriated approximately $16 billion that could be used to support elementary and secondary education, including $13 billion specifically to allow school districts to address needs arising out of the COVID-19 pandemic. The Act expressly required those funds to be allocated pursuant to well-established formulas under Title I of the Elementary and Secondary Education Act ("ESEA"), 20 U.S.C. § 6301 *et seq.*, including a requirement for school districts to reserve funding to provide "equitable services" to students and teachers in private schools based on the number of low-income students residing in the district and attending private schools. In disregard of this clear directive, the Rule adopted by the Department would force school districts to allocate funds not based on

THE COUNCIL OF THE GREAT CITY SCHOOLS PRELIMINARY
INJUNCTION AMICUS CURIAE BRIEF - 1
Case No. 2:20-cv-01119-BJR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

*low-income* private school students *residing* in the districts, but based on *all* students attending private schools in the district *wherever* they live. The Department has unlawfully adopted an interpretation of CARES Act equitable services requirement that is directly contrary to both the plain language of the Act and to Congressional intent.

The Council submits this brief to underscore the outrageousness of the Department's actions and their potentially devastating impact on public school districts struggling to find ways to operate safely and effectively during the COVID-19 pandemic.

## SUMMARY OF ARGUMENT

The Department has tried to unlawfully rewrite important emergency legislation to support its own spending priorities rather than those of Congress. In particular, the Department seeks to divert hundreds of millions of dollars that Congress intended to support public schools grappling with the pandemic, including thousands of schools in Council member districts, to private schools, regardless of the financial need of private school students.

In the CARES Act, Congress appropriated approximately $13 billion directly for use by elementary and secondary schools and directed school districts to allocate a portion of that money to provide equitable services to private schools based on the number of low-income students residing in the district and attending private schools. While an early version of the bill would have allocated funds to private schools based on their total enrollment of district resident students, Congress rejected that approach and instead directed that funds be allocated based on a well-established Title I formula, which has been in use for many years. This made sense in part because Congress already had allocated significant resources to private schools, but not to most public schools, in the form of forgivable loans under the Paycheck Protection Program ("PPP"), CARES Act § 1102, and also had made a variety of tax credits available to private schools but not public school districts.

Moreover, congressional leaders on both sides of the aisle have made clear that Congress intended the requirement that school districts provide "equitable services" under the CARES Act

THE COUNCIL OF THE GREAT CITY SCHOOLS PRELIMINARY
INJUNCTION AMICUS CURIAE BRIEF - 2
Case No. 2:20-cv-01119-BJR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

to be based on low-income private school students residing in their districts and not on all private school students regardless of their affluence or their residence. Likewise, the non-partisan Congressional Research Service concluded this is the proper interpretation of the CARES Act.

Not only is the Department's attempt to rewrite the CARES Act substantively wrong, it has also been done in a chaotic manner that itself has been damaging to public school districts. More than a month after the Act was passed, the Department first issued non-binding regulatory guidance directing that equitable services should be provided to private schools based on their total enrollment. *See* Providing Equitable Services to Students and Teachers in Non-Public Schools Under the CARES Act Programs, (April 30, 2020) ("Guidance").[1] Many states and school districts, seeing that this "interpretation" directly contradicted the language of the Act, indicated that they would not follow it in making their allocations under that CARES Act. In response, two months later, and more than three months after the enactment of the Act, the Department, without notice and comment, adopted the Rule that effectively required the immediate adoption and implementation of its "interpretation" of the CARES Act's equitable services requirement as first set forth in the Guidance. As a result, more than three months after the enactment of the Act, most states and school districts have not yet been able to allocate the desperately needed resources appropriated by Congress to schools.

Even more significantly, the approach demanded by the Department will divert hundreds of millions of dollars from public schools to private schools, regardless of the financial need of their students. The effect on Council members, their schools, and the students they serve will be devastating. This money is needed to fund counselors, social workers and nurses and to purchase equipment like computers, faces masks, thermometers, hand sanitizer and COVID-19 tests. The need to protect the safety of students and faculty today is paramount. Moreover, many of the schools in Council member districts serve disadvantaged communities where schools must address

---

[1] U.S. Dep't of Educ., *Providing Equitable Services to Students and Teachers in Non-Public Schools Under the CARES ACT Programs* (April 30, 2020), https://web.archive.org/web/20200526004048/https://oese.ed.gov/files/2020/04/FAQs-Equitable-Services.pdf

THE COUNCIL OF THE GREAT CITY SCHOOLS PRELIMINARY INJUNCTION AMICUS CURIAE BRIEF - 3
Case No. 2:20-cv-01119-BJR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

the digital divide in order to equitably provide on-line educational opportunities. The Department's unlawful rewrite of CARES Act severely undermines this critical work.

## BACKGROUND

The CARES Act authorized the Department to create three categories of Education Stabilization Funds ("ESF") grants that would be administered through state education agencies ("SEAs"). One of these, the Elementary and Secondary School Emergency Relief ("ESSER") CARES Act § 18003, provides CARES Act funds earmarked specifically for school districts. The ESSER Fund was designed to provide flexible support directly to school districts, as outlined in a non-exhaustive list of broad possible uses in the CARES Act. *Id.* at § 18003(d).[2]

The purpose of section 18003 of the CARES Act was to provide financial support to schools, students, and teachers in light of the COVID-19 pandemic. Most of this money is directed to states and public school districts, but—as with other federal grants—a certain portion of the funding must be used to provide equitable services to non-public school students and teachers. The CARES Act, in section 18005, *expressly* states that the funding must be allocated "in the same manner" as it is allocated in section 1117 of the ESEA, which has long been commonly known as the Title I funding formula. Yet, the Department's initial Guidance, and then its Rule, both suggest and then effectively mandate a different, more generous, formula for the funding of private schools with money Congress allocated for public schools.

## ARGUMENT

**I.      The Department Unlawfully Replaced the Equitable Services Allocation Method Adopted by Congress with Its Own Preferred Approach.**

The CARES Act, as enacted, is clear that the allocation for private schools is to be based on their low-income population residing in the relevant school district just like Title I equitable service calculations. Indeed, Congress did not adopt a draft bill that specifically would have

---

[2] CARES Act, PL 116-136, 134 Stat 281. Because the CARES Act was codified in scattered titles of the United States Code, including as statutory notes, and for ease of reference, all CARES Act provisions enacted in Public Law 116-136, 134 Stat. 281, are cited herein simply as CARES Act § ____. CARES Act sections 18003 and 18005 are codified at 20 U.S.C. § 3401 note.

