ETHAN P. DAVIS
Acting Assistant Attorney General
DAVID M. MORRELL
Deputy Assistant Attorney General
JENNIFER D. RICKETTS
Director, Federal Programs Branch
WILLIAM K. LANE III
Counsel

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON

STATE OF WASHINGTON,

        Plaintiff,

    v.

BETSY DEVOS, in her official capacity as
Secretary of the United States Department of
Education; and the UNITED STATES
DEPARTMENT OF EDUCATION,

        Defendants.

Case No. 2:20-cv-1119-BJR

**DEFENDANTS' MEMORANDUM IN
OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY
INJUNCTION**

Hearing: August 10, 2020

1
2
3
4
5
6
7
8
9

**INTRODUCTION**

In a time of global pandemic and economic turmoil, Congress saw fit to provide emergency funding for services to support schools throughout the nation.  In doing so, Congress mandated that these services be provided *equitably*—for the benefit of both public and non-public students.  The Department of Education's interpretation of the Coronavirus Aid, Relief, and Economic Security Act, which ensures an equitable distribution between public and private schools, is a reasonable one entitled to deference.  Because Plaintiff fails to demonstrate that the agency acted contrary to Congress's mandate or that its Interim Final Rule interpreting the statute is arbitrary or capricious, Plaintiff's motion for a preliminary injunction should be denied.

10

**BACKGROUND**

11

**I.   STATUTORY BACKGROUND**

12
13
14
15
16
17
18
19
20
21
22
23

This case arises from an interim final rule issued by the Department of Education to implement the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116-136, 134 Stat. 281 (2020).  The CARES Act—which Congress enacted to help many sectors of society respond to the coronavirus pandemic—appropriates more than $16 billion into two relief funds, and charges the Department of Education with allocating those funds to the Nation's public schools.  CARES Act §§ 18002-03.  Public school districts that receive CARES Act funds must then "provide equitable services" to private-school students "in the same manner as provided under" a different statute: Section 1117 of the Elementary and Secondary Education Act of 1965 (ESEA), Pub. L. No. 89-10 (1965) (codified at 20 U.S.C. § 6320).  CARES Act § 18005.  Plaintiff argues that, because the rule allegedly apportions CARES Act funds for equitable services to private school students in a manner inconsistent with § 1117 of the ESEA, the rule is unlawful on a variety of theories.

24

**A.  The Elementary and Secondary Education Act of 1965**

25
26
27
28

The ESEA is a comprehensive statutory scheme that supports students in the Nation's elementary and secondary schools.  Title I-A of the ESEA is designed to "improv[e] the academic achievement of" students who are failing (or are at risk of failing) to meet academic standards.  20 U.S.C. §§ 6314(a), 6315(c).  Title I-A accomplishes this by providing federal

funding to States and to local school districts (referred to as Local Educational Agencies, or LEAs) based primarily on the number of economically disadvantaged children that they serve. *Id.* §§ 6313(a), 6314(a), (b)(6), 6315(c); *see id.* § 6333(c) (establishing the parameters for allocating Title I-A funds among States and their constituent public school districts).

The goal of Title I is to provide "all children significant opportunity to receive a fair, equitable, and high-quality education," regardless of whether those children attend a public or private school. *See* 20 U.S.C. §§ 6301-02.  To that end, Section 1117 of the ESEA (codified at 20 U.S.C. § 6320) requires local school districts to supply academic services—such as special-education services, counseling, mentoring, and tutoring—to certain children enrolled in private schools. *Id.* § 6320(a)(1)(A).  Such services must "be equitable in comparison to services and other benefits for public school children" who benefit from Title I-A funds.  *Id.* § 6320(a)(3)(A). Accordingly, Section 1117 instructs local school districts to set aside funds for private school students "equal to the proportion of funds allocated to participating school attendance areas based on the number of children from low-income families who attend private schools" and reside in those attendance areas. *Id.* § 6320(a)(4)(A)(i).  These funds are then used to provide services to private-school students who are eligible to receive them.  A private-school student's eligibility for these services does not turn on his or her socioeconomic standing, despite the fact that the amount of money a school district must reserve to pay for such services is calculated by reference to the number of low-income private-school students who live in participating Title I-A attendance areas within the district's borders.  Instead, a student's eligibility depends on the extent to which he or she is "failing, or . . . at risk of failing, to meet" applicable academic standards along with residence in a participating Title I-A attendance area.  *Id.* § 6315(c)(1)(B).

