1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STATE OF WASHINGTON )
)
           *Plaintiff*, )
)
      v. )
)
BETSY DEVOS, in her official capacity as )
Secretary of the United States Department of )
Education; and the UNITED STATES )
DEPARTMENT OF EDUCATION, a )
federal agency )
)
           *Defendants*. )
_____ )

CASE NO. 2:20-cv-1119-BJR

ORDER GRANTING MOTION FOR
PRELIMINARY INJUNCTION

## I.     INTRODUCTION

Before the Court is the State of Washington's Motion for Preliminary Injunction, seeking to enjoin Defendants Secretary Betsy DeVos and the Department of Education from implementing an interim final rule ("Interim Final Rule"), which outlines how states may allocate funding provided by the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") to private schools. The State claims that the Interim Final Rule misconstrues Congress's intent and effectively diverts emergency relief funding from economically disadvantaged public schools to less disadvantaged private schools. Pl.'s Mot. for Prelim. Inj., Dkt. No. 8. In essence, the parties

1

dispute whether the CARES Act requires States to allocate funding to private schools using a formula based on the *percentage of students from low-income families* who attend private school ("poverty-based formula"), as advanced by the State, or whether, as Defendants claim, the CARES Act authorized the Department to issue the Interim Final Rule, which directs States to allocate that funding based on *total enrollment* in private schools ("enrollment-based formula").   Having reviewed the Motion, the opposition thereto, the record of the case, the relevant legal authorities, and having conducted oral argument on August 10, 2020 via video-teleconference, the Court will grant the Motion and issue the injunction.   The reasoning for the Court's decision follows.

## II.   BACKGROUND

### A.  The COVID-19 Pandemic

The case before the Court is but one of many disputes being played out against the backdrop of the COVID-19 pandemic.   The pandemic has wreaked havoc on this nation and created novel and difficult questions for the courts.   One of the most pressing issues is how to provide education for children at a time fraught with the dangers of a life-threatening, highly communicable disease.

On February 29, 2020, as the virus spread through the State of Washington, Governor Jay Inslee declared a state of emergency.   *See* Compl., Dkt. No. 1 ¶ 25; *see also* Wash. Governor's Proclamation 20-05 (Feb. 29, 2020).[1]   In an effort to protect school students and stem the virus's spread, Gov. Inslee announced the closure of all public and private K-12 schools in King, Snohomish, and Pierce Counties effective March 17 and lasting, at that time, through at least April

---

[1] Available at https://www.governor.wa.gov/sites/default/files/proclamations/20-05%20Coronavirus%20%28final%29.pdf.

24.  Compl. ¶ 26.  Through repeated orders by the Governor, schools throughout the State were ordered closed for the remainder of the school year, forcing educators to transition to online instruction for all students.  *Id.* ¶¶ 26, 30.  The State reports that significant efforts have been taken to provide support to students in need in particular, including serving meals, providing special education and related services to students with disabilities, providing remote learning access for English learners, and offering computing and connectivity technology to low-income students.  *Id.* Many of these efforts are on-going.

**B.  The CARES Act GEER and ESSER Funds**

In response to the wide-ranging economic consequences of the pandemic, Congress passed the CARES Act, which the President signed on March 27, 2020.  *See* Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020); Compl. ¶¶ 32–33.[2]  The CARES Act contains a wide array of federal funding designed to combat the consequences of the pandemic, including $30.75 billion for the creation of an Education Stabilization Fund ("ESF") to address educational needs of the nation's students.  *See* Compl. ¶ 34.

The CARES Act directs the Secretary of Education to allocate ESF funding to three sub-funds, two of which are pertinent here.[3]  *See* CARES Act § 18001(b); Compl. ¶¶ 34–44.  The first

---

[2] Since the CARES Act was codified in scattered titles across the U.S. Code, the Court will refer to specific provisions therein by their section within the CARES Act.  For example, CARES Act sections 18003 and 18005, relevant to this case, are codified in 20 U.S.C. § 3401 note.