THE COUNCIL OF THE GREAT CITY SCHOOLS PRELIMINARY
INJUNCTION AMICUS CURIAE BRIEF - 4
Case No. 2:20-cv-01119-BJR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

provided equitable services for private school students and teachers based on total private school enrollment, as the Department's Rule attempts to do. Moreover, Congress rejected that allocation methodology justifiably as low-income and minority communities, like those served by Title I, have been disproportionately affected by the pandemic, and because the CARES Act and other emergency legislation also provide additional resources to private schools that are not available to public school districts. Finally, there is bi-partisan and non-partisan support for the view that Congress intended the allocations to be done according to the Title I formula, just like the Act says.

### A.   The Department's funding formula erroneously considers *all* private school students rather than only *low-income* students residing in the district.

Allocation of CARES Act funds with respect to private schools is statutorily and expressly tied to the well-established formula set forth in Title I. Under the CARES Act, school districts receiving funding under the Act "shall provide equitable services **in the same manner** as provided under section 1117 of the ESEA of 1965 to students and teachers in non-public schools." CARES Act § 18005 (emphasis added). Section 1117 of the ESEA, or Title I, requires schools to provide equitable services "[t]o the extent consistent with **the number of *eligible* children . . . in the school district** . . . who are enrolled in private" school. 20 U.S.C. § 6320(a)(1) (emphasis added). Title I requires that "[e]xpenditures for educational services and other benefits to eligible private school children shall be equal to the proportion of funds allocated to participating school attendance areas **based on the number of children from low-income families who attend private schools**." *Id.* § 6320(4)(A)(i) (emphasis added). Congress and the Department have long been aware of this methodology and, as recently as October 2019, the Department instructed school districts to "[e]nsure that its expenditures for equitable services [under Section 1117 of Title I] are equal to the proportion of funds generated by children from low-income families who reside in participating Title I public school attendance areas and attend private schools."[3]

---

[3] U.S. Dep't of Educ., *Providing Equitable Services to Eligible Private School Children, Teachers, and Families Updated Non-Regulatory Guidance* (Oct. 7, 2019), https://www2.ed.gov/about/inits/ed/non-public-education/files/equitable-services-guidance-100419.pdf (emphasis added) ("October 2019 Guidance").

THE COUNCIL OF THE GREAT CITY SCHOOLS PRELIMINARY INJUNCTION AMICUS CURIAE BRIEF - 5
Case No. 2:20-cv-01119-BJR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

The Department's directive in its interim final rule—that CARES Act funds should be provided to private schools on the basis of the *number of students attending private school within the school district's boundaries,* regardless of where those students live, rather than on the basis of the *number of low-income students residing in the school district's jurisdiction*—is expressly contrary to the statute for two reasons.

### i. Congress expressly declined to require public school districts to allocate equitable services funding on the basis of *all* students in private schools rather than "eligible" or low-income students.

First, the use of *all* students rather than *low-income* students is not supported by the legislative history of the Act. An early version of the bill would have expressly allocated funds to private schools based on their total enrollment. The enacted CARES Act *rejected* this approach, instead calling for the use of the Title I formula. Under that earlier version of the bill (as under the Department's Rule), hundreds of millions of dollars would have been diverted away from public schools who truly need those funds and towards private schools who do not. Congress refused to adopt this approach when it chose instead to enact a bill that specifically refers to Section 1117 of the ESEA, recognizing that funds to support private schools should be based on the number of *low-income* students, not based on *all* students at private schools.[4]

Specifically, an early draft of the appropriations provision of the CARES Act, received by *amicus curiae* on March 22, 2020, included a section titled "Assistance to Non-Public Schools," which provided as follows:

> SEC. 18005. (a) IN GENERAL.— A local educational agency receiving funds under sections 802 or 803 shall provide equitable services to students and teachers in non-public schools, as determined in consultation with representatives of non-public schools. The level of such services *shall reflect the proportion of students residing within the boundaries of the local educational agency who attend non-public schools.*

---

[4] Significantly, Section 8501 of the ESEA, which does, in fact, direct equitable services to all eligible private school students regardless of residence status, is *not* referenced in the CARES Act.

THE COUNCIL OF THE GREAT CITY SCHOOLS PRELIMINARY
INJUNCTION AMICUS CURIAE BRIEF - 6
Case No. 2:20-cv-01119-BJR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

*See* Exhibit A, Declaration of Jeff Simering; Exhibit A-1, HEN20279 (emphasis added). This language is not present in the enacted bill. Rather, the enacted CARES Act mandates that the familiar Title I formula be used:

> SEC. 18005. (a) IN GENERAL. — A local educational agency receiving funds under sections 18002 or 18003 of this title shall provide equitable services *in the same manner as provided under section 1117 of the ESEA of 1965 to students and teachers in non-public schools*, as determined in consultation with representatives of non-public schools.

CARES Act § 18005(a) (emphasis added). Congress knew how to write an allocation formula like the one that the Department wants. Indeed, it did write one. It just chose not to enact that version into law.

The directive to use the formula set forth in section 1117 of the ESEA—which, as explained above, requires equitable services to be provided to private schools in a proportionate share reflecting the number of low-income students residing within the boundaries of the school district or "local educational agency" ("LEA")—permits less money to flow to private schools than would have occurred under the previous draft of the CARES Act; the proportionate share is not based on *all* the students residing in the district's jurisdiction or even the Title I schools' attendance areas that attend private schools, but only those low-income students who do.

The difference between these two versions of the bill—the earlier draft basing equitable services on *the proportionate share of all private school students residing in the LEA* and the later enacted bill basing equitable services on *the number of low-income students residing in participating Title I attendance areas*—is of critical importance. The Department's Rule may track early development of the CARES Act, but entirely fails to follow its *enacted* provisions.