Section 1117 separately requires local school districts to "timely and meaningful[ly] consult[] with appropriate private school officials."  20 U.S.C. § 6320(a)(1)(A).  The statute sets forth a detailed consultation procedure that specifies the issues that must be discussed, *id.* § 6320(b)(1)(A)-(L), (4); the way disagreements must be raised, *id.* § 6320(b)(2), (6); and the timeframe in which consultation must occur, *id.* § 6320(b)(3).  The statute also requires that "[t]he control of funds provided under" Title I-A of the ESEA "shall be in a public agency."  *Id.*

§ 6320(d)(1).

**B.  The CARES Act**

The CARES Act appropriated over $16 billion in financial assistance that can be used to support elementary and secondary schools, and instructed the Secretary of Education to administer and allocate that money through two separate funds.

The Governor's Emergency Education Relief (GEER) Fund provides emergency grants to state governors.  CARES Act § 18002.  Governors may use GEER funds to "support . . . any . . . education related entity within the State that the Governor deems essential for carrying out emergency educational services to students."  *Id.* § 18002(c).  Governors may also use GEER funds to give "emergency support . . . grants to local education agencies that the State educational agency deems have been most significantly impacted by coronavirus."  *Id.*  The Department of Education must allocate GEER funds among States using a specified statutory formula.  *Id.* § 18002(b) (directing the Secretary to allocate funds based 60 percent on a State's "relative population of individuals aged 5 through 24," and 40 percent on the amount of Title I-A funds that State would receive under the ESEA, 20 U.S.C. § 6333(c)).

The Elementary and Secondary School Emergency Relief (ESSER) Fund provides emergency grants for elementary and secondary schools.  CARES Act § 18003.  The Department of Education must allocate ESSER funds among States "in the same proportion as each State received under [Title I-A] of the ESEA . . . in the most recent fiscal year."  *Id.* § 18003(b).  Similarly, States must allocate ESSER funds to their school districts "in proportion to the amount of funds such local educational agencies and charter schools that are local educational agencies received under [Title I-A] of the ESEA . . . in the most recent fiscal year."  *Id.* § 18003(c).  A school district may use ESSER funds to pay for services that fall within twelve broad categories of expenditures, including emergency preparedness; cleaning supplies; distance-learning technology; meal services; mental health; "[a]ny activity authorized by the ESEA" or several other education-related statutes; and any "[o]ther activities that are necessary to maintain the operation of and continuity of services in [LEAs] and continuing to employ existing staff."  *Id.* § 18003(d).

The CARES Act authorizes the Department of Education to distribute GEER and ESSER funds only to public school districts.  But because the coronavirus pandemic has affected both public and private institutions, Section 18005 of the CARES Act instructs school districts that receive GEER or ESSER funds to "assist[] . . . non-public schools" using the CARES Act funds they have been allocated.  CARES Act § 18005 (casing fixed).  Specifically, local districts "shall provide equitable services in the same manner as provided under section 1117 [20 U.S.C. § 6320] of the ESEA of 1965 to students and teachers in non-public schools."  *Id.* § 18005(a) (referencing 20 U.S.C. § 6320).  Section 18005 further requires that these equitable services must be "determined in consultation with representatives of non-public schools."  *Id.*  Finally, § 18005 requires that "[t]he control of funds for" equitable services provided to private school students "shall be in a public agency."  *Id.* § 18005(b).

## II.    REGULATORY BACKGROUND

In April 2020, the Department issued guidance to help public school districts implement their § 18005 obligation to provide equitable services to students and teachers at private schools. Dkt. # 1-4.  The Department's guidance noted that the CARES Act—unlike Title I-A of the ESEA—places no restrictions on the eligibility of private-school students and teachers to receive "equitable services" under § 18005.  The guidance thus advised that GEER and ESSER funds may be used to "serve all non-public school students and teachers without regard to family income, residency, or eligibility based on low achievement."  *Id.* at 3.  The guidance also noted that the CARES Act permits public school districts that receive GEER or ESSER funds to spend that money to help *all* public schools within the district, and not merely schools with a sufficient number of low-income students to qualify for funding under Title I-A of the ESEA.  The guidance thus advised that, when calculating the share of "equitable services" that public school districts must give private school students under § 18005, public school districts must account for the private schools' total enrollment—not merely for the number of low-income students.  *Id.* at 6-7.