[3] The third sub-fund, the Higher Education Emergency Relief ("HEER") Fund, is not at issue in this case.  *See* CARES Act § 18004.  Notably, however, at least two courts within the Ninth Circuit have recently granted preliminary injunctions limiting the Department's authority to impose eligibility restrictions on students who may receive HEER funding.  *See Oakley v. Devos*, No. 20-cv-03215, 2020 WL 3268661 (N.D. Cal. June 17, 2020); *Washington v. DeVos*, No. 20-cv-0182, 2020 WL 3125916 (E.D. Wash. June 12, 2020).

is the Governor's Emergency Education Relief ("GEER") Fund, for which Congress appropriated approximately $3 billion.  *See* CARES Act § 18002, § 18001(b)(1).  The CARES Act directs the Secretary to make GEER funding available to the governor of each state based on the relative population of students in that state and, in particular, the relative population of students from low-income families.  *Id.* § 18002(a), (b).  The Act further provides that GEER funds may be used to "provide emergency support through grants to local educational agencies [("LEAs")] that the State educational agency [("SEA")] deems have been most significantly impacted by coronavirus to support the ability of such local educational agencies to continue to provide educational services to their students and to support the on-going functionality of the local educational agency."[4] *Id.* § 18002(a), (b), (c)(1).

The second ESF fund is the Elementary and Secondary School Emergency Relief ("ESSER") Fund, for which Congress appropriated approximately $13.5 billion.  *See id.* §§ 18003, 18001(b)(2).  The CARES Act directs the Secretary of Education to make ESSER funding available by grant directly to SEAs, again according to a formula based on the relative population of students from low-income families.  *Id.* § 18003(b).  The Act then instructs SEAs to provide the funding to LEAs through sub-grants.  *Id.* § 18003(c).  The Act specifies the uses that LEAs may

---

[4] An LEA is defined as "a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary schools or secondary schools."  34 C.F.R. § 303.23(a).  In Washington, LEAs include school districts, charter schools, and state-tribal education compact schools.  Compl. ¶ 17.  SEAs are defined as "the State board of education or other agency or officer primarily responsible for the State supervision of public elementary schools and secondary schools."  34 C.F.R. § 300.41.  In Washington, the SEA is the Office of Superintendent for Public Instruction.  Compl. ¶ 39.

put ESSER funding towards, including "[c]oordination of preparedness and response efforts" and "[p]roviding principals and others school leaders with the resources necessary to address the needs of their individual schools." *Id*. § 18003(d)(1)–(12). The statute explicitly provides that ESSER funds may be used for "[a]ctivities to address the unique needs of low-income children or students, children with disabilities, English learners, racial and ethnic minorities, students experiencing homelessness, and foster care youth." *Id*. § 18003(d)(4).

Critically for purposes of this dispute, Congress outlined how LEAs are to allocate GEER and ESSER funding to non-public, *i.e.* private, schools. *See* Compl. ¶ 43–44. Specifically, Section 18005 provides that an LEA "receiving [GEER or ESSER] funds . . . *shall provide equitable services in the same manner as provided under section 1117* of the [Elementary and Secondary Education Act ("ESEA")] of 1965 to students and teachers in non-public schools, as determined in consultation with representatives of non-public schools." CARES Act § 18005(a) (emphasis added).

Given the Act's reference to Section 1117 of the ESEA, closer examination of that statute is necessary. The ESEA, a central component of President Johnson's "War on Poverty," is the statute by which Congress provides federal funding for primary and secondary education. Pub. 89–10, 79 Stat. 27, as amended, 20 U.S.C. § 6301 *et seq*. Title I of the ESEA created a grant program designed to improve the academic achievement of disadvantaged children. *See id.* Under Title I, public schools are eligible to receive funding for schoolwide programs if 40 percent or more of the children in the LEA attendance area come from low-income families. *Id.* § 6314(a)(1)(A).

Section 1117 of Title I—specifically referenced in the CARES Act—outlines how LEAs

5

are to share Title I funding with eligible private schools, instructing LEAs to provide services to private schools "on an equitable basis." 20 U.S.C. § 6320(a)(1). More specifically, the formula that determines how much Title I funding private schools are to receive is to be "equal to the proportion of funds allocated to participating school attendance areas based on the number of children from low-income families who attend private schools." *Id.* § 6320(a)(4)(A)(i). This formula has consistently been interpreted to mean that LEAs are to share their Title I funding in proportion to the number of students from low-income families that reside in their attendance area but who attend private school. This is the "poverty-based formula."