Moreover, there are two formulas in ESEA. In section 1117, equitable services are provided based on the number of low-income students. In contrast, the equitable services provision in section 8501 does *not* require school districts to base private schools' proportional share on the number of low-income children living in the district who attend private school. *See* 20 U.S.C. § 7881(b). Again, if Congress had wanted equitable services to be provided based on *all* students in

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

private schools, it would have enacted the earlier-drafted formula, or referenced section 8501 of ESEA which applies to part C of Title I, part A of Title II, part A of Title IV, and part B of Title IV, rather than section 1117 which applies only to part A of Title I. The choice to use section 1117 was clear and unambiguous.

In enacting the CARES Act, Congress thus declined to use a formula which would allow for *more* money to flow through public schools to serve private schools than is allowed by the longstanding method set forth in section 1117 of the ESEA. The Department's position is not only contrary to the plain language of the CARES Act, but also to clear Congressional intent as demonstrated by the Act's context and legislative history.

### ii.   Congress also required that equitable services funding be allocated on the basis of student residence.

Second, the Department's position that the proportionate share is based on *the number of students who attend a private school that is located in the district*—rather than the *number of low-income students residing in the district who attend a private school*—impermissibly requires that the proportionate share be based not on which students *live* in the district, but which students *attend* private schools in the district. As with the use of *all* private school students in the formula rather than only *low-income* students, the use of *students who attend private school in the district, regardless of where the students reside* leads to more money diverted to private schools. It is also plainly inconsistent with the text of the CARES Act and the ESEA.

This distinction matters: LEAs receive local tax revenue from persons living in their district, but not from those living outside it. Under the Department's interpretation, public schools are required to take money dedicated to the students who both reside in *and* attend school in their district and allocate it instead to students who may reside elsewhere—and pay taxes elsewhere—but attend *private schools* in the district. Ignoring the residency requirement of Section 1117 of the ESEA, as expressly required by the CARES Act, reflects the Department's arbitrary and unlawful interpretation.

THE COUNCIL OF THE GREAT CITY SCHOOLS PRELIMINARY
INJUNCTION AMICUS CURIAE BRIEF - 8
Case No. 2:20-cv-01119-BJR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

Congress expressly chose to require that equitable services be provided to private schools "in the same manner" as that required in Title I, or section 1117 of ESEA. The Department cannot override the statutory text of the CARES Act, and its interpretation must be declared arbitrary and capricious.

### B.    There were good reasons for Congress to choose the specific allocation formula that it did.

First, it is well documented that the COVID-19 pandemic is disproportionately affecting low-income and minority communities. As the primary source of federal support for elementary and secondary education, Title I targets precisely these communities, many of whom are located in Council member districts. It also makes sense, for this same reason, to allocate resources based on *low-income* students rather than all students and to focus on the students in private schools *residing* in these urban areas rather than those that may be commuting to those private schools from affluent suburbs. Indeed, in some Council member districts near state borders, students commute from other states to attend expensive private schools. Thus, allocating resources where they are most needed, which Congress did, makes sense.

Second, allocating these CARES Act funds to private schools based on their total enrollment and thereby dramatically increasing their proportionate allocation would have been unreasonable and unfair for Congress to do, because private schools are eligible for other federal resources that public school districts are not. For example, the CARES Act also created the Paycheck Protection Program ("PPP"), through which the Small Business Administration ("SBA") provided loans to certain small businesses, including private schools. CARES Act § 1102. These loans will be fully forgiven by the SBA. CARES Act § 1106. Under the PPP, all small businesses, as well as all tax-exempt non-profit organizations described in section 501(c)(3) of the Internal Revenue Code, are eligible to receive loans. CARES Act § 1102(a)(2)(D).[5] The 500-employee cap as well as the inclusion of Section 501(c)(3) nonprofits opened the door for private schools to

---

[5] *See also* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20811 (April 15, 2020) (the SBA interim final rule regarding implementation of CARES Act §§ 1102, 1106).

THE COUNCIL OF THE GREAT CITY SCHOOLS PRELIMINARY
INJUNCTION AMICUS CURIAE BRIEF - 9
Case No. 2:20-cv-01119-BJR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

secure PPP loans to the tune of millions of dollars. Just in Council member school districts alone, over 75 private schools each received over a million dollars from the PPP, with some individual schools receiving close to 10 million dollars.[6]

Here are a few examples of such schools:[7]

| School Name | City, State | PPP Loan Range |
|---|---|---|
| Bishop Blanchet High School | Seattle, WA | $2-$5 million |
| St. Ann's School | NYC, NY | $5–$10 million |
| Columbia Grammar and Preparatory School | NYC, NY | $5–$10 million |
| Poly Prep Country Day School | NYC, NY | $5–$10 million |
| Albuquerque Academy | Albuquerque, NM | $2–$5 million |
| Head-Royce School | Oakland, CA | $2–$5 million |
| Francis Parker School | San Diego, CA | $2–$5 million |
| De Paul College Prep | Chicago, IL | $1–$2 million |
| Cincinnati Hills Christian Academy | Cincinnati, OH | $2-$5 million |
| Sidwell Friends School | Washington, D.C. | $5–$10 million |
| St. Louis University High School | St. Louis, MO | $2-$5 million |
| Bishop Lynch High School | Dallas, TX | $2–$5 million |
| Antonian College Preparatory High School | San Antonio, TX | $1–$2 million |
| Christopher Columbus High School | Miami, FL | $2–$5 million |
| Central Catholic High School | Portland, OR | $2–$5 million |

In addition to the benefit of these substantial sums in forgivable loans, private schools are also eligible for tax credits that are not available to public school districts. For example, private schools benefit from payroll tax credits under the Families First Coronavirus Response Act (the "FFCRA"), signed by President Trump on March 18, 2020. PL 116-127, March 18, 2020, 134 Stat 178, Division G, §§ 7001–7005. The FFCRA provides small and midsize employers refundable tax credits that reimburse them, dollar-for-dollar, for the cost of providing paid sick and family leave wages to their employees for leave related to COVID-19. *Id.* §§ 7001 ("Payroll Credit for Required Paid Sick Leave"), 7003 ("Payroll Credit for Required Paid Family Leave"). Similarly, private schools, but not public school districts, also benefit from the Employee Retention Credit,

---

[6] Stephen Rich et al., *Explore the SBA Data on Businesses that Received PPP Loans*, THE WASHINGTON POST (July 6, 2020), https://www.washingtonpost.com/graphics/2020/business/sba-ppp-data/?utm_campaign=wp_main&utm_medium=social&utm_source=twitter&itid=lk_inline_manual_5; *see also* Exhibit B.
[7] *See* Exhibit B (citations contained therein).