In July 2020, the Department formalized its guidance in an interim final rule.  CARES Act Programs; Equitable Services to Students and Teachers in Non-public Schools, 85 Fed. Reg.

39,479.  The Department issued the rule without prior notice and comment because of the significant educational disruptions caused by the coronavirus pandemic.  Specifically, § 18005 of the CARES Act forbids public school districts that receive GEER or ESSER funds from using those funds without consulting with the private schools within their boundaries, which in turn requires districts to "determin[e] the amount of funds available for [equitable] services."  *Id.* at 39,483.  The Department provided a 30-day comment period, however, and committed to considering the views of interested parties in determining whether to undertake additional rulemaking.  *Id.* at 39,484.

The Department explained that the rule was necessary to "resolve[] a critical ambiguity . . . with respect to the equitable services obligation owed by LEAs that receive CARES Act funds to students and teachers in non-public schools."  85 Fed. Reg. at 39,479.  The Department noted that, apart from requiring equitable services to be provided "in the same manner as provided under section 1117" of the ESEA, § 18005 did not specify how to ensure that the services provided are in fact "equitable."  *Id.* at 39,479-81.  The Department further noted that § 1117 of the ESEA is inconsistent with the CARES Act in several crucial respects.  For example, § 1117 forbids private-school students from benefiting from equitable services provided under the ESEA unless they are failing (or in danger of failing) to satisfy certain curricular standards.  20 U.S.C. § 6320.  But both GEER and ESSER funds may plainly be used for the benefit of all students, not merely those students in academic jeopardy.  The Department therefore concluded that rulemaking was necessary to resolve these ambiguities.  *See* 85 Fed. Reg. at 39,479 (recognizing that the Department was obliged to "construe the CARES Act based on plain meaning, context, and coherence within the overall statutory structure . . . and fit, if possible, all its parts into a harmonious whole").

The Department then explained that a "mechanistic application" of § 1117 to § 18005's equitable-services requirement would "disadvantage" private-school students and contravene congressional intent.  85 Fed. Reg. at 39,479.  The Department noted that, if § 1117's proportional-allocation provisions were applied to CARES Act funds, public school districts would only be required to reserve funds for private schools commensurate to the number of

low-income students at each private school—while remaining free to spend their portion of the funds on projects benefiting all public-school students. *Id.* at 39,482. As the Department explained, "the CARES Act does not limit services based on residence and poverty," so "it stands to reason that an LEA should not use residence and poverty to determine the proportional share of available funds for equitable services to non-public school students." *Id.* at 39,482-83.

The rule's interpretation of § 18005 differs from the Department's prior guidance only in that it accords public school districts more choice about how to satisfy the equitable-service requirement. The Department sought to broaden the number of options available to such districts in response to criticism from certain States that its guidance was too inflexible. 85 Fed. Reg. at 39,480. Under the rule, school districts have two pathways to compliance. First, a school district can commit to using its CARES Act funds exclusively on schools eligible for funds under Title I-A of the ESEA—that is, on schools with high instances of poverty. *Id.* at 39,482. If so, that district need only reserve funds for equitable services as specified by § 1117's proportional-allocation provisions—that is, based on the number of low-income students enrolled at private schools. 34 C.F.R. § 76.665(c)(1)(i). Second, a school district may instead commit to using CARES Act funds to benefit all schools, not merely schools with high instances of poverty. *Id.* at 39,482. To maintain equity, that district must then reserve funds for equitable services using the same measure—that is, the number of all students enrolled at private schools. 34 C.F.R. § 76.665(c)(1)(ii).

The Department determined that its interpretation was the appropriate way to ensure that "[e]ducational services and other benefits for students and teachers in non-public elementary and secondary schools [] be equitable in comparison to services and other benefits for public school students and teachers participating in CARES Act programs." 34 C.F.R. § 76.665(d).[1]

---

[1] On May 15, 2020, the House of Representatives passed legislation, referred to as the "HEROES Act," that would amend the CARES Act to require that "equitable services shall be provided by the local educational agency in which the students reside, and the amount of funds available for such equitable services shall be based on the number of nonpublic school students who were identified in the calculation under section 1117(c)(1) of the ESEA for purposes of Title I-A during the 2019-2020 school year relative to the sum of such students in public schools" that same year. *See* HEROES Act, H.R. 6800, 116th Cong. § 10604 (2020).