The State of Washington submitted its application for CARES Act funding pursuant to the GEER and ESSER Funds on April 27, 2020. Compl. ¶ 78; *see also* Compl., Ex. 6, Dkt. No. 1-9. The State was awarded $216.9 million in federal aid through the ESSER Fund and $ 56.8 million through the GEER Fund. Compl. ¶ 78; Pl.'s Mot. for Prelim. Inj. at 6.

## C. The Department's CARES Act Guidance and Interim Final Rule

On April 30, 2020, the Department published guidance purporting to interpret the provision in the CARES Act pertaining to "Assistance to Non-Public Schools," Section 18005. Compl. ¶¶ 53–55; *see also* Compl., Ex. 1, Dkt. No. 1-4 (U.S. Dep't of Educ., *Providing Equitable Services to Students and Teachers in Non-Public Schools Under the CARES Act Programs* (Apr. 30, 2020) ("Guidance")).[5] Claiming an ambiguity in the statute, the Guidance directed LEAs to provide private schools with CARES Act funding according to "the proportional share based on the number

---

[5] Available at https://web.archive.org/web/20200526004048/https://oese.ed.gov/files/2020/04/FAQs-Equitable-Services.pdf.

of children enrolled in each non-public school whose students or teachers participate in the CARES

Act programs compared to the number of students enrolled in public schools in the LEA. Compl.,

Ex. 1 at 4; *see also id.* at 6. In other words, the Guidance adopted a formula for allocating ESF

funding to private schools, based on the total number of enrolled students, regardless of their

families' income levels. This is the "enrollment-based formula."

On July 1, 2020, despite objections from numerous constituencies, including the State, to

the Guidance's adoption of the enrollment-based formula, the Department issued its Interim Final

Rule.[6] *See* CARES Act Programs; Equitable Services to Students and Teachers in Non-Public

Schools, 85 Fed. Reg. 39,479 (codified at 34 C.F.R. § 76.665)[7] ("Interim Final Rule"); *see also*

---

[6] The State was not alone in its concern that the enrollment-based formula would improperly divert funding from public to private schools. The Guidance garnered a bevy of reactions. *See* Compl. ¶¶ 56–58. For example, organizations such as the Council of Chief State School Officers ("CCSSO") and several Members of Congress wrote letters to the Department expressing their view that Section 18005's reference to Section 1117 was clear and required the use of the poverty-based formula. Compl., Ex. 2, Dkt. No. 1-5 (Letter from Carissa Moffat Miller, Exec. Dir., CCSSO, to Betsy DeVos, Sec'y, U.S. Dep't of Educ. (May 5, 2020), https://ccsso.org/sites/default/files/2020-05/DeVosESLetter050520.pdf); Compl., Ex. 3, Dkt. No. 1-6 (Letter from Robert C. "Bobby" Scott, Rosa L. DeLauro, and Patty Murray, U.S. Congress, to Betsy DeVos, Sec'y, U.S. Dep't of Educ. (May 20, 2020), https://edlabor.house.gov/imo/media/doc/2020-5-20%20Ltr%20to%20DeVos%20re%20Equitable%20Services.pdf).

[7] The final text of the Rule reads

(c) Determining proportional share.
(1) To determine the proportional share of funds for equitable services to students and teachers in non-public elementary and secondary schools for each CARES Act program, an LEA must use one of the following measures. The LEA need not use the same measure for each CARES Act program.
(i) An LEA using all its funds under a CARES Act program to serve only students and teachers in public schools participating under Title I, Part A of the ESEA may calculate the proportional share in accordance with paragraph (c)(1)(ii) of this section or by using—
(A) The proportional share of Title I, Part A funds it calculated under section 1117(a)(4)(A) of the ESEA for the 2019–2020 school year; or
(B) The number of children, ages 5 through 17, who attend each non-public school in the LEA that will participate under a CARES Act program and are from low-income families compared to the total number of children, ages 5 through 17, who are from low-income families in both Title I schools and participating non-public elementary and secondary schools in the LEA.

Compl. ¶¶ 62–73.

Based again on a claimed ambiguity in Section 18005, the Department gave LEAs two options.  First, an LEA could choose to use either the enrollment-based or poverty-based formula, but only if it agreed to limit CARES Act funding to schools that are qualified to participate in the ESEA Title I grant program, and actually receive funding under that program.  Alternatively, if the LEA elected to use its CARES Act funding for all schools within its attendance area, regardless of Title I participation, the Final Interim Rule required the LEA to use the enrollment-based formula in apportioning funding to private schools.  Interim Final Rule at 39,481; *see also* 34 C.F.R. § 76.665(c).