THE COUNCIL OF THE GREAT CITY SCHOOLS PRELIMINARY
INJUNCTION AMICUS CURIAE BRIEF - 10
Case No. 2:20-cv-01119-BJR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

which is a refundable tax credit against certain employment taxes equal to 50 percent of the qualified wages an eligible employer pays to employees after March 12, 2020, and before January 1, 2021. CARES Act, § 2301. Eligible employers can get immediate access to the credit by reducing employment tax deposits they are otherwise required to make. *Id*. For each employee, wages (including certain health plan costs) up to $10,000 can be counted to determine the amount of the 50% credit. *Id*. § 2301(a)(b)(1). Congress clearly has provided many significant COVID-19-related financial benefits to private schools that it has not provided to public school districts.

Thus, for at least two obvious reasons, it made sense for Congress to reject a bill that would have allocated CARES Act resources to private schools based on their total enrollment and to instead mandate the Title I allocation methodology. In contrast, the Rule adopted by the Department is not only unlawful (as discussed above in section I.A.) but also unfair and unreasonable (as discussed further below in sections II and III).

### C. There is bi-partisan support that Congress's intent was that funds be allocated based on the Title I formula.

Even if in some manner the relevant text of the CARES Act were ambiguous—which it is not—and the legislative history were unpersuasive—which it is not—the drafters of the bill themselves have clearly indicated that it was their intent in drafting and passing the bill that equitable services be provided to private schools using the Title I funding formula.

For example, on May 20, 2020, three Democratic congressional leaders—Representative Bobby Scott, Representative Rosa DeLauro, and Senator Patty Murray—wrote to Secretary DeVos, stating:

> [T]he Department broke with statutory requirements of the CARES Act and longstanding precedent of the equitable services provision in section 1117 of ESEA by issuing guidance that directs LEAs to use emergency relief funds for the provision of services to students at private schools regardless of their wealth or residence. This action also contradicts the Department's equitable services non-regulatory guidance issued on October 7, 2019.

THE COUNCIL OF THE GREAT CITY SCHOOLS PRELIMINARY
INJUNCTION AMICUS CURIAE BRIEF - 11
Case No. 2:20-cv-01119-BJR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

Exhibit C.[8] The members, all of whom are Congressional committee chairs or ranking members on committees specific to education and/or appropriations, went on to say, "[t]he statutory language and Congressional intent is clear: LEAs should use these emergency relief funds to provide equitable services only based on the number of low-income students attending private schools in their LEA, not all students attending private schools in the LEA." *Id.* This Congressional intent was confirmed by senior Republican Senator Lamar Alexander, chairman of the Senate Committee on Health, Education, Labor, and Pensions and former U.S. Secretary of Education, the next day. On May 21, 2020, Senator Alexander was asked about the Department's Guidance, and said, "I thought, and I think most of Congress thought, that money from the CARES Act would be distributed in the same way that Title I is distributed."[9]

Moreover, the non-partisan Congressional Research Service ("CRS") undertook an extensive analysis of the text of the CARES Act and its legislative history and concluded that "a straightforward reading of section 18005(a) based on its text and context suggest that the CARES Act requires LEAs [school districts] to follow section 1117's method for determining the proportional share, and thus to allocate funding for services for private school students and teachers based on the number of low income children attending private schools." Memorandum from Congressional Research Service to House Comm. on Educ. and Labor 2 (July 1, 2020) (attached hereto as Exhibit D). The CRS further concluded that the relevant number for this calculation is the "number of private-school children from low-income families residing in the LEA's participating public school attendance areas." *Id.* at 3.

Thus, Congress clearly intended that the funds provided to school districts under the CARES Act be proportionately shared with private schools *based on the number of low-income students residing in the school district's Title I school attendance areas*. This clear Congressional

---

[8] Letter from Robert C. "Bobby" Scott, Rosa L. DeLauro, and Patty Murray, U.S. Congress, to Betsy DeVos, Sec'y, U.S. Dep't of Educ. (May 20, 2020) (available at https://edlabor.house.gov/imo/media/doc/2020-5-20%20Ltr%20to%20DeVos%20re%20Equitable%20Services.pdf and attached hereto at Exhibit C).

[9] Andrew Ujifusa, *Sen. Alexander Splits from Betsy DeVos on COVID-19 Aid to Help Private Schools*, EDUCATION WEEK (May 21, 2020), https://blogs.edweek.org/edweek/campaign-k-12/2020/05/alexander-devos-COVID-aid-private-schools-CDC-reopening.html.

THE COUNCIL OF THE GREAT CITY SCHOOLS PRELIMINARY
INJUNCTION AMICUS CURIAE BRIEF - 12
Case No. 2:20-cv-01119-BJR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

intent, supported by the statutory text itself as well its context and legislative history, is controlling. The Department does not have any authority to depart from that clear intent or to rewrite the plain language of the Act.

## II.     The Chaotic Manner in which the Department has Acted Has Delayed the Distribution of Critical Resources and Placed School Districts in Legal Jeopardy.

Besides being an unlawful abuse of agency authority resulting in significant harms— including the potential deprivation of hundreds of millions of dollars of much-needed funds for our nation's most vulnerable students, as detailed in Section III below—the Department's arbitrary and *ad hoc* actions also have led to considerable confusion that has delayed the distribution of critical resources. The Department's interpretation of the Act has constantly shifted since its enactment. For example, the Rule issued on July 1, 2020 contains *new* substantive requirements that differ both from those in the Act (enacted in March), the Department's initial notice, and the Department's April 30, 2020 Guidance. Moreover, by virtue of its interim nature, the Rule also creates the possibility for yet additional changes in the Department's policy after the 30-day comment period. Throughout this period of uncertainty, however, the Department has consistently done one thing: presented school districts with an impossible choice between compliance with its current "interpretation" or with the actual terms of the Act. If school districts do the former, they forfeit hundreds of millions of dollars to private schools and also run the risk of violating certifications that they will follow the allocation requirements of the Act. If they do the latter, they risk penalties from the Department. The Department's actions over the last four months thus have created an untenable situation.