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 2:20-cv-1119-BJR

1

**ARGUMENT**

2

A preliminary injunction is "an extraordinary and drastic remedy" that should not be

3

granted "unless the movant, *by a clear showing*, carries the burden of persuasion." *Lopez v.*

4

*Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). "A plaintiff seeking a preliminary injunction must

5

establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in

6

the absence of preliminary relief, that the balance of equities tips in his favor, and that an

7

injunction is in the public interest." *Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir. 2019)

8

(quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)); *see Munaf v. Geren*, 553 U.S.

9

674, 690 (2008) (likelihood of success requires far more than identifying "serious, substantial,

10

difficult[,] and doubtful" questions). Plaintiff fails to meet any of these requirements.

11

**I.   PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS**

12

**A.**   Plaintiff's principal argument is that the Department's rule violates the

13

Administrative Procedure Act because it cannot be reconciled with § 18005 of the CARES Act,

14

and because the CARES Act did not give the Department authority to interpret § 18005.

15

*See* ECF No. 8, Mot. for Prelim. Inj. "Mot.", at 7-17.  This argument lacks merit.

16

Section 18005 of the CARES Act requires public school districts to provide equitable

17

services to private school students "in the same manner" as that specified in § 1117 of the

18

ESEA.  CARES Act, § 18005.  Section 1117 applies to certain equitable services provided

19

within the ambit of Title I-A of the ESEA, and includes a proportional-apportionment formula

20

based on the number of low-income students who reside in a Title I-A public school attendance

21

area and are in a private school.  20 U.S.C. § 6320(a)(4)(A).  But as the Department explained,

22

§ 1117—and the ESEA more broadly—cannot be imported into the CARES Act scheme in

23

"mechanistic" fashion.  85 Fed. Reg. 39,479.

24

Two examples illustrate the point.  First, § 1117 prohibits private-school students from

25

receiving "equitable services" using Title I-A funds unless they are at risk of failing out of

26

school.  20 U.S.C. § 6320(a)(1)(A) (restricting eligibility for services to "eligible children"); *id.*

27

§ 6315(c)(1)(B) (defining "eligible children" as "children identified by the school as failing, or

28

most at risk of failing, to meet . . . State academic standards").  But the plain text of the CARES

Act makes clear that GEER and ESSER funds may be used to pay for a broad range of services that benefit *all* students—such as disaster-preparedness planning, sanitation supplies, distance-learning technology, and pandemic-response plans developed in coordination with authorities at every level of government.  CARES Act §§ 18002(c), 18003(d); *see* 85 Fed. Reg. at 39,480.  Incorporating § 1117's "eligible children" restriction into the CARES Act would contravene those other CARES Act provisions by forcing private schools to restrict these services to the academically challenged—for instance, by implementing a pandemic-response plan that applies only to that subset of students, or by purchasing sanitation supplies that can be used only to clean certain classrooms.

Second, two of § 18005's provisions are substantively identical to two provisions in § 1117.  *See* 85 Fed. Reg. at 39,481.  Section 18005(a) requires public school districts to consult with private schools in deciding how equitable services should be provided, just like § 1117(b).  *Compare* CARES Act § 18005(a) *with* 20 U.S.C. § 6320(b).  And § 18005(b) requires public schools to maintain control over all CARES Act funds, using language nearly identical to that in § 1117(d).  *Compare* CARES Act § 18005(b) *with* 20 U.S.C. § 6320(d).  If the CARES Act's use of the phrase "in the same manner" incorporated every jot and tittle of § 1117, both the consultation and the public-control provisions of § 18005 would be superfluous.

For these reasons, the Department concluded, the phrase "in the same manner" must mean that § 18005 incorporates something less than every provision of § 1117.