According to the State, this choice has the effect of increasing the proportion of CARES Act funding going to its private schools, at the expense of its public schools.  In Washington, as in many states, not all Title I eligible schools choose to participate in Title I.  The State avers that of its 2,369 primary and secondary public schools, 1,594 are eligible to participate in Title I, but only 1,002 actually do.  Compl. ¶ 74.  Regardless of which option an LEA chooses, in a state like Washington in which not all Title I eligible schools participate in that program, private schools will receive a larger share of CARES Act funding than they would under a straight-forward application of Section 1117's poverty-based formula.

---

(ii) Any other LEA must calculate the proportional share based on enrollment in participating non-public elementary and secondary schools in the LEA compared to the total enrollment in both public and participating non-public elementary and secondary schools in the LEA.

34 C.F.R. §76.665(c).

### D.  Procedural History

The State filed suit challenging the Department's Interim Final Rule on July 20, 2020.  *See* Compl., Dkt. No. 1.[8]  The State's Complaint advances five causes of action; three under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, (Counts I to III),[9] and one each under Separation of Powers (Count IV) and the Spending Clause, U.S. CONST. art. I. § 8, cl. 1 (Count V). Compl. ¶¶ 95–119.  The Complaint seeks injunctive and declaratory relief, including a declaration that the Interim Final Rule is contrary to law and invalid; and preliminary and permanent injunctions prohibiting its implementation, compelling the issuance of the contested CARES funding to the State without the restrictions imposed by the Interim Final Rule, and permitting the State to use the apportionment formula provided by Section 1117 of the ESEA.  *Id.* at 30, ¶¶ a–f. On July 23, 2020, the State filed its Motion for Preliminary Injunction, asking the Court to preliminarily enjoin Defendants from implementing or enforcing the Interim Final Rule.  *See* Pl.'s Mot. for Prelim. Inj., Dkt. No. 8.  In its response to the motion, the Department denies that the State is likely to succeed on the merits of its claims, or that the State will suffer irreparable harm absent an injunction.  Defs.' Mem. in Opp'n to Pl.'s Mot. for Prelim. Inj., Dkt. No. 50.  A hearing on the motion took place, over video-teleconferencing, on August 10, 2020.  Dkt. No. 52.

---

[8] The parties have advised the Court that this is one of four related cases challenging the same agency action.  *See Council of Parent Attorneys and Advocates, Inc. v. DeVos, et al.*, No. 20-cv-02310 (D. Md. Filed Aug. 10, 2020); *NAACP, et. al. v. Elizabeth DeVos, et. al.*, 20-cv-1996 (D.D.C. filed July 22, 2020); *State of Michigan, et. al. v. Betsy DeVos, et. al.*, No. 20-cv-4478 (N.D. Cal. filed July 7, 2020).

[9] In Count III of its Complaint, the State alleges that the Department's promulgation of the Interim Final Rule runs contrary to the APA's procedural requirements because it was issued without notice and comment or sufficient justification for foregoing notice and comment.  Compl. ¶¶ 103–06.  The State has not, however, raised this claim in this Motion.

### III.   LEGAL STANDARD

A preliminary injunction is an extraordinary remedy.  *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008).  To demonstrate entitlement to a preliminary injunction, the movant bears the burden of establishing: (1) likelihood of success on the merits; (2) likelihood of suffering irreparable harm in the absence of a preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest.  *See E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 844–45 (9th Cir. 2020) (citing *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009)); *see also Pimentel-Estrada v. Barr*, No. 20-cv-495, 2020 WL 2092430, at *10 (W.D. Wash. Apr. 28, 2020).  "When the government is a party, the[] last two factors merge."  *E. Bay Sanctuary Covenant*, 964 F.3d at 845 (quoting *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)).

In weighing whether a preliminary injunction is appropriate, courts in this Circuit may use a "sliding scale" approach, in which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another."  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–35 (9th Cir. 2011); *see also Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020); *Kater v. Churchill Downs Inc.*, 423 F. Supp. 3d 1055, 1061 (W.D. Wash. 2019).