### A.     The Guidance created unnecessary confusion for school districts and put them at legal risk.

Congress passed the CARES Act on March 27, 2020. Section 18002(a) of the Act mandated: "[T]he Secretary *shall* make Emergency Education Relief grants to the Governor of each State with an approved application"; "*shall* issue a notice inviting applications not later than

THE COUNCIL OF THE GREAT CITY SCHOOLS PRELIMINARY
INJUNCTION AMICUS CURIAE BRIEF - 13
Case No. 2:20-cv-01119-BJR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

30 days of enactment of this Act"; and "*shall* approve or deny applications not later than 30 days after receipt." CARES Act § 18002(a) (emphasis added).

Accordingly, on April 23, 2020, the Department published a notice which included a "Deadline for Transmittal of Certification and Agreement" of "[n]o later than July 1, 2020." *See* U.S. Dep't of Educ., *Notice Announcing Availability of Funds and Deadline for the Elementary and Secondary School Emergency Relief Fund* at 2 (April 23, 2020)[10] (the "Notice"). The Notice also indicated that "[e]ach SEA's Certification and Agreement will be processed as it is received and funds will be obligated on a rolling, expedited basis with the expectation that State educational agencies (SEAs) and local educational agencies (LEAs) will also use every effort to expend the funds quickly to address exigent student needs." *Id.* The Notice emphasized the urgency of applying for and utilizing the emergency funding to address challenges of educating students in a remote learning environment, stating:

> Consistent with section 18003(d) of the CARES Act, LEAs may use ESSER funds to address the impact that COVID19 has had, and continues to have, on elementary and secondary schools across the Nation. The Department encourages SEAs to use funds for remote learning to make strategic investments that promote student achievement through long-term improvements in infrastructure and operations so that students may receive educational services whether or not school campuses are open or closed.

*Id.* at 4. With respect to equitable services, the Notice restated the text of section 18005(a), without any indication that it would be deviating from the approach recently reaffirmed[11] in its 2019 Title I equitable services guidance. *See Id.* at 6 ("An SEA must ensure that an LEA that receives an ESSER Fund subgrant provides equitable services to students and teachers in non-public schools located within the LEA in the **same manner as provided under section 1117 of the ESEA** . . . .") (emphasis added).[12]

---

[10] Available at https://oese.ed.gov/files/2020/04/ESSER-Fund-Notice-Final.pdf.
[11] *See* October 2019 Guidance, *supra* n. 2.
[12] Although the equitable services provision of the Notice indicated that, "[t]he Department will provide additional guidance to LEAs on equitable services requirements," *id.*, no reasonable state or school district could have predicted the Department's arbitrary conditions imposed on the provision of ESSSER funds first in the Guidance on April 30 and then in the Rule issued on July 1.

THE COUNCIL OF THE GREAT CITY SCHOOLS PRELIMINARY
INJUNCTION AMICUS CURIAE BRIEF - 14
Case No. 2:20-cv-01119-BJR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

Consistent with the Act, the Notice included "Certification and Agreement" instructions, requiring each applicant to "provide an assurance that it will comply with all requirements that apply to the ESSER Fund," including the statute's equitable services provision. Relevant here, the certification form required applicants for CARES Act funds to:

- "allocate [ESSER] funds to LEAs on the basis of their respective shares of funds received under title I, part A of the Elementary and Secondary Education Act of 1965 in fiscal year 2019";

- "ensure that LEAs receiving ESSER funds will provide equitable services to students and teachers in non-public schools as required under 18005 of Division B of the CARES Act"; and

- "*ensure that an LEA receiving ESSER funds will provide equitable services to students and teachers in non-public schools located within the LEA in the same manner as provided under section 1117 of the ESEA*, as determined through timely and meaningful consultation with representatives of non-public schools."[13]

Thus, as of April 23, 2020, school districts and states were led to believe by the plain language of the Act and by the form released by the Department that equitable services allocations under the CARES Act would employ the Title I methodology. Initial planning proceeded based on that understanding and many states and school districts, including Council members, executed certifications that they would comply. It was not until the non-binding Guidance was issued on April 30, 2020 (more than a month after the Act was enacted) that school districts had any idea the Department might encourage—and subsequently require—a different approach.

As a result, school districts face legal risk if they fail to follow the allocation method set forth in the Act, as they have certified that they will. On the other hand, if they follow the Act and not Department's "interpretation" as originally announced in the Guidance, they face potential penalties from the Department and possible challenges from private schools based on the Department's position. Either way, the Department has put school districts in an impossible situation.

---

[13] U.S. Dep't of Educ., *Certification and Agreement for Funding under the Education Stabilization Fund Program Elementary and Secondary School Emergency School Relief Fund (ESSER Fund)* at 2–3 (April 2020), https://oese.ed.gov/files/2020/04/ESSERF-Certification-and-Agreement-2.pdf.

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**B.     The Rule effectively mandates the Department's flawed interpretation and increases confusion and hardship for school districts.**

Recognizing the significant hardships the Guidance imposed on school districts, multiple educational associations, spearheaded by the Council of Chief State School Officers ("CCSSO"), alerted the Department of its flawed interpretation of the CARES Act and put the Department on notice of the significant confusion and harm the Guidance was causing for both states and school districts. *See* Letter from Carissa Moffat Miller, Exec. Dir., CCSSO, to Betsy DeVos, Sec'y, U.S. Dep't of Educ. (May 5, 2020).[14] Rather than mitigate the damage already done by withdrawing and/or amending the Guidance, the Department doubled down, accusing the CCSSO of "improperly discriminat[ing] against an entire class of children," despite the fact that Congress, not the CCSSO, had selected the allocation formula.[15]