**B.**      In light of the disparate purposes of the CARES Act (to provide emergency relief to all students and schools) and Title I-A (to provide services for low-achieving students), the Department reasonably concluded that "in the same manner" does not incorporate § 1117's proportional-apportionment provisions.  Those provisions—developed in the wholly separate context of equitable services provided under Title I-A—require public school districts to reserve funds in proportion to the number of low-income students enrolled in private schools who reside in Title I attendance areas.  20 U.S.C. § 6320(a)(4)(A).  As noted, however, Congress designed both the GEER and the ESSER programs to permit expenditures across a wide swath of areas that clearly benefit all students.  *See* CARES Act §§ 18002(c), 18003(d).  Given this tension, the

Department properly declined to interpret the phrase "in the same manner" to import § 1117's proportional-apportionment provisions into the CARES Act. *See King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) ("[O]ftentimes the meaning—or ambiguity—of certain words or phrases may only become evident when placed in context.") (citation and internal quotation marks omitted); *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010) (holding that courts "construe statutes, not isolated provisions"). Indeed, the word "manner" suggests that § 18005 refers to the way in which services are provided under § 1117, and not how the money to pay for those services is apportioned. *See American Heritage Dict.* 763 (2d College ed. 1985) (defining "manner" as "[a] way of doing something or the way in which a thing is done or happens").

In any event, "[t]he power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, *implicitly or explicitly*, by Congress." *Morton v. Ruiz*, 415 U.S. 199, 231 (1974) (emphasis added). The phrase "in the same manner" is at a minimum ambiguous with regard to the question whether Congress intended § 1117's proportional-apportionment provisions to apply to "equitable services" provided with CARES Act funds. To the extent the text of § 18005 does not supply a clear answer to that question, the Department may use rulemaking to "develop a harmonious construction faithful" to Congress's directive that billions of dollars in emergency appropriations be used *equitably*. 85 Fed. Reg. at 39,479. Indeed, the Secretary of Education has broad authority to "make, promulgate, [and] issue, … rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department." 20 U.S.C. § 1221e-3; *accord id.* § 3474 ("The Secretary is authorized to prescribe such rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department."). And it is well settled that, "whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matter subjected to agency regulations," an agency's resolution of a statutory ambiguity warrants deference.

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984) (citation omitted).

Deference is appropriate where, as here, the agency's interpretation of an ambiguous statute is reasonable. The Department of Education resolved the tension between the CARES Act and the provisions of § 1117 by reference to Congress's command that the services provided to private schools be "equitable." CARES Act § 18005(a). The Department determined that it is inequitable to apportion expenditures for private schools on the basis of low-income students when public school districts may use their share of CARES Act funds to benefit all schools and students. 85 Fed. Reg. at 39,483. In the Department's expert judgment, equity in this context instead demands either that: (1) public school districts that spend CARES Act funds to benefit all schools and students apportion private-school funds based on total enrollment; or (2) public school districts that choose to apportion private-school funds based on low-income enrollment then limit their own spending to low-income schools. *Id.* at 39,482. Those, of course, are the same two pathways to § 18005 compliance that the challenged rule sets forth. *Id.*[2]

Plaintiff disputes (Mot. 8, 11-12) that § 18005 is ambiguous. In its view, if Congress intended that CARES Act funds be apportioned to private schools based on total enrollment, Congress would have written § 18005 to cross-reference § 8501 of the ESEA, which is codified at 20 U.S.C. § 7881. That statute governs equitable services rendered under a different portion of the ESEA, and it is functionally identical to § 1117 in all but one respect: Unlike § 1117, § 8501 requires public school districts to reserve funds for private schools in proportion to their total enrollment in the relevant program. *Id.* § 7881(a)(4)(A). But even if Congress had

---

[2] Plaintiff is similarly incorrect in asserting that the Rule is not entitled to *Skidmore* deference (Mot. 13-14). That doctrine accords deference to agency interpretations that are "not controlling" but have "power to persuade." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Plaintiff's argument ignores the basis of the Rule—*i.e.*, the tension between the CARES Act's provision of funds for services to benefit all students *equitably* and Section 1117's eligibility- and income-based restrictions. The Department's resolution of that tension is, at minimum, persuasive. And administering the complex scheme of allocating and administering funds for the provision of equitable services between public and private schools is uniquely within the Department's expertise, further counseling deference to the agency's interpretation.

enacted this hypothetical version of § 18005, ambiguity would remain.  Like § 1117, § 8501 also includes consultation and public-control provisions indistinguishable from those present in § 18005.  *Id.* § 7881(c) (consultation); *id.* § 7881(d) (public control).  Thus, had Congress required CARES Act funds to be apportioned "in the same manner as that specified in § 8501," questions would remain about *which* provisions of § 8501 Congress meant to incorporate— since incorporating *all* of § 8501's provisions would create the very same superfluity whose existence illustrates the ambiguity that the Department intended the rule to resolve.