### IV.   DISCUSSION

#### A. Likelihood of Success on the Merits

"Likelihood of success on the merits is a threshold inquiry and the most important factor."  *Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1080 (9th Cir. 2020).  The State bears the burden of showing that it is likely to succeed on the merits of its claims.  *See E. Bay Sanctuary Covenant*,

10

964 F.3d at 845.

    1. _Administrative Procedure Act Claims (Counts I and II)_

    The State first challenges the Department's actions under the APA, which broadly "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." _Dep't of Homeland Sec. v. Regents of the Univ. of California_, 140 S. Ct. 1891, 1905 (2020) (quoting _Franklin v. Massachusetts_, 505 U.S. 788, 796 (1992)). Under the APA, agencies must "engage in reasoned decisionmaking," and the Court is empowered to set aside any action which runs afoul of the APA's requirements. _Id._ (citations omitted). When reviewing a claim under the APA, the Court is limited to reviewing "the grounds that the agency invoked when it took the action." _Id._ at 1907 (quoting _Michigan v. EPA_, 576 U.S. 743, 758 (2015)). 5 U.S.C. § 706 lays out the familiar scope of judicial review under the APA and instructs, in its relevant parts, that the Court "shall . . . hold unlawful and set aside agency action . . . found to be . . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).  In its Motion, the State challenges the Interim Final Rule on both grounds, which the Court examines in turn.

    a. _Count I- The Agency's Action is in Excess of Statutory Authority and Not in Accordance with Law_

    The State argues that the Department's Interim Final Rule is in excess of statutory authority and not in accordance with law.  Compl. ¶¶ 95–98; Pl.'s Mot. for Prelim. Inj. at 8–11; Pl.'s Reply in Supp. of Mot. for Prelim. Inj., Dkt. No. 51 at 2–5.  Specifically, the State claims that Congress did not delegate to the Department the authority to promulgate rules under Section 18005 of the CARES Act.  Compl. ¶ 97.  Further, the State argues that Section 18005 is not ambiguous, and

that the Department therefore has no implicit rulemaking authority.  Pl.'s Mot. for Prelim. Inj. at 8.  The Department, in response, argues that it had general rulemaking authority to promulgate the Interim Final Rule and that Section 18005 is ambiguous and, therefore, it had implicit authority to interpret the statute by way of the Rule.  Defs.' Mem. in Opp'n to Pl.'s Mot. for Prelim. Inj. at 7–9.

i.  *There is No Delegation of Rulemaking Authority to the Department*

The Department does not, and indeed cannot, argue that Congress explicitly delegated it rulemaking authority over the CARES Act, because such authority is simply absent from its text.  Instead, the Department argues that its authority to promulgate the Interim Final Rule is grounded in the Secretary's general rulemaking authority in 20 U.S.C. § 1221e-3 and 20 U.S.C. § 3474.  *See* Interim Final Rule at 39,481.  Again, however, nothing in either the text or construction of Section 18005 of the CARES Act evidences an intent to import general rulemaking authority.  *See Washington*, 2020 WL 3125916, at *9 ("Nothing in the CARES Act grants [the Department] authority to use [its] general rulemaking power . . . to impose conditions on the general allocations made in the CARES Act.").  As the State observes, other sections of the CARES Act, in contrast, affirmatively grant the implementing agencies such authority.  *See, .e.g.,* CARES Act §§ 1114, 3513(f), 12003(c).  Congress therefore knew how to delegate such authority but declined to do so in Section 18005.  The Court therefore finds that the Department did not have explicit authority—either specific or general—to promulgate rules under this section of the CARES Act.

ii.  *The Statute is Not Ambiguous*

The Department further argues that it was permitted to engage in rulemaking because Section 18005 is ambiguous, and "ambiguities in statutes within an agency's jurisdiction to

12

administer are delegations of authority to the agency to fill the statutory gap in a reasonable fashion." *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980, (2005).

To determine if a statute is ambiguous, the Court "must exhaust all the 'traditional tools' of construction." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 n.9 (1984)).  This involves "'carefully consider[ing]' the text, structure, history, and purpose of a regulation, in all the ways [the Court] would if it had no agency to fall back on." *Id.* (quoting *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 707 (1991) (Scalia, J., dissenting)).  Based on such a review, a statute is only ambiguous if it is "susceptible to more than one reasonable interpretation." *Alaska Wilderness League v. U.S. E.P.A.*, 727 F.3d 934, 938 (9th Cir. 2013).