Therefore, many states and school districts subsequently decided to follow the statute and to expressly reject the approach outlined in the Guidance. According to one report,[16] a number of states led by both Republican and Democratic governors rejected the Department's interpretation. For example, Washington, Oklahoma, Mississippi, Indiana, Maine, Pennsylvania, New Mexico and Wisconsin, all began calculating allocations according to the plain text of the statute. New Mexico, for example, in a letter from its Public Education Department to superintendents and charter school heads stated it would follow the plain language of the CARES Act stating "[t]his advisory aligns with the plain language of the CARE Act and is consistent with longstanding equitable services calculations under Title I criteria, as well as U.S. Department of Education's

---

[14] *Available at* https://ccsso.org/sites/default/files/2020-05/DeVosESLetter050520.pdf.
[15] *See* Letter from Betsy DeVos, Sec'y, U.S. Dep't of Educ., to Carissa Moffat Miller, Exec. Dir., CCSSO (May 22, 2020) (hereinafter "DeVos Letter") https://blogs.edweek.org/edweek/campaign-k-12/Secretary%20DeVos%20Response%20to%20Carrisa%20Moffat%20Miller%205%2022%2020.pdf; *see also* Andrew Ujifusa, *DeVos to Release Rule Cementing COVID Aid Push for Private School Students*, EDUCATION WEEK (May 26, 2020), https://blogs.edweek.org/edweek/campaign-k-12/2020/05/devos-covid-aid-private-school-students-rule.html)
[16] *See* Bianca Quilantan, *Weekly Education: States Push Back Against Steering Coronavirus Funds to Private Schools*, POLITICO (June 1, 2020), https://www.politico.com/newsletters/morning-education/2020/06/01/meet-acts-new-top-executive-788066.

THE COUNCIL OF THE GREAT CITY SCHOOLS PRELIMINARY
INJUNCTION AMICUS CURIAE BRIEF - 16
Case No. 2:20-cv-01119-BJR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

interpretations of the [ESEA] over decades and as recently as October 2019." Mem. from State of New Mexico Public Educ. Dep't 5 (May 14, 2020) (attached hereto as Exhibit E).

In early June, ten states indicated they would or were likely to follow the Department's guidance.[17] States such as Colorado, Illinois and Ohio have followed the Department's cautionary directive in its letter response to CCSSO[18] and advised school districts to calculate the equitable share based on students in poverty, but to set aside the difference in funding in an escrow account.[19] Other states remained unsure and are still waiting to see what happens.

In response, however, more than three months after the CARES Act was enacted, the Department concluded its Guidance was inadequate and it adopted the Rule. On July 1, 2020, the Department published the Rule in the Federal Register without notice and comment and made it effective immediately. 85 Fed. Reg. 39,479. In so doing, the Department added yet another layer of confusion and complexity to Congress's simple mandate to "make Emergency Education Relief grants to the Governor of each State with an approved application." *See* CARES Act § 18002(a).

Indeed, instead of merely codifying the already flawed and inequitable approach suggested by the Guidance, the Rule effectively created two ostensible choices for school districts with respect to how to calculate the proportional share of CARES Act funds for equitable services. However, neither of these "choices" is viable. Under the Rule, school districts can either (1) follow the Department's preferred approach, in violation of the Act, and forfeit a substantial share of their funds for the benefit of private schools, but maintain their congressionally-granted discretion with respect to how to spend the remaining funds; or (2) maintain the full funding intended for public schools under the CARES Act, but give up the ability to serve all of their students and adhere to severe restrictions on how the money can be spent.

Neither option is allowed by the Act, as discussed above, and neither one is workable for school districts. First, the funds allocated are desperately needed by school districts trying to

---

[17] *Id.*

[18] *See* DeVos Letter, *supra* n. 13, at 1 ("If they or their district superintendents insist on acting contrary to the Department's stated position, they should, at minimum, put into an escrow account the difference between the amount generated by the proportional-student enrollment formula and the Title I, Part A formula.").

[19] Quilantan, *supra* n. 14.

THE COUNCIL OF THE GREAT CITY SCHOOLS PRELIMINARY
INJUNCTION AMICUS CURIAE BRIEF - 17
Case No. 2:20-cv-01119-BJR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

reopen during the pandemic. COVID-19 has drastically affected public education in the United States. School districts across the nation were ordered to close and transition to online learning in the spring, incurring significant additional expenses to ensure all students (particularly low-income students like many of those served by Council members) had adequate access to necessary technology. Since then, states throughout the country have faced declining revenue and corresponding budget cuts, including billions of dollars in reduction to funding for public education. These cuts come at the same time when the additional costs of re-opening schools safely, according to protocols recommended by the Center for Disease Control ("CDC"), are estimated by the CCSSO to amount to somewhere between $158 and $245 billion.[20] School districts cannot afford to lose any resources at this time.

Similarly, it is impractical for school districts, including Council members, to give up their ability under the CARES Act to use these funds with flexibility in any school in which they are needed. Some of the emergency funds authorized by Congress are desperately needed precisely to make up for lost state and local revenue, an approach complicated if not made unworkable by the Rule, particularly if a school district follows the Act's allocation method rather than the Department's. Likewise, as discussed in Section III below, resources to open schools safely like personal protective equipment for schools opening for in-person instruction or technology to support online instruction are needed at all schools and not only Title I schools, but the Rule would restrict districts from using the funds in this manner, unless they adopt the Department's allocation method. As a result, the Rule does not give school districts any actual choice.

The Rule also increases the legal pressure on school districts because it purports to be legally binding, even though it directly contradicts the Act. And, to make matters worse, as an interim rule, the Rule itself is subject to further modification by the Department. In sum, the Rule exacerbates the problems for school districts caused by the Guidance and further underscores the arbitrary nature of the Department's approach to equitable services under the CARES Act.

---

[20] Letter from Carissa Miller, Exec. Dir., CCSSO, to Lamar Alexander, U.S. Congress (June 24, 2020) (available at https://ccsso.org/sites/default/files/2020-06/HELPLetterFinal.pdf).

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

**C.     The Department's inconsistent interpretation also has resulted in delay in the distribution of critical resources.**

In addition to causing unnecessary confusion and uncertainty regarding an otherwise clear and unambiguous statutory entitlement, the Department's unclear and shifting "guidance" has resulted in unacceptable delay in school districts' ability to apply for and access these much-needed resources.