Plaintiff claims that even if the Department reasonably interpreted an ambiguous statute, "agencies generally lack authority to interpret appropriations statutes and courts owe no deference to their interpretation."  Mot. 10.  But the authorities on which Plaintiff relies stand for, at most, the proposition that courts may decline to defer to an agency's interpretation of an appropriation not within the exclusive province of that agency.  Clearly, where Congress allocates funds to be distributed or overseen by a particular agency, that agency's reasonable interpretation of an ambiguous provision of an appropriations statute is entitled to deference. *See, e.g.*, *Sherley v. Sebelius*, 644 F.3d 388, 394 (D.C. Cir. 2011) ("we must uphold the NIH's interpretation of Dickey-Wicker if it is but 'reasonable'" (citing *Chevron*, 467 U.S. at 844)); *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 752 (D.C. Cir. 2002) (deference owed to agency interpretation of the 2000 Appropriations Act).

Plaintiff argues, alternatively, that the challenged rule is arbitrary or capricious.  *See* Mot. 14-17.  But the rule reflects the Department's considered resolution of the tension that it perceived between the purposes of the GEER and ESSER programs and § 18005's ambiguous reference to § 1117.  And the rule offers public school districts the choice of two equitable paths, to fulfill the statutory command in the CARES Act that the services provided by public school districts be "equitable."  *Cf. King*, 135 S. Ct. at 2493 ("We cannot interpret federal statutes to negate their own stated purposes.") (quoting *New York State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 419-20 (1973)).  This Court should decline Plaintiff's invitation to second-guess the Department's policy judgment on that score.  *See FCC v. Fox Television Stations, Inc.*, 556 U.S.

502, 530 (2009).  Plaintiff further contends (Mot. 14-17) that the IFR is arbitrary and capricious because the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem," and "offered an explanation for its decision that runs counter to the evidence before the agency."  But Plaintiff's one-sided assessment of harms ignores those suffered by private school students and teachers during the pandemic, and overlooks that Congress directed that use of CARES Act funds be equitable.  The Department's decision to require parity between the students *benefiting* from CARES Act services and the private-school students *counted* in apportioning CARES Act funds is a policy choice not susceptible to judicial second-guessing either.

Plaintiff next asserts (Mot. 15) that the agency's decision must be set aside because it "is flatly inconsistent with its prior guidance of October 7, 2019" and thus reverses prior guidance without adequate explanation.  But the agency has not reversed course or rescinded prior policy. The Department's general interpretation of Section 1117's equitable-services mandate, issued in October 2019, *see* Mot. Ex. 5, Crisalli Decl. at 15, remains unaltered—as does its interpretation of the provision of equitable services *using Title I funds*.  In contrast, the challenged rule relates to equitable services provided using CARES Act funds—a question the Department could not possibly have had any position or policy on previously.  As the rule explains, the Department's interpretation rests on the fact that CARES Act funds can be used more broadly than Title I-A funds, and that the national emergency prompting its passage "has harmed *all* our Nation's students by disrupting their education."  85 Fed. Reg. at 39,479.

**D.**     Plaintiff's constitutional claims should fail for the same reasons that its APA claims should be rejected.  Each such claim rests on the premise that the Department of Education lacked statutory authority to issue the challenged rule.  But as the Supreme Court has held, "in cases in which the [government] concedes, either implicitly or explicitly, that the only source of [its] authority is statutory, no constitutional question whatever is raised," "only issues of statutory interpretation."  *Dalton v. Specter*, 511 U.S. 462, 474 n.6 (1994).  Plaintiff's contrary view would have the sweeping implication that every challenge to an agency regulation could be re-characterized as a "constitutional" claim, given the general absence of any background

constitutional authority for agencies to take action in the absence of congressional authorization. Because the challenged rule is a permissible construction of § 18005, there is no freestanding constitutional impediment to the Department's actions.