Here, the statute could hardly be less ambiguous.  In Section 18005, Congress unequivocally and plainly instructed the Department to allocate GEER and ESSER funding "in the same manner as provided under section 1117 of the ESEA of 1965 to students and teachers in non-public schools."  This directive, referring to a simple, familiar, and time-tested formula, includes all the hallmarks of inflexibility, such as an explicit command in the use of "shall" and an overt statutory cross-reference.  Moreover, historically speaking, Congress's reference to Section 1117 of the ESEA cannot be construed as casual or incidental; it is an explicit citation to a formula with which LEAs are well acquainted, grounded as it is in one of the nation's flagship educational programs, providing funding for some of the nation's neediest students.

The Guidance and Interim Final Rule outline the Department's claims to ambiguity, which the Department repeats in response to the State's Motion.  These purported justifications do not

alter the Court's conclusion.  First, the Interim Final Rule claims ambiguity arising from an alleged tension between the CARES Act's goal of helping all students regardless of economic circumstances, on the one hand, and Section 1117's focus on economically disadvantaged students, on the other.  *See, e.g.*, Interim Final Rule at 39,479 ("[t]he CARES Act is a special appropriation to combat the effects of . . . COVID-19. . . . Nothing in the CARES Act suggests Congress intended to differentiate between students based upon the public or non-public nature of their school with respect to eligibility for relief.").

This argument is unavailing.  Distribution of funds under the poverty-based formula will not result in private schools receiving no ESF funding; only in receiving funding in a smaller proportion than they would under the Department-created formula.  This reflects Congress's stated intent in the CARES Act to distribute education funding to all, but to concentrate on those in direst need.  As the CARES Act explicitly provides, one of the central uses for the ESSER Fund is to address "the unique needs of low-income children or students" and other disadvantaged communities.  CARES Act § 18003(d)(4).  Furthermore, as the State notes, private schools have access to other sources of relief provided by Congress to which public schools do not, such as Payback Protection Program loans and benefits under the Families First Coronavirus Response Act.  *See* Compl. ¶ 87.  There is no tension between the two statutes, and certainly not one that creates ambiguity sufficient to sanction rulemaking.

The Court also rejects the Interim Final Rule's attempt to create ambiguity from the statute's text.  First, the Rule argues that in prescribing how funding should be allocated, "Congress did not need to add the words 'in the same manner' if it simply intended to incorporate '[S]ection 1117 of the ESEA of 1965' by reference in the CARES Act.  The unqualified phrase 'as provided

14

in' alone would have been sufficient."  Interim Final Rule at 39,481.

The Department's argument that an ambiguity arises from the use of a slightly longer phrase "in the same manner as provided in" rather than the more succinct "as provided in" is, generously put, a stretch; its adoption would render all but the most laconic Congressional directives ambiguous.   Section 18005 contains a clear reference to the poverty-based formula found in Section 1117, which ends the Court's inquiry.  *See* 20 U.S.C. § 6320(a)(4)(A)(i); *see Judd v. Weinstein*, No. 19-55499, 2020 WL 4343738, at *3 (9th Cir. July 29, 2020) ("[u]nless the statute clearly expresses otherwise, we interpret statutory terms in accordance with their ordinary meaning").  The wording choice here simply does not create an ambiguity, or otherwise evidence Congressional intent to open up the funding process to agency rulemaking.  *See Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("canons of construction are no more than rules of thumb that help courts determine the meaning of legislation, and in interpreting a statute a court should always turn first to one, cardinal canon before all others.  We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.").

Second, the Interim Final Rule identifies ambiguity arising from Congress's inclusion of consultation and public control of funds provisions in Section 18005 notwithstanding the fact that Section 1117 already contains similar provisions.  Interim Final Rule at 39,481; *compare* CARES Act § 18005(a) ("as determined in consultation with representatives of non-public schools"), § 18005(b) (Public Control of Funds) *with* 20 U.S.C. § 6320(a)(1)(A), § 6320(b) (consultation provisions), § 6320(d) (Public Control of Funds).  Given the purportedly duplicative provisions, according to the Department, Section 18005's broad reference to Section 1117, if taken literally,

15

would create redundancies requiring resolution.