First, because of the changing interpretations and the introduction of entirely new formulas for calculating the proportionate share under the Guidance and then the Rule, there is little to no consensus or clarity regarding the actual dollar amounts available for school districts to rely on in order to plan appropriately for their use. Because of the Department's actions, the academic (and fiscal) year during which the pandemic first began disrupting delivery of in-person education and other operations has now expired without school districts having access to congressionally-appropriated emergency funds to cover expenditures back to March. In addition, with each new interpretation, school districts have been required to re-analyze and re-assess current budgets, undermining school administrators' ability to focus on the real emergencies at hand: initially, the continuation of high-quality education with schools closed and, now, the safe return of students and teachers to schools (if possible) in the midst of a global pandemic.

Second, under the CARES Act, as under Title I, school districts must engage in a consultation process with private schools in order to provide appropriate services to students in those private schools.[21] With each new interpretation from the Department, school districts have had to delay, restart, or repeat this consultation process, which has harmed not only students in public school districts, but also disadvantaged students in private schools who should be benefitting from these resources. In some states, like Texas, state educational authorities have gone so far as to expressly require school districts to restart a consultation requirement based on the

---

[21] *See* CARES Act § 18005(a) (requiring LEAs to provide equitable services "in consultation with representatives of non-public schools"); *see also* Notice, *supra* note n.7, at 6 ("An SEA must ensure that an LEA that receives an ESSER Fund subgrant provides equitable services to students and teachers in non-public schools located within the LEA in the same manner as provided under section 1117 of the ESEA, *as determined through timely and meaningful consultation with representatives of non-public schools*.") (emphasis added).

THE COUNCIL OF THE GREAT CITY SCHOOLS PRELIMINARY
INJUNCTION AMICUS CURIAE BRIEF - 19
Case No. 2:20-cv-01119-BJR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

Department's July 1 Rule.[22] As mandated by the Act, it is critical for school districts to engage in a meaningful consultation process with private school representatives to ensure that the funds are utilized in an effective way.

The Department's chaotic deployment of its preferred policy position through the Guidance and then the Rule has unnecessarily delayed that process to the detriment of school districts and private schools nationwide.

### III. The Interim Final Rule Adopted by the Department Would Divert Hundreds of Millions of Dollars from Public Schools to Private Schools with Devastating Consequences for School Districts and their Students.

If the approach to CARES Act equitable services allocations suggested in the Guidance and mandated by the Rule is allowed to stand, it would divert hundreds of millions of dollars away from public school districts that are already facing massive budget cuts and exacerbate the challenges of operating safely and effectively during an ongoing global pandemic. The consequences of this diversion would be devastating for students and teachers nationwide, including the millions in Council member districts.

### A. The amount of funds diverted is substantial.

The approach towards equitable service allocations suggested and then mandated by the Department would dramatically increase the percentage of the funds appropriated by Congress under the CARES Act to support elementary and secondary education that flow to private schools, regardless of the number of low-income students they serve. For example, the proportion of CARES Act allocations going to private schools would increase in member districts polled by the Council, in one district by as much at 1280%. *See* Exhibit. F, Declaration of Manish Naik; Exhibit F-1. The diversion of funds to private schools, regardless of need, would dramatically reduce the funds available to public school districts like members of the Council. In polling its members last

---

[22] *See* Texas Educ. Agency, *Providing Equitable Services to Students and Teachers in Participating Private Non-Profit Schools Under the CARES Act Programs* 3 (updated July 9, 2020), https://tea.texas.gov/sites/default/files/covid/COVID-19-CARES-Act-Equitable-Services-FAQ.pdf ("If consultation has already been completed and the district is changing the calculation option, the consultation process must be reopened. The revised consultation process must be documented. TEA recommends extending consultation timeline to ensure the new requirements are discussed with private school officials.").

THE COUNCIL OF THE GREAT CITY SCHOOLS PRELIMINARY
INJUNCTION AMICUS CURIAE BRIEF - 20
Case No. 2:20-cv-01119-BJR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

week, the Council received 16 reliable responses which indicated that the dollar amount lost to private schools in these districts would range from about $628,000 to $6,485,000. *See* Exhibit F ¶¶ 3-6; Exhibit F-1. Seattle Public Schools, for example, would lose more than $1,684,000. *Id.* The total amount lost by these districts would be approximately $33,337,000. *Id.* Three other Council members, the New York City Department of Education, the Chicago Public Schools, and the San Francisco Unified School District, all of whom are Plaintiffs in a similar case pending in the Northern District of California, disclosed in written testimony that they would lose about $53,000,000, $10,170,000, and $1,740,000 respectively. *See* Exhibit F ¶¶ 7, 9. If the amount of CARES Act funding lost through the Department's approach was similar in other school districts relative to their total low-income population, the Council projects that its member districts would lose a total of about $292,000,000 of these much-needed, emergency resources. *Id.* ¶ 11.

Moreover, the Council's 76 members, though relatively large in size are just a small fraction of the public school districts in the United States. An analysis of the effect of the Department's approach on the 185 school districts in Texas alone, for example, indicates that those districts would collectively lose about $38 million in CARES Act funds.[23]

The allocation method effectively mandated by the Rule would also divert resources from private schools that serve a large number of low-income students. In Cleveland, for example, where a large number of low-income students attend private schools because of Ohio's voucher program, Council member the Cleveland Metropolitan School District ("CMSD") estimates that most private schools will lose money under the Department's methodology, favoring a select few who serve few low-income students. *Id.* ¶¶ 13-14. Overall the cumulative effect of the allocating funds for equitable services based on total enrollment in Cleveland's private schools would be to divert about $822,952 away from CMSD's public schools, reallocate approximately $890,000

---

[23] Morgan Craven and Roy L. Johnson, *An Analysis of How the Department of Education's Equitable Services Rule Will Harm Texas Students and School Districts*, IDRA ISSUE BRIEF (July 16, 2020), https://www.idra.org/education_policy/cutting-public-school-relief-funds-to-subsidize-private-schools-issue-brief/ ("IDRA Issue Brief").

THE COUNCIL OF THE GREAT CITY SCHOOLS PRELIMINARY
INJUNCTION AMICUS CURIAE BRIEF - 21
Case No. 2:20-cv-01119-BJR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

away from 47 non-public schools with high poverty, and redirect approximately $1.7 million to 16 private schools with low numbers of high poverty students. *Id.* ¶¶ 14-15.