## II. PLAINTIFF HAS NOT ESTABLISHED THAT IRREPARABLE HARM IS LIKELY IN THE ABSENCE OF AN INJUNCTION

Plaintiffs seeking a preliminary injunction bear the burden of demonstrating that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20; *see also Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (plaintiffs must show irreparable harm is likely, not just possible). To establish a likelihood of irreparable harm, plaintiffs "must do more than merely allege imminent harm sufficient to establish standing; [they] must demonstrate immediate threatened injury." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016). Plaintiffs must also show that the threatened harm would *not* occur if an injunction were granted. *See Winter*, 555 U.S. at 20; *Sierra Club v. Trump*, 379 F. Supp. 3d 883, 925-26 (N.D. Cal. 2019) (preliminary injunction warranted only if it "will *prevent* some irreparable injury that is likely to occur before the Court has time to decide the case on the merits") (emphasis added), *appeal filed,* No. 19-16102 (9th Cir. May 29, 2019).

Here, Plaintiff seeks an injunction to allow public school districts to apportion CARES Act money as it sees fit. It is well established that, ordinarily, economic injury does not qualify as irreparable harm. *See Rent–A–Ctr., Inc. v. Canyon Tele. & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991); *see also Barber v. Ohana Military Comm., LLC*, 694 Fed. App'x 583, 584 (9th Cir. 2017) ("Economic injury alone cannot support a finding of irreparable harm"). Even putting that aside, Plaintiff's claimed injuries are not irreparable because, if it were ultimately to prevail in its challenge to the rule, public school districts could at that point reapportion unobligated GEER and ESSER funds to provide equitable services under Plaintiff's interpretation of § 18005. This conclusion is not altered by the fact that public school districts must consult with private school officials regarding the provision of equitable services before expenditures are made. Plaintiff does not suggest that such districts must, or even desire to,

spend *all* their GEER and ESSER funds in the immediate future, or even before the start of the school year.  Accordingly, nothing prevents LEAs from reapportioning funds and altering the provision of equitable services for private-school students in the event Plaintiff prevails.[3]

### III. PLAINTIFF HAS NOT ESTABLISHED THAT THE PUBLIC INTEREST SUPPORTS AN INJUNCTION

Plaintiff must also establish both that the balance of equities tips in its favor and that the public interest favors an injunction.  *Alliance for the Wild Rockies*, 632 F.3d at 1135.  These factors merge when the federal government is a party.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  Plaintiff fails to support an injunction on either ground.

Plaintiff asserts (Mot. 24) that the Rule "imposes significant harms to Washington's educational institutions and the students they serve" and that the "public interest favors protecting Washington's ability to serve vulnerable students so they can safely continue to receive [an] education during the pandemic, as Congress intended." Those statements present only half the picture.  In arguing that an injunction is needed to support *public schools'* continued ability to provide their students with an education, Plaintiff overlooks (1) that Congress also directed that equitable services be provided to private-school students, who also have had their educations interrupted by the pandemic, and (2) that the Department reasonably determined that private-school services would not be *equitable* unless funded by reference to the students whom a public school chooses to serve under the CARES Act, *i.e.*, students in Title I schools or in all schools.  Indeed, Plaintiff admits that Washington's state constitution requires it "to amply provide for the education of *all* children within its borders," (Mot. 21, emphasis added), yet it fails to grapple with the impact on private schools and teachers should its preferred allocation method take effect. At bottom, the harms articulated by Plaintiff as a

---

[3] Plaintiff relies on *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018), for the proposition that economic injury can support a finding of irreparable harm in the APA context because damages are not available to compensate for losses.  But that case is distinguishable because the rule at issue was found likely to cause the state to expend its own money to compensate for the effect of the rule, whereas here the rule concerns only the amount of emergency relief funds available to a public school district.  Moreover, Plaintiff does not claim to need to spend all of its CARES Act funds immediately in a manner that would make later reapportionment impossible.

result of the pandemic are common to many throughout the country and do not justify preliminary relief to thwart the Department's determination of how best to align § 1117 with the broad purposes of the CARES Act and the equity mandate imposed by Congress.  The public interest here is in allowing the Department to continue implementing the sections of the CARES Act that Congress assigned it to administer, and to ensuring that *all* students benefit from CARES Act funds in an equitable manner.

## **CONCLUSION**

For the foregoing reasons, Plaintiff's motion for preliminary injunction should be denied.


DATED:  August 6, 2020                          Respectfully submitted,

ETHAN P. DAVIS
Acting Assistant Attorney General

DAVID M. MORRELL
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director, Federal Programs Branch

*/s/ William K. Lane III*
WILLIAM K. LANE III
(D.C. Bar #1034955)
Counsel, Civil Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530
(202) 305-7920
william.lane2@usdoj.gov


*Attorneys for Defendants*