This argument also fails.  Section 18005's reference to Section 1117 does not compel, as the Department argues, the importation of all of Section 1117's requirements into Section 18005.  A straightforward reading of Section 18005's reference to Section 1117 is that "in the same manner as provided in" incorporates only Section 1117's poverty-based formula; not that it requires wholesale import of all of Section 1117.  The Department's convoluted reading essentially creates an ambiguity to justify resolving it, thereby thwarting Congress's obvious intent.  This the APA does not allow.  *See In re Pangang Grp. Co., LTD.*, 901 F.3d 1046, 1056 (9th Cir. 2018) ("we disfavor efforts to use canons of construction to introduce ambiguity into straightforward text").  Thus, Congress's inclusion of separate consultation and public control of funds provisions in both statutes can be more easily interpreted as purposeful.  Congress instructed SEAs and LEAs examining Section 18005's consultation and public control of funds provisions need look no further than their familiar mirrors in Section 1117 to determine how such provisions are intended to operate.

Finally, the Department relies heavily on Section 18005's statement that "[a] local educational agency receiving funds under sections 18002 or 18003 of this title shall provide equitable services."  CARES Act § 18005(a).  From use of the word "equitable," the Department apparently discerns a congressional intent that funding for private schools should  be "equal" or close thereto.  *See, e.g.*, Defs.' Mem. in Opp'n to Pl.'s Mot. for Prelim. Inj. at 1 ("Congress mandated that these services be provided *equitably*—for the benefit of both public and non-public students") (emphasis in original).  First, it should be apparent that "equitable" does not mean the

16

same thing as "equal."  *Compare Equitable*, *Dictionary.com* (last visited Aug. 21, 2020)[10] ("characterized by equity or fairness; just and right; fair; reasonable") *with Equal*, *Dictionary.com* (last visited Aug. 21, 2020)[11] ("as great as; the same as").  Funding can be equitable even if it is not equal, which is certainly the case when Congress chooses to concentrate funding on those in the most need.  Further, the term "equitable" in Section 18005 modifies "services," and does not refer, as the Department would have it, to how funds should be apportioned.  Thus, the context and plain meaning of this term show that Congress meant "equitable services" to refer to the apportioned funds themselves, *i.e.* the support LEAs must provide private schools, not to the manner of apportioning that funding.  For that, the Court repeats, Congress referred the LEAs to Section 1117.

Based on the foregoing, the Court concludes that Congress neither explicitly, nor implicitly by ambiguity, granted the Department the authority to promulgate the Interim Final Rule.  The Court finds that the Rule's promulgation was in excess of statutory authority and not in accordance with law, and that the State, therefore, is likely to succeed on the merits of this claim.  *See* 5 U.S.C. § 706(2)(A) and (C).

b.   *Count II- Arbitrary and Capricious Agency Action*

The State also claims that the Interim Final Rule runs contrary to 5 U.S.C. § 706(2)(A) of the APA because it is arbitrary and capricious.  Compl. ¶ 99–102.  As the Court has already concluded that the Department did not have the authority to promulgate the Interim Final Rule in

---

[10] Available at https://www.dictionary.com/browse/equitable?s=t.

[11] Available at https://www.dictionary.com/browse/equal.

the first instance, however, it need not visit this claim.  *See Oakley*, 2020 WL 3268661, at *12 (declining to rule on arbitrary and capriciousness); *Washington*, 2020 WL 3125916, at *11 (same).

    2.  *Constitutional Claims (Counts IV and V)*

    The State claims the Interim Final Rule runs afoul of two Constitutional principles, (1) Separation of Powers (Count IV) and (2) the Spending Clause (Count V).  Compl. ¶¶ 107–19.

    Again, however, given the conclusion that the Department lacked authority to promulgate the Rule, the Court declines to reach this question.  It is well-established that courts should not reach a "constitutional question if there is some other ground upon which to dispose of the case." *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009) (internal quotation and citation omitted); *see also State v. Trump*, 441 F. Supp. 3d 1101, 1125 (W.D. Wash. 2020).  As the Court has already determined that the State is likely to succeed on its APA claim, it need not reach the State's constitutional claims.  *See Washington*, 2020 WL 3125916, at *11.