The overall effect of the Department's approach is thus to divert hundreds of millions of dollars of critically needed funds away from public school districts serving low-income communities and millions more away from private schools serving high percentages of low-income students. This is not how Congress wanted to support educators' efforts to address the pandemic.

### B. The diversion would deprive millions of public school students of critical resources and life-saving services during the pandemic.

The diversion of these substantial funds away from school districts is depriving millions of students of exactly the resources these funds were supposed to support. The funds made available through the CARES Act were intended, once allocated, to be used for purposes such as purchasing sanitization and cleaning supplies, purchasing personal protective equipment for teachers and students, and planning for and coordinating long-term closures including by providing portable meals and technology services. These are critical resources necessary during this pandemic that are being deprived from millions of students in Council member districts.

The Council polled its member districts and asked them to list the consequences of the diversion of funds away from public schools. Exhibit F, ¶¶ 3-4. Here are five salient examples:

- **Broward County Public Schools**: Because $540,000 has been diverted to private school funding, the District was not able meet the technology needs of schools as they transitioned to a virtual environment. It also had to reduce funds for professional development and instructional materials.

- **Baltimore City Public Schools**: If the District must provide the additional $2,419,639 to private schools this will reduce the number of students that can receive a Chromebook to support distance learning by 6,050. Alternatively, the District would have to reduce the number of students that can be provided a semester of tutoring by 3,252.

THE COUNCIL OF THE GREAT CITY SCHOOLS PRELIMINARY
INJUNCTION AMICUS CURIAE BRIEF - 22
Case No. 2:20-cv-01119-BJR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

- **Charleston County School District**: This District was not able to provide the childcare services that the district's teachers needed to support online instruction. It also will not be able to purchase sufficient PPE to support reopening. In addition, it will struggle to provide Wi-Fi devices for students living in areas with limited internet capability.

- **District of Columbia Public Schools:** The $1.8M this District will lose could purchase 2,100 additional laptop devices for low-income students to support their virtual learning. $400,000 could provide mentoring and tutoring services for 400 at-risk students. $1.2M could purchase internet connectivity for one year for 5,000 low-income students.

- **Portland Public Schools:** This District would need to cut more than $628,000 from needed Chromebooks, safety supplies and materials, and other resources as well.

The analysis of Texas school districts discussed earlier shows a similar impact across the school districts in that state. The study concludes that the $38 million lost by those districts could "have been used to fund hundreds of counselors, social workers and nurses and to purchase equipment like facemasks and hand sanitizer. It could have been used to support remote learning and other critical services for students and teachers." IDRA Issue Brief at 1.

As positive COVID-19 test results rise throughout numerous places in the country, school districts are faced with an impossible choice made even more difficult by this diversion of funds: do we start school in-person without enough face masks and personal protective equipment or do we start school remotely when often large portions of the student body have neither internet connectivity or laptop devices to allow them to work remotely? This dilemma was intended to be at least partially alleviated by the availability of CARES Act funds. Instead, the Department's unlawful Guidance and Rule exacerbate the problem by depriving public schools of necessary funds. If the language of the CARES Act itself is properly followed, then Council member districts would have significantly more funds available to help address current conditions by providing resources necessary for safe in-person instruction and/or equitable remote learning.

THE COUNCIL OF THE GREAT CITY SCHOOLS PRELIMINARY
INJUNCTION AMICUS CURIAE BRIEF - 23
Case No. 2:20-cv-01119-BJR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

The challenges facing public school districts today are real and the potential consequences are grave. School districts are addressing unprecedented issues with scarce resources. The Department's attempt to divert hundreds of millions of dollars should not be allowed to make these difficult tasks even more challenging. The funds these districts stand to lose under the Department's arbitrary interpretation, if freed up for their intended purpose, would allow them better to address the challenges of the COVID-19 pandemic.

## **CONCLUSION**

For all of these reasons, the Council of the Great City Schools respectfully suggests that Plaintiff's motion for preliminary injunction should be granted.

DATED this 5th day of August, 2020.

PACIFICA LAW GROUP, LLP

By *s/Gregory J. Wong*
Gregory J. Wong, WSBA # 39329
1191 Second Avenue
Suite 2000
Seattle, Washington 98101-3404
Telephone: (206) 245-1700
Greg.Wong@pacificalawgroup.com

HUSCH BLACKWELL LLP

John W. Borkowski (IL Bar No. 6320147)
Mary Deweese (IL Bar No. 6326512)
*Admitted pro hac vice*
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Phone: (312) 526-1538
Fax: (312) 655-1501
john.borkowski@huschblackwell.com
mary.deweese@huschblackwell.com

Paige Duggins-Clay (TX Bar No. 24105825)
*Admitted pro hac vice*
111 Congress Avenue, Suite 1400
Austin, Texas 78701
Phone: (512) 472-5456

THE COUNCIL OF THE GREAT CITY SCHOOLS PRELIMINARY
INJUNCTION AMICUS CURIAE BRIEF - 24
Case No. 2:20-cv-01119-BJR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

Fax: (512) 479-1101
scott.schneider@huschblackwell.com
paige.duggins-clay@huschblackwell.com

Aleksandra O. Rushing (MO Bar No. 68304)
Shmuel B. Shulman (MO Bar No. 71175)
*Admitted pro hac vice*
190 Carondelet Plaza, Suite 600
St. Louis, Missouri 63141
Phone: (314) 345-6275
Fax: (314) 480-1505
aleks.rushing@huschblackwell.com
shmuli.shulman@huschblackwell.com

THE COUNCIL OF THE GREAT CITY SCHOOLS PRELIMINARY
INJUNCTION AMICUS CURIAE BRIEF - 25
Case No. 2:20-cv-01119-BJR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of August, 2020, I electronically filed the foregoing document with the United States District Court ECF system, which will send notification of such filing to all counsel of record.

Dated this 5th day of August, 2020.

*s/ Thien Tran*
Thien Tran, Paralegal/Legal Assistant

THE COUNCIL OF THE GREAT CITY SCHOOLS PRELIMINARY
INJUNCTION AMICUS CURIAE BRIEF - 26
Case No. 2:20-cv-01119-BJR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750