**B.  Irreparable Harm**

    It is the burden of a plaintiff seeking a preliminary injunction to demonstrate that irreparable harm is likely in the absence of an injunction.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (listing cases); *see also E. Bay Sanctuary Covenant*, 964 F.3d at 854. Irreparable harm is traditionally defined as "harm for which there is no adequate legal remedy, such as an award of damages."  *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014); *see also E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1280 (9th Cir. 2020) ("[E]conomic harm is not generally considered irreparable. But where parties cannot typically recover monetary damages flowing from their injury—as is often the case in APA cases— economic harm can be considered irreparable.").

18

The State's claims to irreparable harm are myriad, and include interference with the obligation enshrined in its Constitution to provide essential education to its children.  *See* Pl.'s Mot. for Prelim. Inj. at 19–23.  The heart of the State's argument, however, is that Washington's public schools, and in particular the State's poorest public school students, are irreparably harmed by the Interim Final Rule's diversion of CARES Act funding to private schools.  The Court agrees that this potential harm is great, and irreparable.

The nature of this pandemic is that its consequences have fallen most heavily on the nation's most vulnerable populations, including its neediest students.  The funding provided throughout the CARES Act, and in particular to schools, is desperately and urgently needed to provide some measure of relief from the pandemic's harms, many of which cannot be undone.  Congress, in its wisdom and without equivocation, determined that funding to schools should be distributed according to the same formula found in Section 1117 of the ESEA; to allow otherwise under the guise of a manufactured ambiguity runs counter to the APA and to Congressional intent.

The Department's claim that the State faces only an economic injury, which ordinarily does not qualify as irreparable harm, is remarkably callous, and blind to the realities of this extraordinary pandemic and the very purpose of the CARES Act: to provide emergency relief where it is most needed.  The school year is rapidly approaching; every day that goes by in which educators are denied access to these funds creates unnecessary risk, to both the health and education of Washington's students.  In most of the State's school districts, the percentage of low-income families is significantly higher in public schools than in private schools.  Compl. ¶ 55.  As a consequence, distribution of CARES Act funding according to an enrollment-based formula ineluctably advantages private schools at the expense of public schools.  Forcing the State to divert

19

funds from public schools ignores the extraordinary circumstances facing the State and its most disadvantaged students.

The Court therefore concludes that not only are the State's interests harmed by the Interim Final Rule's transgression of the APA; that harm is, with potentially tragic consequences in this case, irreparable. *See Oakley*, 2020 WL 3268661, at \*16–17 (finding irreparable injury); *Washington*, 2020 WL 3125916, at \*11 (same).

## C. Balance of Equities and Public Interest

As a final consideration, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quotation marks and citation omitted).

The State argues that the balance of equities and the public interest tilts in its favor because such interests disfavor the perpetuation of an unlawful agency action. Pl.'s Mot. for Prelim. Inj. at 23–24; Pl.'s Reply in Supp. of Mot. for Prelim. Inj. at 8. Further, the State argues, the public interest favors permitting the State to expend the emergency funds Congress allocated to serve its most vulnerable students. The Department replies that the balance of equities disfavors an injunction and that the State highlights only the harm to public schools and discounts the harm to private schools. Defs.' Mem. in Opp'n to Pl.'s Mot. for Prelim. Inj. at 14–15.

The Court concludes that the balance of equities favors the issuance of a preliminary injunction. "There is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal quotations and citations omitted). Conversely,

public interest tips strongly in favor of permitting the State to apportion its emergency funding according to Congress's express intention, "in the same manner as" Section 1117 of the ESEA. *See Oakley*, 2020 WL 3268661, at \*17–18 (finding the balance of equities favored the State); *Washington*, 2020 WL 3125916, at \*12 (same).

## V.     CONCLUSION

For the foregoing reasons, the Court hereby GRANTS the State's Motion for Preliminary Injunction.  Dkt. No. 8.  The Court hereby ORDERS as follows

1) The United States Department of Education, Secretary of Education Betsy DeVos, and their officers, agents, servants, employees, attorneys, and any person in active concert or participation with them, are hereby preliminarily enjoined from implementing or enforcing the provisions in the Guidance of April 30, 2020 or the Interim Final Rule issued July 1, 2020.

2) No bond shall be required pursuant to Federal Rule of Civil Procedure 65(c).


DATED this 21st day of August, 2020.



_____
BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE

21